## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED], and on behalf of the STATES of FLORIDA, GEORGIA, NORTH CAROLINA, TENNESSEE, and the Commonwealth of VIRGINIA,<br><br>     Plaintiff-Relator,<br><br>v.<br><br>**[SEALED]**<br><br>     Defendant. | Case Number: 8:22 cv 2361 TPB—MRM<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS**<br><br>**Jury Trial Demanded** |

**RELATOR'S SEALED QUI TAM COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730 ET SEQ. AND STATE LAW COUNTERPARTS**

TPA - 633378
$402.00

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PUBLIX LITIGATION PARTNERSHIP, LLP and on behalf of the STATES of FLORIDA, GEORGIA, NORTH CAROLINA, TENNESSEE, and the Commonwealth of VIRGINIA,<br><br>    Plaintiff-Relator,<br><br>v.<br><br>PUBLIX SUPER MARKETS, INC.,<br><br>    Defendant. | Case Number:<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE ON PACER**<br><br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS**<br><br><br>**Jury Trial Demanded** |

**RELATOR'S <u>SEALED</u> QUI TAM COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730 ET SEQ., AND STATE LAW COUNTERPARTS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................2

II.     JURISDICTION AND VENUE ...............................................................7

III.    THE PARTIES.........................................................................................8

        A.      Plaintiff/Relator Publix Litigation Partnership, LLP .............................8

        B.      Defendant Publix Super Markets, Inc. ....................................................9

IV.     THE OPIOID CRISIS IN THE U.S. ......................................................10

V.      THE APPLICABLE STATUTES...........................................................13

        A.      The Controlled Substances Act ............................................................ 14

                1.      Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved................................................................... 19

                2.      The Corporate Parent of Chain Pharmacies Is Responsible for the Dispensing Practices in Its Stores ....................................... 21

                3.      The CSA Applies to All Persons Who Dispense Controlled Substances . 22

                4.      Publix Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists ........................................................... 24

                5.      The Purpose and Intent of the CSA Bolsters Finding Liability of Corporate Parent Publix ........................................................ 28

        B.      The False Claims Act............................................................................ 30

        C.      Opioid Use and Treatment by Government Programs............................ 32

                1.      Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications........................................................ 32

                2.      Medicaid Beneficiary Opioid Use and Abuse ........................... 34

                3.      Medicare Beneficiary Opioid Use and Abuse ........................... 35

                4.      Tricare Beneficiary Coverage and Opioid Use and Abuse...................... 37

                5.      Federal Employee Health Benefit Program Beneficiary Coverage and Opioid Use and Abuse ............................................... 39

                6.      Other Government Health Care Program Beneficiary Coverage and Opioid Use and Abuse ............................................................ 40

        D.      Federal Guidance Governing Pharmacy Dispensing of Opioids ........................... 41

        E.      Inspector General's List of Excluded Individuals/Entities ..................................... 44

        F.      State Laws Governing Pharmacy Dispensing of Opioids..................................... 47

        G.      State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping .............................................................. 48

H.    Unlawfulness of a Prescription Is Material to Government Programs' Payment. 50

VI.    BACKGROUND ....................................................................................51

    A.    Publix Was Well Aware of the Opioid Crisis and Failed to Take Adequate Steps to Curtail and Prevent Expansion of the Problem at Its Stores............................ 52

    B.    Publix Only Cared About Profit and Enforced No Policies and Procedures to Prevent Illegal Dispensing.................................................................... 53

    C.    Publix's Pharmacists Faced Extreme Pressure and Time Constraints................. 61

    D.    Publix Turned a Blind Eye to the Opioid Crisis .................................... 64

VII.    PUBLIX, AS A DISTRIBUTOR, VIOLATED THE CSA AND THE FCA....................68

    A.    Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Florida ....................................... 82

        1.    Partner A (Oviedo, Florida) ...................................................... 86

        2.    Partner B (Lake Mary, Florida) ................................................. 91

        3.    Pharmacist No. 1 (Venice and North Port, Florida).................................. 99

        4.    Pharmacist No. 2 (Saint Petersburg, Florida) ......................................... 102

        5.    Pharmacist No. 3 (Lake Wales and Haines City, Florida)...................... 104

        6.    Pharmacist No. 4 (Sarasota and Nokomis, Florida)................................. 105

        7.    Pharmacist No. 5 (Gainesville, Florida) ................................................. 107

        8.    Pharmacist No. 6 (Jacksonville, Florida)................................................. 109

        9.    Pharmacist No. 7 (New Smyrna Beach and Deltona, Florida) ............... 111

        10.    Pharmacist No. 8 (Panama City, Florida) .............................................. 112

        11.    Pharmacist No. 9 (Parkland, Fort Lauderdale, Aventura, West Palm Beach, Boca Raton, and Coral Springs, Florida) .................................... 116

    B.    Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Alabama................................................. 118

        1.    Pharmacist No. 10 (Dothan, Montgomery, and Prattville, Alabama)..... 120

    C.    Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Georgia .................................... 122

        1.    Pharmacist No. 11 (Lawrenceville and Snellville, Georgia) ................. 124

        2.    Pharmacist No. 12 (Lawrenceville, Georgia) ......................................... 127

        3.    Pharmacist No. 13 (Fayetteville, Peachtree City, and Morrow, Georgia) .......................................................................................... 128

        4.    Pharmacist No. 14 (Lithonia, Georgia).................................................. 130

    D.    Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in North Carolina......................................... 130

|   |   | 1. | Pharmacist No. 15 (Weaverville, North Carolina) | 132 |
|---|---|---|---|---|
|   |   | 2. | Pharmacist No. 16 (Charlotte, North Carolina) | 133 |
|   | E. | Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in South Carolina | | 136 |
|   |   | 1. | Pharmacist No. 17 (Greenville, South Carolina) | 138 |
|   |   | 2. | Pharmacist No. 18 (North Augusta, Aiken, Columbia, Greenville, South Carolina) | 139 |
|   | F. | Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Tennessee | | 140 |
|   |   | 1. | Pharmacist No. 19 (Antioch, Tennessee) | 145 |
|   |   | 2. | Pharmacist No. 20 (Franklin and Nashville, Tennessee) | 146 |
|   | G. | Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Virginia | | 148 |
|   |   | 1. | Pharmacist No. 21 (Fredericksburg, Williamsburg, Midlothian, Colonial Heights, Charlottesville, and Glen Allen, Virginia) | 150 |

IX.   CAUSES OF ACTION ... 151

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ... 151

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ... 151

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ... 152

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ... 152

COUNT V (Violation of False Claims Act, 31 U.S.C. § 3730(h)) ... 153

COUNT VI (Violation of Florida False Claims Act) ... 153

COUNT VII (Violation of Georgia False Medicaid Claims Act) ... 154

COUNT VIII (Violation of North Carolina False Claims Act) ... 155

COUNT IX (Violation of Tennessee Medicaid False Claims Act) ... 156

COUNT X (Violation of Virginia Fraud Against Taxpayers Act) ... 157

X.   PRAYER FOR RELIEF ... 159

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729, *ET SEQ.*, AND STATE LAW COUNTERPARTS

1.     On behalf of the United States of America ("United States"), the States of Florida, Georgia, North Carolina, Tennessee, and the Commonwealth of Virginia (collectively, the "Whistleblower States"), Relator Publix Litigation Partnership, LLP (hereinafter "Relator") hereby files this Complaint against Publix Super Markets, Inc. ("Publix" or "Defendant"), pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*  The state jurisdictions are referred to collectively herein as the "Whistleblower States" and the state statutes are referred to collectively herein as the "State *Qui Tam* Statutes" or "State FCAs."

2.     As both a pharmacy and a distributor, Publix assumed critical gatekeeping responsibilities under the Controlled Substances Act ("CSA"). At two stages—when deciding whether to fill individuals' prescriptions for controlled substances and when deciding whether to fill its pharmacies' wholesale orders for controlled substances from its distribution warehouse— the CSA required Publix to take steps to prevent diversion. It failed in both.

3.     Relator brings this action against Publix under the False Claims Act and State Whistleblower Statutes for Defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA"), its implementing regulations, 21 C.F.R. § 1301, *et seq.* and under Whistleblower State pharmacy laws and regulations. Those violations include: (a) knowingly dispensing controlled substances throughout the Southeastern United States without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally distributing

and dispensing controlled substances throughout the Southeastern United States outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C. § 841(a). Relator also seeks to recover monies that Defendant caused the Government Programs to pay for controlled substances dispensed at its pharmacies throughout the Southeastern United States that were medically unnecessary and/or lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as well as State *qui tam* laws.

## I.    INTRODUCTION

4.    The nation is experiencing a national public health emergency involving opioid abuse. The dispensing of controlled substances, including prescription opioid painkillers, without a legitimate medical purpose and outside the usual course of professional practice exacerbates this crisis. This crisis has touched, and continues to touch, nearly all Americans, individuals, and families, in some way.

5.    In addition to its human cost, the epidemic has had a monetary one as well. Besides financial impacts like the increased costs for health care, substance abuse treatment, and law enforcement, the cost has also been felt by government programs like Medicare, Medicaid, and other Federal and State programs (collectively, "Government Programs"). The Government Programs have paid for inappropriate opioid prescriptions dispensed throughout the Southeastern United States because Publix has intentionally and knowingly disregarded its duties under the law to properly vet prescriptions and ensure that it only dispensed drugs pursuant to a legal prescription and for a legitimate medical purpose.

6.    Publix has both fueled and profited from this epidemic throughout the Southeastern United States by repeatedly distributing excessive amounts of opioids and dispensing controlled substances prone to diversion and abuse without a legitimate medical purpose and outside the usual course of professional medical practice.

7.     Even while rampant drug diversion and abuse was occurring at and around the Publix-owned pharmacies throughout the Southeastern United States, many filled all prescriptions presented—regardless of validity—resulting in inappropriate and medically unnecessary prescriptions being filled and billed, the public health and public treasury be damned. Throughout the Southeastern United States, Publix has repeatedly dispensed controlled substances prone to diversion and abuse without a legitimate medical purpose and outside the usual course of professional practice.

8.     Publix is subject to duties under the Controlled Substances Act ("CSA") and under the Whistleblower State pharmacy laws and regulations to take special care before distributing and dispensing these addictive and dangerous drugs. These laws and regulations have required Publix to (1) review each opioid prescription prior to dispensing and to make a determination that the prescription is both effective and valid; (2) ensure that each prescription for an opioid is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; (3) refuse to dispense medication if there is reason to believe that the prescription was not issued for a legitimate medical purpose; and (4) provide effective systems, controls, and procedures to prevent diversion and abuse of opioids.  Publix violated these duties of care by distributing and dispensing extremely large amounts of opioids from its retail pharmacy stores throughout the Southeastern United States and in this District, as alleged in more detail below.

9.     Pharmacies serve as the last line of defense between dangerous opioids and the public. For this reason, under the CSA and the Whistleblower State pharmacy laws and regulations, a pharmacy's duty to use due care when filling prescriptions goes beyond simply following the prescription's directions. Pharmacies that are on notice of signs of abuse or diversion and any other red flags that the prescriptions are not medically appropriate may not simply robotically fill

prescriptions. This is particularly true when prescriptions are unreasonable on their face because they are written in a quantity, frequency, or other manner that would cause a reasonable pharmacist to do additional investigation and due diligence. Publix failed to fulfill these duties.

10.     As a distributor, Publix had a basic obligation to detect suspicious orders placed by its own pharmacies for controlled substances and to report those orders to DEA. Distributors of controlled substances are required by 21 C.F.R. § 1301.74(b) to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," and "shall inform" DEA of those suspicious orders "when discovered." Thus, a distributor must itself identify suspicious orders and report them to DEA. This requirement protects against diversion by requiring distributors to monitor pharmacies for warning signs of such misconduct.

11.     DEA's regulations provide that suspicious orders "include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." In other words, orders that are unusual in one or more of those three ways—size, pattern, or frequency—are deemed "suspicious orders," and a distributor must report them. The regulation does not limit "suspicious orders" to those three categories, however. It states, non-exclusively, that suspicious orders "include" those categories.

12.     Because Publix has acted as its own distributor for controlled substances since at least 2016, it had a special advantage: Publix had extensive data and other information that gave it the ability— had it wanted to do so—to evaluate orders for controlled substances.

13.     But for years, Publix has maintained a wholly inadequate system for reporting suspicious controlled substance orders placed by its pharmacies, routinely failing to report orders that exhibited unusual frequency, deviated from the normal ordering pattern, or were of unusual size.

14.     Publix's inadequate suspicious order monitoring program contributed to its failure to stop diversion of controlled substances at its pharmacies and created a major obstacle to efforts to combat the opioid epidemic. Had the company identified and investigated its extraordinary number of suspicious orders, it could have stopped the pharmacies that were placing those orders from unlawfully filling controlled substance prescriptions or otherwise contributing to the diversion of controlled substances.

15.     Each time Publix failed to comply with its legal obligation to report a suspicious order, it violated the CSA. Pursuant to 21 U.S.C. § 842(a)(5), it is unlawful for a distributor to refuse, or negligently fail, to make or furnish reports, notifications, or information that are required under the CSA. For each violation of 21 U.S.C. § 842(a)(5), Publix is liable for a civil penalty under the CSA and has violated the FCA.

16.     As a pharmacy, Publix was clearly on notice of red flags that should have caused it to investigate (and then reject) opioid prescriptions instead of filling them. Examples of such red flags include: (1) doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area; (2) doctors who are under investigation by the DEA and/or state board(s) of medicine for inappropriate and/or medically unnecessary opioid prescribing; (3) early refills for opioid prescriptions; (4) prescriptions with unusual quantities, dosages, or combinations of opioids; (5) patients seeking to fill a prescription written for someone else; (6) multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; (7) patients who drive long distances to have a prescription filled; (8) consumers who seek large volumes of controlled substances in the highest strength for each prescription type; (9) patients who appear to be creating cocktails with muscle relaxants or tranquilizers; or (10) consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

17.     Publix-owned pharmacies throughout the Southeastern United States routinely overlooked numerous red flags and instead filled even what were clearly inappropriate opioid prescriptions. Publix could have—and was required to have—leveraged its network of over 1,000 pharmacies throughout the Southeastern United States to combat the scourge of inappropriate and/or medically unnecessary opioid prescriptions. Instead of limiting the filling of inappropriate and medically unnecessary prescriptions, Publix has deliberately ignored the increasingly rampant prescribing abuse, refused to identify medically inappropriate or unnecessary prescriptions, and did not provide its individual pharmacy locations adequate training and tools to control opioid dispensing and to combat diversion and abuse.

18.     Publix did next to nothing to reduce inappropriate dispensing, instead focusing on its pharmacies' profitability over any impact on Government Programs and the safety and well-being of the public.

19.     Publix-owned pharmacies throughout the Southeastern United States routinely filled opioid prescriptions with unresolved red flags of diversion, in violation of its duties under the CSA and state pharmacy laws and regulations.

20.     Publix did little to train or instruct its employees with respect to proper policies and protocols to prevent diversion of opioids. This has had the direct, readily foreseeable (and intended) result of its pharmacies throughout the Southeastern United States continuing to fill prescriptions despite clear red flags of diversion and abuse.

21.     Publix's failure to adequately identify, monitor, detect, investigate, report, and/or refuse to distribute, sell, fill, or dispense inappropriate prescriptions of opioids also violated its duty to act reasonably in light of the serious and foreseeable harms associated with opioid diversion and abuse. Publix's failure to take reasonable steps to prevent opioid diversion and abuse is a direct

and proximate cause of, and/or substantial factor contributing to, the diversion of prescription opioids in the United States – for consumption for non-medical, non-scientific purposes.

22.    Publix knew that widespread diversion and abuse of opioids was occurring throughout the Southeastern United States (and in this District) at a staggering scale but turned a blind eye in order to earn higher profits. The foreseeable result of Publix's decision to continue distributing and dispensing vast quantities of opioids having no medical justification has led to widespread addiction, overdoses, death, harms to Government Programs, and the societal and economic harms that flow from prescription opioid diversion and abuse.

23.    Publix is primarily a grocery store chain and saw its pharmacies purely as profit centers that could supplement, and in some cases keep alive, its grocery stores. But in order to ensure its pharmacies were profitable, Publix buried its head in the sand and ignored the blatantly illegal dispensing going on in its pharmacies. It gave its pharmacists few, if any, resources or support to stop illegal dispensing, but rather intentionally and actively insisted its pharmacists increase their dispensing of opioids to boost its bottom line. Publix's stunning abdication of its duty to prevent diversion from its pharmacies led to the widespread filling of inappropriate and/or medically unnecessary prescriptions as detailed herein.

24.    The conduct alleged herein is ongoing.

## II.    JURISDICTION AND VENUE

25.    According to 28 U.S.C. §§ 1331 and 1345, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States—in particular, the FCA. In addition, the FCA specifically confers jurisdiction upon the United States District Court under 31 U.S.C. § 3732(b).

26.    Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the States because the

claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

27.    This District Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant is headquartered and transacts business in this District and engaged in wrongdoing in this District. Likewise, the FCA authorizes nationwide service of process and the Defendant has sufficient minimum contacts with the United States of America.

28.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b). Defendant is headquartered and has transacted business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

29.    Relator is unaware of any public disclosure of the information or allegations that are the basis of the Complaint. If there has been a public disclosure, Relator is the original source of the information and allegations contained in this Complaint. Prior to the filing of this action, Relator voluntarily provided the United States Government and the Whistleblower States with material information supporting the false claims that are the subject of this Complaint.

30.    The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal its wrongdoing from the United States and the Whistleblower States in connection with the allegations made herein.

## III.    THE PARTIES

### A.  Plaintiff/Relator Publix Litigation Partnership, LLP

31.    Plaintiff/Relator Publix Litigation Partnership, LLP ("Relator"), a Delaware limited liability partnership, brings this action on behalf of itself, the United States of America and the Whistleblower States. The registered office of Relator is located at 1925 Lovering Avenue, Wilmington, Delaware 19806, and the name of the registered agent at such address is The First State Registered Agent Company.

32.     Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Relator is not distinct from its partners, who, by virtue of their former employment with Publix, at all times material hereto, have had firsthand, personal knowledge of the false claims, statements, and concealments alleged herein. The two partners/owners of the partnership are "Partner A" and "Partner B."

33.     Partner A was employed as a pharmacist at Publix from 2008 to 2021 and has extensive personal knowledge and experience regarding Publix's scheme, including personal contact with the employees and executives who have committed violations of law alleged herein. Partner A has observed numerous instances of illegal conduct by Publix.

34.     Partner B was employed as a pharmacist at Publix from 2014 to 2019 and has extensive personal knowledge and experience regarding Publix's scheme, including personal contact with the employees and executives who have committed violations of law alleged herein. Partner B has observed numerous instances of illegal conduct by Publix.

35.     Relator has direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation to uncover false claims submitted to the United States and the Whistleblower States. Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint within the meaning of the federal FCA and the state false claims acts.

**B. Defendant Publix Super Markets, Inc.**

36.     Defendant Publix Super Markets, Inc. is a Florida corporation with its principal place of business in Lakeland, Florida.

37.     Publix, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a registered wholesale distributor and as a pharmacy.

38.     Publix operates approximately 1,297 supermarkets across Florida, Georgia, Alabama, North Carolina, South Carolina, Tennessee, and Virginia.   Of these supermarkets, approximately 82 are located in Alabama, 833 are located in Florida, 196 are located in Georgia, 51 are located in North Carolina, 64 are located in South Carolina, 52 are located in Tennessee, and 19 are located in Virginia.   Most, if not all, of Publix's supermarkets include a pharmacy. Publix also operates 9 distribution centers out of Florida, Georgia, and Alabama, as well as 11 manufacturing facilities out of Florida and Georgia.

39.     Publix is the largest employee-owned company in the United States, with approximately 232,000 employees at the end of 2021.   Publix ranks #76 on the Fortune 500 rankings of the largest United States corporations by total revenue, with revenues of over $48 billion for fiscal year 2021, $44.9 billion for 2020, and $38.1 billion for 2019.

40.     As of 2014, Publix operated approximately 929 pharmacies in the Southeastern United States, with sales exceeding $2.2 billion annually.   On information and belief, Publix now operates over 1000 pharmacies in the Southeastern United States.

41.     Publix has sold millions of opioid drugs that were clinically inappropriate and/or medically unnecessary throughout the Southeastern United States during all relevant times material hereto.

## IV.    THE OPIOID CRISIS IN THE U.S.

42.     Opioids are a class of drugs that range from pain relievers available legally by prescription—such as oxycodone, hydrocodone, codeine, morphine, and fentanyl—to illegal narcotics such as heroin. According to the Medicaid and CHIP Payment and Access Commission,

"the origins of widespread prescription opioid use can be traced back to the 1990s."[1] That is when the medical profession began using pain as a so-called "fifth vital sign," and drug manufacturers heightened their marketing campaigns.

43.     All opioids are chemically related and interact with opioid receptors on nerve cells in the body and brain. Opioid pain relievers are generally safe when taken for a short time and as prescribed by a doctor, but because they produce euphoria in addition to pain relief, they can be misused (taken in a different way or in a larger quantity than prescribed or taken without a doctor's prescription). Regular use—even as prescribed by a doctor—can lead to dependence and, when misused, opioid pain relievers can lead to addiction, overdose incidents, and death.[2]

44.     Deaths from prescription opioid overdoses quadrupled from 1999 to 2011,[3] as have opioid prescriptions, even though pain levels reported by Americans have not changed.[4] By 2013, drug overdoses were the nation's leading cause of deaths from injury, prompting one author to write: "The opioid epidemic . . . that has been ravaging and shortening lives from coast to coast is a new plague for our new century."[5]

45.     Some 70,237 drug overdose deaths occurred in the United States in 2017. The age-adjusted rate of overdose deaths increased significantly by 9.6% from 2016 (19.8 per 100,000) to 2017 (21.7 per 100,000). Opioids—mainly synthetic opioids (other than methadone)—are

---

[1] Medicaid & CHIP Payment Access Comm'n, *Report to Congress On Medicaid And CHIP: Chapter 2: Medicaid And The Opioid Epidemic* 79 (2017), https://www.macpac.gov/wp-content/uploads/2017/06/Medicaid-and-the-Opioid-Epidemic.pdf.

[2] NIH National Institute on Drug Abuse: Advancing Addiction Science, https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue.

[3] Vikki Wachino, *CMCS Informational Bulletin: Best Practices for Addressing Prescription Opioid Overdoses, Misuse and Addiction* 1 (Jan. 28, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-02-02-16.pdf.

[4] Ctrs. For Medicare & Medicaid Servs., Centers For Medicare & Medicaid Services (CMS), *Opioid Misuse Strategy 2016* 2 (Jan. 5, 2017), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/CMS-Opioid-Misuse-Strategy-2016.pdf.

[5] Nicholas N. Eberstadt, *Our Miserable 21st Century*, COMMENTARY MAG. (Feb. 2017), https://www.commentarymagazine.com/articles/our-miserable-21st-century/.

currently the main driver of drug overdose deaths. Opioids were involved in 47,600 overdose deaths in 2017 (67.8% of all drug overdose deaths).[6]

46.     Every day, more than 130 people in the United States die after overdosing on opioids.[7] The misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare. The Centers for Disease Control and Prevention ("CDC") estimates that the total "economic burden" of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.[8]

47.     Recently, the congressionally-chartered National Safety Council revealed that, for the first time in U.S. history, a person is more likely to die from an accidental opioid overdose than from a motor vehicle crash. The analysis showed that the odds of dying from opioid overdose are also higher than from falls, drowning, gun assault, or choking.[9]

48.     According to the CDC, retail opioid prescriptions were dispensed in 2017 at a national rate of 58.7 prescriptions per 100 persons.[10]

---

[6] U.S. Ctrs. for Disease Control & Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html.
[7] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics, *National Vital Statistics System, Mortality*, CDC WONDER (2018), https://wonder.cdc.gov.
[8] Florence CS, Zhou C, Luo F, Xu L., The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 54 Med Care. 901-906 (2016).
[9] Nat'l Safety Council, *Injury Facts*, https://injuryfacts.nsc.org/all-injuries/preventable-death-overview/odds-of-dying/; *see also* Press Release, Nat'l Safety Council, *For the First Time, We're More Likely to Die from Accidental Opioid Overdose than Motor Vehicle Crash* (Jan. 14, 2019), https://www.nsc.org/in-the-newsroom/for-the-first-time-were-more-likely-to-die-from-accidental-opioid-overdose-than-motor-vehicle-crash).
[10] U.S. Ctrs. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps*, https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

49.     From 1999 to 2017, almost 400,000 people have died from an overdose involving any opioid, including prescription and illicit opioids.[11] This rise in opioid overdose deaths can be outlined in three distinct waves:

- The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1999.

- The second wave began in 2010, with rapid increases in overdose deaths involving heroin.

- The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids – particularly those involving fentanyl.[12]

50.     Neonatal Abstinence Syndrome ("NAS") or neonatal opioid withdrawal syndrome ("NOWS") may occur when a woman uses drugs such as opioids during pregnancy. A recent national study showed a fivefold increase in the incidence of NAS/NOWS between 2004 and 2014, from 1.5 cases per 1,000 hospital births to 8.0 cases per 1,000 hospital births. That is one baby born with NAS/NOWS every 15 minutes in the United States. During the same period, hospital costs for NAS/NOWS births increased from $91 million to $563 million, after adjusting for inflation.[13]

## V.    THE APPLICABLE STATUTES

51.     In March 2016, the CDC, in order to reduce opioid addiction, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer

---

[11] Scholl L., Seth P., Kariisa M., Wilson N., Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017.* Morb. And Mortal. Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.
[12] *Id.*; *see also* Rudd R.A., Aleshire N., Zibbell J.E., Gladden R.M. *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014,* 64 Morb. And Mortal Wkly. Rep. 1378-82 (2016).
[13] NIH National Institute on Drug Abuse, *Advancing Addiction Science,* https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue; NIH National Institute on Drug Abuse, *Advancing Addiction Science, Tennessee Opioid Summary, Opioid-Involved Overdose Deaths,* https://www.drugabuse.gov/opioid-summaries-by-state/tennessee-opioid-summary.

treatment, palliative care, and end-of-life care.[14] The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[15]

52.     Congress has found that pharmacies share responsibility for the crisis: "The opioid epidemic ... has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[16]

53.     The grave statistics about the human toll of the opioid crisis are shocking enough. But the crisis goes beyond the human toll. Not only have millions of lives been lost to opioid addiction, millions of Government Program dollars have been squandered on inappropriate and/or otherwise medically unnecessary opioid prescriptions.

54.     Publix has put profits over patients and indiscriminately dispensed and billed opioid prescriptions that were inappropriate and/or medically unnecessary.

55.     Publix knowingly violated its duties under the CSA and the United States state pharmacy laws and regulations, ignoring obviously medically unnecessary prescriptions, filling them, and fraudulently charging Government Programs.

A. The Controlled Substances Act

56.     The Controlled Substances Act ("CSA") and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is

---

[14] *See generally,* Deborah Dowell, M.D., *et al.*, CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016, 65 Morb. And Mort. Wkly. Rep. 1 (2016) [hereinafter, CDC Guideline].
[15] *Id.* at 3.
[16] U.S. Senate Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement 4 (July 12, 2017).

unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[17]

57.     The CSA categorizes controlled substances in five "Schedules."

58.     Schedule II (also called herein CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[18]

59.     Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[19]

60.     Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[20]

61.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[21]

62.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[22]

63.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[23] A registrant is only permitted to

---

[17] *See* 21 U.S.C. § 841(a).
[18] 21 U.S.C. § 812(b)(2).
[19] 21 U.S.C. § 812(b)(3).
[20] 21 U.S.C. § 812(b)(4).
[21] 21 U.S.C. § 812(b)(5).
[22] 21 U.S.C. § 841(a)(1).
[23] 21 U.S.C. § 822(a).

dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[24]

64.     An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[25]

65.     At all times relevant to this Complaint, Publix had registered its retail pharmacies with the DEA in Schedule II–V controlled substances. Those DEA registrations authorize Publix-owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user ... by, or pursuant to the lawful order of, a practitioner."[26]

66.     Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy like Publix, are not required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment."[27]

67.     Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[28]

68.     Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[29] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[30]

---

[24] 21 U.S.C. § 822(b).
[25] 21 U.S.C. § 829.
[26] 21 U.S.C. §§ 823(f), 802(10).
[27] 21 U.S.C. § 822(c)(1).
[28] *See generally* 21 C.F.R. § 1306.
[29] 21 U.S.C. § 829(a).
[30] 21 U.S.C. § 829(b).

69.     Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[31]

70.     A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[32] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment ... is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances."[33]

71.     As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[34]  Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

72.     Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy...."[35]

73.     Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice – *i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[36]

---

[31] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.
[32] 21 C.F.R. § 1306.04(a).
[33] *Id.* (emphasis added).
[34] *Id.*
[35] 21 C.F.R. § 1306.06 (emphasis added).
[36] *Id.*

[SEALED] COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
AND STATE LAW COUNTERPARTS
- Page 17 -

74.     Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[37]

75.     Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions.[38]

76.     A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[39] The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

77.     A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is to be made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license.[40]

---

[37] *See* 21 C.F.R. §§ 1306.04, 1306.06.
[38] 21 U.S.C. 842, 843.
[39] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020).
[40] *See, e.g., U.S. v. Kershman*, 555 F.2d 198 (8th Cir. 1977).

78.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[41]

### 1.    *Pharmacies Are Obligated Not to Fill Prescriptions Until All Red Flags Are Resolved*

79.    A pharmacy cannot ignore red flags indicative of diversion and abuse. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[42] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[43] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse or diversion.[44] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[45]

---

[41] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Healthcare, L.L.C., v. DEA*, 881 F.3d 823 (11th Cir. 2018)).

[42] *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (Dep't of Justice July 24, 1990).

[43] *East Main Street Pharmacy*, Affirmance of Suspension Order, 75 Fed. Reg. 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010).

[44] *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990).

[45] *Id.*; *see also Townwood Pharmacy*, 63 Fed Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*, 77 Fed. Reg. 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*, 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008) (revocation of registration); *Notice of United Prescriptions Services, Inc.*, 72 Fed. Reg. 50397- 01, 50407-8, 2007 WL 2455578 (Aug. 31, 2007) (revocation of registration).

80. Courts, too, have recognized the obligation of pharmacies *not* to dispense until red flags are resolved.[46] In *Medicine Shoppe-Jonesborough,* the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[47] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[48] "[B]y filling these prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[49]

81. The Court presiding over the federal multi-district litigation involving claims against opioid manufactures, distributors, and dispensers (hereinafter "Opioids MDL") recently addressed this very issue. The Court unequivocally stated that "[t]here is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances."[50]

82. In fact, the Opioids MDL Court found that the corporate parents of chain pharmacies have an affirmative obligation under the CSA to "design and implement systems,

---

[46] *See Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008); United States v. Henry, 727 F.2d 1373, 1378-79 (5th Cir.1984); Holiday CVS, L.L.C. v. Holder, 839 F. Supp.2d 145 (D.D.C. 2012).

[47] *Id*. at 412 (emphasis added).

[48] *Id*.

[49] *Id*.

[50] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 22; *see also City & Cnty. of San Francisco v. Purdue Pharma L.P.,* No. 18-CV-07591-CRB, 2022 WL 3224463, at \*19 (N.D. Cal. Aug. 10, 2022) ("Any red flags present on the face of a prescription must be resolved before the prescription is dispensed. … If a pharmacist cannot resolve a red flag, the prescription cannot be dispensed." [internal citations omitted]).

policies, or procedures to identify red flag prescriptions."[51]   The Court reasoned that chain pharmacies "cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that '[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft <u>and</u> diversion of controlled substances.'" 21 C.F.R. § 1301.71(a) (emphasis added)."[52]

### 2.   *The Corporate Parent of Chain Pharmacies Is Responsible for the Dispensing Practices in Its Stores*

83.    The responsibility for dispensing is not limited to pharmacists, pharmacies, or holders of DEA dispensing registrations. Rather, the corporate parent of a pharmacy is responsible for the dispensing practices of its pharmacies and pharmacists.[53] This is so regardless of whether the parent is a registrant under the CSA or whether the parent is the entity or person actually doing the dispensing.

84.    In short, case law discussed below holds that individuals or entities who have the ultimate responsibility for the dispensing of controlled substances can be liable for violations of the CSA, regardless of whether they are DEA registrants.  To the extent that a corporate parent of a chain pharmacy like Defendant exerts sufficient control over the pharmacy operations at its stores, which the large chains likely do, these corporate parents can be held liable for dispensing

---

[51] *Id.* at 25.
[52] *Id.*
[53] *See United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D.Ala.1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass.1996); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, at *6 (S.D. Fla. Sept. 11, 2012).

violations.  Moreover, to the extent that Defendant attempts to blame the individual pharmacists themselves, cases hold that parent company liability can be imposed in addition to any individual pharmacist's liability.

85.    Courts routinely find that liability can attach to a broad array of persons or entities under Section 842.  In particular, courts reject two arguments for limiting liability under Section 842 and its regulations.  First, courts find that Section 842 can impose liability on non-registrants.  Second, courts find that Section 1306.4 can be the basis for liability of pharmacy owners in addition the pharmacists themselves.  These holdings are based on the purpose and structure of the CSA: those who have the ultimate responsibility for the controlled substances and ensuring compliance with the CSA should be held liable for violations, regardless of whether they are registered with the DEA.

86.    The Court in the Opioids MDL firmly rejected many of the arguments against holding corporate parents of chain pharmacies responsible for the dispensing at individual stores.[54]

### 3.    *The CSA Applies to All Persons Who Dispense Controlled Substances*

87.    Courts have found that because the plain language of Section 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[55]  Importantly, in those cases, the courts found that because the pharmacy owners,

---

[54] *See generally In Re: National Prescription Opiate Litigation*, Opinion and Order (Case No. 17-md-2804) (Dkt. 3403).

[55] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313–14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[56]

88.     At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions.  In *USA v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section 842(a)(1) even though he was not a registrant and the pharmacies he owned were separately incorporated.[57] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[58]

89.     The Court held that Section "842(a)(1) applies to non-registrants."[59] The Court explained that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[60]  To support its conclusion, the Court concentrated on defendant Lewis' involvement with the pharmacies at issue, looking specifically at his investment of the funds to organize and open the pharmacy, the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

---

[56] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").
[57] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016).
[58] *Id*. at *2.
[59] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F. Supp. 808, 813-814 (S.D. Ala. 1996)).
[60] *Id*.

90.     The *City Pharmacy* Court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability.  Evaluating various legal mechanisms for piercing the corporate form, the court concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[61]  Thus, the Court held, "given the nature of these criminally-grounded allegations, it is not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[62]

91.     Just like the defendant in *City Pharmacy*, as alleged herein, Publix has invested the funds to organize and open its numerous pharmacies and plays a very active role in the management of its pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

### 4.    *Publix Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists*

92.     In addition to finding that individuals or entities who own and control pharmacies can be liable for CSA violations, irrespective of their DEA registration status, the case law also makes it clear that pharmacies cannot escape liability under the CSA by simply blaming the

---

[61] *Id.* at *4.
[62] *Id.*; *see also Poulin*, 926 F. Supp. at 249 *("Mattapoisett Pharmacy, Inc.* is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); *S & S Pharmacy*; 46 Fed. Reg. 13051-52 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

pharmacists who work for them. Even though the "corresponding responsibility" of pharmacists is discussed in terms of what a pharmacist – not a pharmacy – must do, courts have found that a narrow reading of the language to insulate pharmacies from liability is not supported by the language or structure of the regulations. In fact, one Court has called such a reading "deeply troubling."[63]

93.     In *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1186 (E.D. Ky. 2017), the Court looked at the regulations regarding dispensing under Section 842 and found that the pharmacy owner could be held personally liable for dispensing violations.

94.     Defendant Appalachian Regional Healthcare ("ARH") unsuccessfully argued that it could not be held liable as a corporate pharmacy under Section 842(a)(1) because its implementing regulations, namely 21 C.F.R. § 1306.04, articulated the duties under that section in terms of the "pharmacist" or "practitioner," not the corporate pharmacy entity.[64] The court rejected ARH's narrow, technical reading, instead holding that "when § 1306.04(a) states that the person knowingly filling the prescription is subject to penalties, it contemplates liability for corporate entities as well."[65]   The court continued, finding that there is "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions."[66]

---

[63] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 13.
[64] *See, e.g.,* § 1306.4(a) ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.").
[65] *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d at 1189.
[66] *Id.* at 1189-1190; *see also Moore v. Covenant Care Ohio, Inc.*, 18 N.E.3d 1260, 1270 (Oh. App. 2014) (a corporate pharmacy whose subsidiary voluntarily undertook to provide pharmaceutical services to a nursing home owed a duty to exercise reasonable care in providing such services and also owed a common law duty to exercise reasonable care in dispensing and labeling of medicines).

95.     Likewise, other federal courts have found pharmacies and other DEA registrants liable for violations of the CSA and CSA Regulations.[67]  For example, in *Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008), the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated Section 829 of the CSA and Section 1306.04 of the CSA Regulations.

96.     Specifically, the Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[68]  "Medicine Shoppe fell asleep at the wheel in honoring prescriptions no reasonable pharmacist would fill without further inquiry."[69] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[70] "[B]y filling these prescriptions anyway . . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[71]

---

[67] *See United States v. Green Drugs*, 905 F.2d 694, 694-5 (3rd Cir. 1990) (affirming retail pharmacy liability for violating Section 842(a)); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-3 (5th Cir. 1991) (affirming liability under Section 842(a) for corporate operator of clinic that illegally distributed controlled substances); *United States v. Cap Quality Care, Inc.*, 486 F. Supp. 2d 47, 54 (D. Maine 2007) (granting summary judgment to the United States on claims that DEA registrant clinic improperly dispensed controlled substances in violation of Sections 829 and 842); *United States v. Grab Bag Distrib.*, 189 F. Supp. 2d 1072, 1082 (E.D. Cal. 2002) (granting summary judgment to the United States on liability); *United States v. Little*, 59 F. Supp. 2d 177, 186-8 (D. Mass. 1999) (granting summary judgment to Government for pharmacy's violations of § 842(a) and concluding "a pharmacy empowered to dispense controlled substances will now be held liable . . . if it knew or should have known about an illegal diversion, or inaccurate records, and chose to do nothing"); *Poulin*, 926 F. Supp. at 252-3 (holding pharmacy liable for "filling a total of six invalid prescriptions"); *United States v. Queen Village Pharm.*, No. 89-2778, 1990 WL 165907, *2-4 (E.D. Pa. Oct. 25, 1990) (finding retail pharmacy liable for violating Section 842(a)).
[68] *Id.* at 412 (emphasis added).
[69] *Id.* at 413.
[70] *Id.*
[71] *Id.*

The Sixth Circuit made no distinction between the pharmacy and the pharmacists employed there when determining liability.[72]

97.     The Opioids MDL also "firmly rejected" the argument that only individual pharmacists could be held liable for illegal dispensing: "The Court concludes that the Pharmacy Defendants have not shown that the sole responsibility for their dispensing practices rests with their pharmacist-employees. Rather, the CSA makes clear that any *person*, which includes a pharmacy itself, who knowingly fills or allows to be filled an illegitimate prescription is in violation of the [Controlled Substances] Act."[73]

98.     In a recent decision finding Walgreens liable for the opioid epidemic in San Francisco, Judge Breyer held that "[w]hile the corresponding responsibility requires pharmacists to perform due diligence on controlled substance prescriptions, pharmacies have a duty to ensure that the corresponding responsibility is being fulfilled."[74] The Court also found that "[p]harmacists are the agents of a pharmacy, and the pharmacy is responsible for their conduct," and "pharmacies act as the 'last line of defense' for guarding against diversion by providing their pharmacists with the training and resources needed to ensure that pharmacists only dispense legitimate prescriptions for controlled substances."[75]

99.     These decisions make clear that the dispensing obligations under the CSA are not imposed solely on pharmacists, but on pharmacies and their corporate owners. For this reason, the

---

[72] *See also Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 823, 835 (11th Cir. 2018) (affirming revocation of pharmacy registration for, among other things, pharmacists dispensing prescriptions that prescriptions presented various red flags, *i.e.*, indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).
[73] *In Re: National Prescription Opiate Litigation*, Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 21.
[74] *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-07591-CRB, 2022 WL 3224463, at *19 (N.D. Cal. Aug. 10, 2022).
[75] *Id.*

chain pharmacy parent corporations like Publix had a responsibility, under the CSA, not to dispense opioids in the face of unresolved red flags about the legitimacy of the prescriptions.

### 5. *The Purpose and Intent of the CSA Bolsters Finding Liability of Corporate Parent Publix*

100.    The logic of the above authority is consistent with the purpose and intent of the CSA. The Supreme Court has explained that when enacting the CSA "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels."[76] So, to address this concern, courts resist attempts by defendants to use the DEA registration process and requirements (*i.e.*, the structure of the legitimate channels) to shield those responsible from liability. As one court put it, "[t]o accept [defendant's] argument that the Act does not apply to her [because she was not a registrant], even though she was responsible for the drugs, would eviscerate the goal of ensuring the movement of drugs is closely controlled."[77] "The legislative history [of the CSA] indicates that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant."[78]

101.    The DEA made a similar finding in *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*.[79] The Chief Administrative Law Judge rejected CVS's argument that the corporate parent of a chain pharmacy was not responsible for the actions of its pharmacies. In its analysis of whether or not CVS took responsibility for its actions, the Chief ALJ held that:

> [T]he Agency's rule is clear and the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists. Therefore, I decline to create one rule for chain pharmacies and another rule for closely held or sole proprietor owned pharmacies.

---

[76] *United States v. Moore*, 423 U.S. 122, 135 (1975).
[77] *Robinson*, 2012 WL 3984786 at *7.
[78] *United States v. Moore*, 423 U.S. at 134.
[79] 77 Fed. Reg. 62316-01, 62321-2; 2012 WL 4832770 (D.E.A. Oct. 12, 2012).

Because Respondents have failed to satisfy this requirement, the ALJ properly held that they have not accepted responsibility for their misconduct.[80]

102. At its most fundamental level, the purpose of the CSA and CSA regulations is to create a closed system for delivery of controlled substances and prevent the distribution of controlled substances outside of that system. To allow the entity that fully controls the operations of the registrants (such as the corporate parent of a chain pharmacy like Publix) to escape responsibility because of corporate structure thus would defeat the purpose and intent of the CSA.

103. As the Opioids MDL Court held: "[T]he Pharmacy Defendants' ultimate argument–that they cannot be liable to Plaintiffs because only their pharmacist-employees are responsible for preventing diversion of opioids via illegitimate prescriptions – is premised upon a tortured reading of the CSA and its regulations. Because Defendants' reading of the CSA is antithetical to its very purpose, the Court rejects [Pharmacy] Defendants' positions."[81]

104. Consequently, the dispensing of controlled substances when faced with warning signals, without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates both 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829), because doing so violated the pharmacist's corresponding responsibility to ensure the legitimacy of the prescription (21 C.F.R. § 1306.04), and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA), because the prescription was filled outside of the pharmacist's usual course of professional practice (21 C.F.R. § 1306.06).

---

[80] *Id.*

[81] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 25.

**B. The False Claims Act**

105.    The FCA[82] prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.

106.    The FCA[83] prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim.

107.    The FCA[84] further imposes liability upon any person who conspires to commit a violation of the FCA.

108.    The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.  Any claim submitted by a Government Program provider for a payment constitutes a claim under the FCA.  Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

109.    Under the FCA, a "claim" is defined broadly to include any request or demand for money that is presented to the United States, or is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest.[85]

110.    In the Medicare Part D context, the "claim" is the Prescription Drug Event (PDE) that is sent by the dispensing pharmacy to a Part D plan sponsor or Pharmacy Benefit Manager ("PBM"), and then forwarded to CMS as part of the payment process.

---

[82] 31 U.S.C § 3729(a)(1)(A).
[83] 31 U.S.C § 3729(a)(1)(B).
[84] 31 U.S.C § 3729(a)(1)(C).
[85] 31 U.S.C. § 3729(b)(2).

111.    The Part D statute provides that drugs may only be reimbursed under the program if the drug is a "covered outpatient drug." Consequently, one of the elements of the PDE is to designate whether a dispensed drug is a covered outpatient drug. Covered outpatient drugs must be dispensed pursuant to a valid prescription. Under the CSA and many parallel state laws, a prescription must satisfy a number of requirements. For example, the prescriber must be authorized to prescribe controlled substances in the jurisdiction in which he or she is licensed to practice and must be either registered with DEA or exempt from registration.[86]

112.    Perhaps most significantly, in order to be valid, a prescription must be issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[87] This requirement "ensures [that] patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse."[88] It also "bars doctors from peddling to patients who crave the drugs for those prohibited uses."[89] Violation of any one of the above requirements potentially satisfies the FCA falsity requirement.

113.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation for violations that occurred before November 2, 2015 and, for violations that occurred after that date, a civil penalty of between $11,181 and $22,363.[90]

114.    One method for preventing the over-prescribing of potentially harmful opioids is to pursue those who cause the submission of false or fraudulent claims for payment for those drugs under Medicare Part D, Medicaid, and other federal and state programs. The treble damages and

---

[86] 21 C.F.R. § 1306.03(a).
[87] 21 C.F.R. § 1306.04(a).
[88] *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).
[89] *Id.*
[90] 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

civil penalties awardable under the FCA, as well as State *qui tam* statutes, can provide a powerful incentive for physicians and others to avoid prescribing and dispensing these substances for indications that are not supported by the approved drug compendia.[91]

115.    Relevant here, Department of Justice counsel have argued that the "combining the CSA and FCA enforcement schemes can be an effective tool to address violations of the CSA that may lead to diversion of narcotics and Part D fraud,"[92] particularly in combatting the "twin evils of opioid addiction" and Government Program fraud.[93]

### C. Opioid Use and Treatment by Government Programs

116.    There is an array of health care programs operated and funded by the United States and the Qui Tam States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries.  Several of these Government Programs are described below.

#### 1.    *Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications*

117.    Medicare coverage for opioid medications is provided in Part D, the prescription drug benefit program available to Medicare recipients who voluntarily enroll.[94] To participate in Part D, beneficiaries must enroll in a Part D Plan of their choice. The beneficiary pays premiums to the Plan's sponsor, which is a private entity approved by the Centers for Medicare and Medicaid Services ("CMS"). Coverage in the Plan includes deductibles, copayments, and benefit caps. The beneficiary fills the prescription at a pharmacy, which submits a claim to the Plan sponsor, and the

---

[91] Roger Wenthe, *Fighting Opioid Abuse Under Federal Health Programs With the False Claims Act*, 64 United States Attorneys' Bulletin 93, 100 (Nov. 2016).
[92] Edward A. Baker, Stacy Gerber Ward, *Pursuing False Claims Act Liability for Controlled Substances Act Violations*, 64 United States Attorneys' Bulletin 101, 113 (Nov. 2016).
[93] *Id.* at 102.
[94] 42 U.S.C. §§ 1395w-102 (2010).

sponsor pays the pharmacy directly or through a subcontractor. CMS reimburses the sponsor for varying portions of the prescription costs.[95]

118.    To be a "covered Part D drug," a drug must be: (1) dispensable only by prescription; (2) one of the three types of "covered outpatient drug" defined in 42 U.S.C. § 1396r-8(k)(2)(A) (2016); and (3) used for a "medically accepted indication."[96]

119.    The most important of these three requirements for present purposes is the third, that the drug be used for a medically accepted indication. The statute and the regulation define this term by incorporating the Medicaid definition in 42 U.S.C. §§ 1396r-8(k)(6) (2016).[97]

120.    The definition is: "The term 'medically accepted indication' means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 *et seq.*] or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i) of this section."[98] The compendia referred to are "(I) American Hospital Formulary Service Drug Information; (II) United States Pharmacopeia-Drug Information (or its successor publications); and (III) the DRUGDEX Information System."[99]

121.    The Medicare manuals provide additional guidance on Part D drug coverage. The MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL, Ch. 6, § 10.6 (Rev. 18, Jan. 15, 2016), states that a medically accepted indication "refers to the diagnosis or condition for which a drug is being prescribed, not the dose being prescribed for such indication."[100]

---

[95] See *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp.2d 945, 948-49 (N.D. Ill. 2009).
[96] 42 U.S.C. §§ 1395w-102(e)(1) (2010).
[97] *See* 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii)(2010); 42 CFR § 423.100 (2016).
[98] 42 U.S.C. §§ 1396r-8(k)(6) (2016).
[99] 42 U.S.C. §§ 1396r-8(g)(1)(B)(i).
[100] *Id.*

122.    Therefore, Medicare Part D and Medicaid cover only prescription drugs used for a "medically accepted indication," which means used either for an indication approved on the Food and Drug Administration (FDA) label, or for an "off-label" indication which is "supported" by one of the approved compendia. If a drug is prescribed outside of these limitations, it is not a "covered drug," and a claim for payment based on the prescription is a false claim.

### 2.    *Medicaid Beneficiary Opioid Use and Abuse*

123.    Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal Government and state governments.

124.    While Medicaid undoubtedly helps many deserving recipients, it also creates a series of incentives for potential abuse or diversion of opioids, which are rooted in federal law itself. Patients on Medicaid typically "pay no part of costs for covered medical expenses," other than perhaps a small co-payment.[101] Federal law requires that Medicaid co-payments and other "cost-sharing" borne by Medicaid recipients at lower income levels be nominal. CMS has determined that states could charge those on Medicaid no more than $4 for certain classes of drugs.[102] For dangerous opioids such as oxycodone, Medicaid co-pays can run as low as $1 for as many as 240 pills—pills that can be sold for up to $4,000 on the street.

125.    As one longtime local prosecutor in opioid-ravaged eastern Kentucky recounted in DREAMLAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC: "We can talk morality all day long, but if you're drawing five hundred dollars a month and you have a Medicaid card that allows

---

[101] U.S. Dep't of Health & Hum. Servs., *Frequently Asked Questions: What is the Difference* Between *Medicare and Medicaid?*, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html.

[102] *See* Final Rule, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, Eligibility Notices, Fair Hearing and Appeal Processes, and Premiums and Cost Sharing; Exchanges: Eligibility and Eligibility and Enrollment, 78 Fed. Reg. 42159-42322 (July 15, 2013) (codified in scattered pts. of 42 C.F.R.), https://www.gpo.gov/fdsys/pkg/FR-2013-07-15/html/2013-16271.htm.

you to get a monthly supply of pills worth several thousand dollars, you're going to sell your pills."[103]

126.    Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."  "Covered outpatient drugs" are drugs that are used for "a medically accepted indication."

### 3.    *Medicare Beneficiary Opioid Use and Abuse*

127.    Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases.  The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

128.    Starting in January 2006, Part D of the Medicare Program provided subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries, with low-income individuals receiving the greatest subsidies.  However, a "covered Part D drug" must be used for a "medically accepted indication."

129.    Medicare's Prescription Drug Program, known as Part D, provides optional drug benefits to Medicare beneficiaries.  CMS contracts with private insurance companies, called sponsors, to provide Part D prescription drug coverage to beneficiaries who choose to enroll. Sponsors offer drug coverage to beneficiaries through Part D prescription drug plans.  These Part D programs are subsidized by the federal Government, which covers the cost of drug payments.

---

[103] Sam Quinones, Dreamland: The True Tale of America's Opiate Epidemic 211 (2015).

130. In 2016, one out of every three beneficiaries received at least one prescription opioid through Medicare Part D. In total, 14.4 million of the 43.6 million beneficiaries enrolled in Medicare Part D had received opioids. Medicare Part D paid almost $4.1 billion for 79.4 million opioid prescriptions for these beneficiaries. The vast majority of these opioids (80 percent) were Schedule II or III controlled substances, meaning they have the highest potential for abuse or diversion among legally available drugs.[104]

131. In addition, one in ten Medicare Part D beneficiaries nationwide received opioids on a regular basis. Specifically, five million beneficiaries received opioids for three months or more in 2016. Research shows that the risk of opioid dependence increases substantially for patients receiving opioids continuously for three months. Of these five million beneficiaries, 3.6 million received opioids for six or more months and nearly 610,000 received opioids for the entire year.[105]

132. A total of 501,008 beneficiaries received high amounts of opioids through Medicare Part D in 2016. This does not include beneficiaries who had cancer or were in hospice care. Each of the 501,008 beneficiaries received an average morphine equivalent dose (MED) of greater than 120 mg a day for at least 3 months. MED is a measure that equates all the various opioids and strengths into one standard value. A daily MED of 120 mg is equivalent to taking 12 tablets a day of Vicodin 10 mg or 16 tablets a day of Percocet 5 mg. These dosages far exceed the amounts that the manufacturers recommend for both of these drugs. They also exceed the 90 mg MED level that CDC recommends avoiding for patients with chronic pain.[106]

---

[104] Dept. of Health & Human Services OIG, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, 2 (July 2017), HHS OIG Data Brief OEI-20-17-00250, https://oig.hhs.gov/oei/reports/oei-02-17-00250.pdf.
[105] *Id.*
[106] *Id.*

133.    As the statistics make clear, there is a real problem with inappropriate opioid prescriptions being filled by Medicare patients. Pharmacies should not be dispensing most, if not all, of the prescriptions that are clearly for excessive amounts of opioids or for patients who have been doctor shopping. However, pharmacies like Publix have failed to block these prescriptions and instead filled them, while choosing to bill Medicare for medically unnecessary and/or inappropriate prescriptions.

### 4.    *Tricare Beneficiary Coverage and Opioid Use and Abuse*

134.    TRICARE is the insurance plan of the U.S. Department of Defense and provides health care coverage for over 9 million beneficiaries. Approximately 20% of the covered population is active-duty military, with the remainder composed of retirees, disabled personnel, and dependents.

135.    Prescription drugs are an important part of the TRICARE health benefit, including coverage for opioid drugs.

136.    Service members were prescribed pain medication at a rate four times higher in 2009 than in 2001.[107] Chronic pain medication and opioid use rates in the military, specifically in Service members returning from Afghanistan, were estimated at approximately 44% and 15%, respectively.[108] Most of the prescription drugs misused by Service members are opiate pain medications, which include codeine, morphine, oxycodone, oxymorphone, hydrocodone, and hydromorphone. Combat-related injuries may help explain the increase in prescriptions and the corresponding increase in self-reported misuse of prescription drugs. Post-traumatic stress and other mental health disorders are associated with substance misuse, as are other problems

---

[107] Institute of Medicine (IOM), 2012.
[108] R.L. Toblin, P.J. Quartana, L.A. Riviere, K. Walper, C.W. Hoge, *Chronic pain and opioid use in U.S. soldiers after combat deployment*, 174 JAMA Internal Medicine 1400-1401 (2014).

experienced by returning military personnel, including sleep disturbances, traumatic brain injury, and unemployment.[109]

137.    Military physicians wrote nearly 3.8 million prescriptions for pain medication in 2009, more than quadruple the number of such prescriptions written in 2001.[110]  However, in the past few years, self-reported use of both prescription opioid pain relievers and use of sedatives has decreased among active-duty personnel. From 2011 to 2015, the percentage of service members using pain relievers in the past month decreased by nearly half, likely reflecting prevention and appropriate prescribing initiatives set in motion by the Department of Defense.[111]  Nonetheless, these medications were misused and overused more often than other drugs. Prescription drug misuse was highest in the Army and lowest in the Coast Guard.[112]

138.    Opioid use disorders among military personnel often begin with an opioid pain prescription following an injury during deployment. However, due to the addictive nature of opioids, particularly coupled with mental health struggles experienced by some military service men and women, regular use of opioids can lead to addiction.

139.    Many veterans have unique issues related to pain management, with two-thirds reporting they experience pain.[113] More than 9% reported that they experience severe pain, compared to only 6.4% of non-veterans, putting them at higher risk for accidental opioid pain reliever overdoses.[114] From 2001 to 2009, the percent of veterans in the VHA system receiving an

---

[109] National Institute on Drug Abuse (2013): *Drug Facts: Substance Abuse in the Military*, Retrieved from http://www.drugabuse.gov/publications/drugfacts/substance-abuse-inmilitary.
[110] Institute of Medicine, *Substance Use Disorders in the US Armed Forces*, National Academies Press (2013) https://www.nap.edu/catalog/13441/substance-use-disorders-in-the-us-armed-forces.
[111] Lin, L.A., Bohnert, A.S., Kerns, R.D., et al., Impact of the Opioid Safety Initiative on Opioid-Related Prescribing in Veterans, 158 Pain 833-839 (2017).
[112] Meadows, S.O., Engel, C.C, Collins, R.L, *et al.*, *Health Related Behaviors Survey: Substance Use Among U.S. Active-Duty Service Members*, RAND Corporation, 2018, www.rand.org/pubs/research_briefs/RB9955z7.html.
[113] Nahin R. L., Severe pain in veterans: *The effect of age and sex, and comparisons with the general population*, 18 The Journal of Pain 247–254 (2017).
[114] *Id.*

opioid prescription increased from 17% to 24%.[115] Similarly, the overall opioid overdose rates of veterans increased to 21% in 2016 from 14% in 2010.[116]

### 5. *Federal Employee Health Benefit Program Beneficiary Coverage and Opioid Use and Abuse*

140. The Federal Employees Health Benefits ("FEHB") Program is a system in which employee health benefits are provided to civilian government employees and annuitants of the United States government. The FEHB Program covers some nine million federal civilian employees, retirees, former employees, and their families. The FEHB Program is voluntary and is financed through employee and employer contributions.

141. Prescription drug coverage, available at retail and mail service pharmacies, is a key component of the FEHB Program's benefit design.

142. The opioid crisis has had a significant impact on the FEHB Program, including:

- The largest FEHB Program carrier reported a 300% increase from 2012 through 2017 in the identification of beneficiaries potentially abusing prescription opioid medications;

- The number of prescriptions for Narcan, Naloxone and Evzio, drugs used to thwart opioid-related overdoses, doubled from 2016 through 2017;

- In 2017, the percentage of FEHB Program members enrolled in employee organization fee-for-service plans who were taking opioid prescriptions ranged between 17.8 percent and 24.3 percent of total beneficiaries; and

---

[115] Teeters, J.B., Lancaster, C.L., Brown, D.G., & Back, S.E., *Substance use disorders in military veterans: prevalence and treatment challenges*, 8 Substance Abuse and Rehabilitation 69-77 (2017).
[116] Lewei, A.L., Peltzman, T., McCarthy, J.F., *et al.*, *Changing trends in opioid overdose deaths and prescription opioid receipt among veterans*, 57 American Journal of Preventive Medicine 106-110 (2019).

- FEHB Program ancillary costs for treatment of substance abuse have risen sharply at a rate of nearly 283 percent, from 2013 through 2016.[117]

### 6. *Other Government Health Care Program Beneficiary Coverage and Opioid Use and Abuse*

143.    State governments provide some form of health insurance coverage for their employees, retirees, as well as their beneficiaries and survivors.

144.    There are numerous state and local government employees and families covered by employer health insurance in Florida, Georgia, Alabama, North and South Carolina, Tennessee, and Virginia.  Comprehensive prescription drug coverage, including for opioid drugs, is a key feature of the benefits offered to these state and local government employees and retirees as well as their beneficiaries and survivors, including coverage for prescription opioid drugs.

145.    In addition, the Children's Health Insurance Program ("CHIP") is a partnership between the federal and state governments that provides low-cost health coverage to children in families that earn too much money to qualify for Medicaid. All states provide comprehensive coverage for prescription drugs through CHIP, including coverage for opioid drugs.

146.    Florida, Georgia, Alabama, North and South Carolina, Tennessee, and Virginia state governments also offer prisoners coverage for prescription opioid drugs.

147.    These other Government Programs have also experienced widespread diversion and abuse of opioids.

148.    For example, a significant percentage of the nation's prison and jail population suffers from drug addiction. The Bureau of Justice Statistics (BJS), part of the U.S. Department of Justice (DOJ), estimated in a 2017 report that two-thirds of offenders held in state prisons and local

---

[117] U.S. Office of Personnel Management, Office of the Inspector General, *Top Management Challenges: Fiscal Year 2018* (Nov. 5, 2018), at 7-8, https://www.opm.gov/our-inspector-general/publications/special-reports-and-reviews/2018-top-management-challenges.pdf.

jails had substance abuse problems, yet only a quarter of that group received adequate drug treatment.

149.   A 2016 study published in *Substance Abuse and Rehabilitation* estimated that between 24% and 36% of opioid-dependent adults cycle in and out of jails each year, creating a cycle between drug addiction and incarceration.

### D. Federal Guidance Governing Pharmacy Dispensing of Opioids

150.   The CDC has published guidelines regarding the proper use of opioids.[118] The guidelines explicitly state that "Opioid pain medication use presents serious risks, including overdose and opioid use disorder."[119]   Furthermore, "[s]ales of opioid pain medication have increased in parallel with opioid-related overdose deaths."[120]

151.   The CDC guidelines, and many state laws, rely on Morphine Milligram Equivalents ("MME"). As the name suggests, MME is an opioid's dosage's equivalency to morphine. Using MME is useful because it provides a constant metric to compare opioids of varying types, strengths, and delivery methods. This is particularly useful for patients who may be using a combination of different opioid products or have changed products over time.

152.   The CDC has a conversion chart of the most common opioids in milligrams (mg) to MMEs.[121] So, for example, 10 tablets of hydrocodone/acetaminophen 5mg/300mg would equal 50 MME (10 tablets x 5mg of hydrocodone x 1 hydrocodone oxycodone conversion factor = 50

---

[118] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. And Mort. Wkly. Rep. (March 18, 2016).
[119] *Id.*
[120] *Id.*
[121] Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf.

MME). 2 tablets of oxycodone 30mg would equal 90 MME (2 tablets x 30mg of oxycodone x 1.5 oxycodone conversion factor = 90 MME).[122]

153.    The CDC has determined that "[h]aving a history of a prescription for an opioid pain medication increases the risk for overdose and opioid use disorder, highlighting the value of guidance on safer prescribing practices for clinicians. For example, a recent study of patients aged 15–64 years receiving opioids for chronic non-cancer pain and followed for up to 13 years revealed that one in 550 patients died from opioid-related overdose at a median of 2.6 years from their first opioid prescription, and one in 32 patients who escalated to opioid dosages >200 morphine milligram equivalents (MME) died from opioid-related overdose."[123]

154.    In addition, the CDC found that "opioid-related overdose risk is dose-dependent, with higher opioid dosages associated with increased overdose risk. [Four studies] evaluated similar MME/day dose ranges for association with overdose risk. In these four studies, compared with opioids prescribed at <20 MME/day, the odds of overdose among patients prescribed opioids for chronic non-malignant pain were between 1.3 and 1.9 for dosages of 20 to <50 MME/day, between 1.9 and 4.6 for dosages of 50 to <100 MME/day, and between 2.0 and 8.9 for dosages of ≥100 MME/day. Compared with dosages of 1-<20 MME/day, absolute risk difference approximation for 50-<100 MME/day was 0.15% for fatal overdose and 1.40% for any overdose, and for ≥100 MME/day was 0.25% for fatal overdose and 4.04% for any overdose."[124]

155.    "A recent study of Veterans Health Administration patients with chronic pain found that patients who died of overdoses related to opioids were prescribed higher opioid dosages

---

[122] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.
[123] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. And Mort. Wkly Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.
[124] *Id.*

(mean: 98 MME/day; median: 60 MME/day) than controls (mean: 48 MME/day, median: 25 MME/day). Finally, another recent study of overdose deaths among state residents with and without opioid prescriptions revealed that prescription opioid-related overdose mortality rates rose rapidly up to prescribed doses of 200 MME/day, after which the mortality rates continued to increase but grew more gradually."[125]

156.    Furthermore, "epidemiologic studies suggest that concurrent use of benzodiazepines and opioids might put patients at greater risk for potentially fatal overdose. Three studies of fatal overdose deaths found evidence of concurrent benzodiazepine use in 31%–61% of decedents. In one of these studies, among decedents who received an opioid prescription, those whose deaths were related to opioids were more likely to have obtained opioids from multiple physicians and pharmacies than decedents whose deaths were not related to opioids."[126]

157.    "[M]ost fatal overdoses could be identified retrospectively on the basis of two pieces of information, multiple prescribers and high total daily opioid dosage, both important risk factors for overdose that are available to prescribers in the PDMP."[127]

158.    In those guidelines, the CDC recommends numerous strategies to reduce inappropriate opioid prescribing. Of particular relevance here, the CDC recommends that clinicians "should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day."[128]

---

[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] U.S. Centers for Disease Control *Guidelines for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf.

159.     Dosages at or above 50 MME/day increase the risks of overdose by at least 2x over the risk at <20 MME/day. In a national sample of Veterans Health Administration (VHA) patients with chronic pain receiving opioids from 2004–2009, patients who died of opioid overdose were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day.[129]

### E. Inspector General's List of Excluded Individuals/Entities

160.     In addition to providing guidance related to the proper use of opioids, the federal government also maintains a list of healthcare providers that are excluded from federally funded health care programs. While there are different reasons for exclusions, of relevance here are the exclusions for conduct related to the improper and/or illegal prescribing or dispensing of controlled substances.

161.     The Office of the Inspector General (OIG) of the U.S. Department of Health & Human Services has the authority to exclude individuals and entities from federally-funded health care programs pursuant to Section 1128 of the Social Security Act and from Medicare and State health care programs under Section 1156 of the Act.[130]

162.     The OIG's exclusions process is governed by regulations at 42 C.F.R. §§ 1001.2001 – 1001.2007. Under this authority, the OIG maintains and publishes a list of all currently excluded individuals and entities called "the List of Excluded Individuals/Entities" (LEIE).[131]

163.     The regulations make some exclusions mandatory and others permissive. Under Section 1128(a) (42 U.S.C. § 1320a-7(a)), the OIG is required by law to exclude individuals and

---

[129] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.
[130] While the OIG has implemented exclusions since 1981, the Department of Health & Human Services first began imposing them in 1977.
[131] The OIG's List of Excluded Individuals/Entities is available for download at: https://oig.hhs.gov/exclusions/exclusions_list.asp. There is also a searchable database available at: https://exclusions.oig.hhs.gov/.

entities convicted of various criminal offenses, including (but not limited to) Medicare or Medicaid fraud, patient abuse or neglect, and felony convictions relating to the unlawful manufacture, distribution, prescription, or dispensing of controlled substances.  The mandatory exclusions are:

| Social Security Act | 42 USC § | Amendment |
|---|---|---|
| 1128(a)(1) | 1320a-7(a)(1) | Conviction of program-related crimes. Minimum Period: 5 years |
| 1128(a)(2) | 1320a-7(a)(2) | Conviction relating to patient abuse or neglect. Minimum Period: 5 years |
| 1128(a)(3) | 1320a-7(a)(3) | Felony conviction relating to health care fraud. Minimum Period: 5 years |
| 1128(a)(4) | 1320a-7(a)(4) | Felony conviction relating to controlled substance. Minimum Period: 5 years |
| 1128(c)(3)(G)(i) | 1320a-7(c)(3)(G)(i) | Conviction of second mandatory exclusion offense. Minimum Period: 10 years |
| 1128(c)(3)(G)(ii) | 1320a-7(c)(3)(G)(ii) | Conviction of third or more mandatory exclusion offenses. Permanent Exclusion |

164.    Under Section 1128(b) (42 U.S.C. § 1320a-7(b)), the OIG has discretion to exclude individuals and entities on a number of grounds, including (but not limited to) misdemeanor convictions related to health care fraud and the unlawful manufacture, distribution, prescription, or dispensing of controlled substances.  A selection of some of the most relevant permissive exclusions follows:

| Social Security Act | 42 USC § | Amendment |
|---|---|---|
| 1128(b)(1)(A) | 1320a-7(b)(1)(A) | Misdemeanor conviction relating to health care fraud. Baseline Period: 3 years |
| 1128(b)(3) | 1320a-7(b)(3) | Misdemeanor conviction relating to controlled substance. Baseline Period: 3 years |
| 1128(b)(4) | 1320a-7(b)(4) | License revocation, suspension, or surrender. Minimum Period: Period imposed by the state licensing authority. |
| 1128(b)(5) | 1320a-7(b)(5) | Exclusion or suspension under federal or state health care program. Minimum Period: No less than the period imposed by federal or state health care program. |
| 1128(b)(7) | 1320a-7(b)(7) | Fraud, kickbacks, and other prohibited activities. Minimum Period: None |

165.   The LEIE contains information about the entity being excluded. The LEIE data identifies the name of the provider, their type of medical practice or specialty, their National Provider Identifier (formerly known as the UPIN), their date of birth, address, date of exclusion, and mandatory or permissive reason for exclusion (*i.e.*, the nature of their conviction or offense), among other fields.

166.   In this context, the LEIE is a valuable tool for a chain pharmacy to use when considering its compliance with the federal Controlled Substances Act and corresponding state laws and regulations. [132]

167.   Publix should have used the LEIE to ensure it was not filling prescriptions for the prescribers and billing a federal healthcare program. Whenever Publix pharmacies filled such prescriptions, such conduct would constitute a violation of Section 1128 of the Social Security Act and 42 U.S.C. § 1320a-7a, as well as the Controlled Substances Act. Further, filling a controlled substance prescription for a prescriber *after* that prescriber was added to the LEIE is strong evidence no due diligence was conducted for that prescription at all, and that the pharmacy directly contributed to the diversion and abuse of controlled substances.

168.   In addition, a meaningful and effective anti-diversion program would have identified (and reported to the DEA) any prescribers as problematic before they were ultimately indicted, convicted, or added to the LEIE. The LEIE thus should have been used by Publix as a baseline for pharmacies to evaluate and improve their own suspicious prescriber identification and reporting programs (to the extent it had them at all).  Specifically, if it were in fact running a meaningful compliance program, Publix should have, at a minimum, utilized the LEIE to

---

[132] In addition to the federal LEIE database, many states also maintain separate exclusion databases/lists for state Medicaid payments, which chain pharmacies should have also been using to maintain and enhance their own anti-diversion programs.  (*See, e.g.*, https://verisys.com/screening-state-medicaid-exclusion-databases/).

determine if its pharmacies had actually identified and then blocked prescribers who were ultimately convicted of controlled substance-related crimes, or the extent to which the Publix pharmacies had filled the prescriptions for those prescribers before their convictions.

### F.  State Laws Governing Pharmacy Dispensing of Opioids

169.    Over half of all states have enacted laws that restrict the prescribing or dispensing of opioids for acute pain. Fifteen states have passed laws limiting opioid prescribing for acute pain in an opioid naive patient to a seven-day supply.[133]

170.    Among the states with the strictest limits are Tennessee and Kentucky, where initial prescribing is limited to three to four days.[134]

171.    When addressing risks for drug overdose, studies support the need to monitor not only duration of initial therapy, but also total daily dosing for patients. Tennessee allows 60 MME per day if it is for 3 days or less. Otherwise, the prescriptions are restricted to 50 MME daily.[135]

172.    Rather than setting opioid limits by statute, a few state laws direct or authorize other entities to do so (*e.g.*, Virginia). These entities may include the Department of Health, a designated state health official, or regulatory boards, such as the Board of Medicine, Nursing and/or Dentistry.

173.    Consequently, the dispensing of controlled substances, when faced with warning signals and without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the pharmacist's

---

[133] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.
[134] *Id.*
[135] *Id.*

corresponding responsibility under the CSA[136] to ensure the legitimacy of the prescription[137] as well as pharmacy laws and regulations in a majority of the states.

174.     Prescribing or dispensing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Prescribing or dispensing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion.

## G. State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping

175.     It is undeniable that illicit street opiates and prescription opioid medications can often be linked, with legitimate prescriptions initiating the addiction, often followed by the person seeking the chemical from illegal sources once the prescription has ended. Sometimes, however, they will resort to "doctor shopping" – *i.e.*, visiting multiple physicians in various ambulatory settings to obtain more of the same opioid medications if the patient's own health care provider is unwilling or unable to renew or refill the prescription. State prescription drug monitoring programs ("PDMPs") make a significant contribution to fighting the opioid epidemic by preventing and inhibiting doctor shopping.

176.     PDMPs, or PMPs (prescription monitoring programs) as they are alternatively known, are utilized by all 50 states, as well as Guam and the District of Columbia. Although requirements vary by state, they generally collect data from dispensers and report to authorized users of a state's database the number of prescriptions that have been filled for scheduled drugs

---

[136] 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829).

[137] 21 C.F.R. § 1306.04 and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA because the prescription was filled outside of the pharmacist's usual course of professional practice); *see also* 21 C.F.R. § 1306.06.

for each recipient. Access to the information contained in such databases is typically limited to prescribers and state officials. State pharmacy boards and health departments operate most PDMPs, but a minority relies on professional licensing agencies, law enforcement, state substance abuse agencies.

177.   All PDMPs monitor at least Schedule II through IV Drugs, with some also monitoring Schedule V and "Drugs of Concern" as designated by an authorized state agency. Eighteen states and the District of Columbia maintain a voluntary system, with no mandatory enrollment required of either prescribers or dispensers.[138] Still, the majority of state legislatures understand that the sum total is only as good as its parts. For example, recently Georgia tied mandatory PDMP registration to the licensed practitioner's ability to secure or renew a DEA number.[139]

178.   Statutory requirements for submitting and gathering prescription data are of little value if the statutes fail to specify how the data will be used. At least fifteen states enhanced their "query" requirements or how a prescriber or dispenser must check the state's PDMP system for patient information before prescribing a controlled substance. Checking the PDMP for opioid prescriptions from other sources is a recommended step in the CDC's "Checklist for prescribing opioids for chronic pain."[140] Some states do not require query of all controlled substance prescriptions in certain situations. For example, the query requirement may not be applicable to providers of certain specialties if the prescription is for less than a three-day supply and contains less than 26 pills, the patient is terminally ill, or when the controlled substance is administered in a hospital.

---

[138] PDMP TTAC, *PDMP Mandatory Query by Prescribers and Dispensers*,
www.pdmpassist.org/pdf/Mandatory_Query_20170824.pdf.
[139] H.B. 249 (Ga. 2017), www.legis.ga.gov/Legislation/20172018/170657.pdf [hereinafter H.B. 249].
[140] U.S. Centers for Disease Control, *Checklist for Prescribing Opioids for Chronic Pain*,
https://www.cdc.gov/drugoverdose/pdf/pdo_checklist-a.pdf.

179.    Mandatory use of PDMP programs has proven successful. In 2011 and 2012 respectively, some states mandated clinicians to review PDMP data and implemented pain clinic regulation. In these states, MME per capita decreased in 85 percent and 62 percent of counties, respectively, from 2010 to 2015.[141]

180.    Research has shed light on how a PDMP affects these Medicare patient behaviors.[142] A study compared Medicare opioid prescription data in 10 states that enacted use mandates from 2007 through 2013 with 17 other states implementing PDMPs without use mandates. In states with mandates, the percentage of Medicare enrollees who obtained prescriptions from five or more doctors was eight percent lower, compared with other states. The percentage of people getting opioids from five or more pharmacies was 15 percent lower.[143]

181.    States with use mandates also saw a decline in the number of Medicare enrollees filling opioid prescriptions before the previous one had run out or obtaining more than a seven-month supply of opioids in a half-year period. These states also saw a 15 percent reduction in the number of Medicare enrollees with four or more new patient visits in six months. It is estimated that Medicare would save $348 million annually in unnecessary new patient visits if every state mandated use of its PDMP.[144]

**H. Unlawfulness of a Prescription Is Material to Government Programs' Payment**

182.    Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances was and remains material to Government Programs' decision to pay Publix's claims for reimbursement of controlled substances. Compliance with these requirements

---

[141] U.S. Centers for Disease Control, *State Successes*, https://www.cdc.gov/drugoverdose/policy/successes.html.
[142] Nat'l Bureau Econ. Res. Working Paper Series, *The Effect of Prescription Drug Monitoring Programs on Opioid Utilization in Medicare* 23148 (2017), https://www.nber.org/papers/w23148.pdf.
[143] *Id.*
[144] *Id.*

is central to Government Program benefits and is a condition of these medications being covered by these programs.

183.   Government Programs routinely deny payment for controlled substance medications, or seek to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is intended for purposes of addiction or recreational abuse. For example, DOJ has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Government Program members that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with State law.

184.   The HHS Secretary's declaration that the opioid epidemic is a national public health emergency under federal law reflects the government's stance to deny payment for improperly dispensed controlled substances.

185.   Accordingly, at all times material hereto, Publix knew or should have known that Government Programs would not pay for claims submitted if they knew that the controlled substance prescriptions at issue were invalid, did not comply with federal and/or state law, and/or lacked a legitimate medical purpose for a medically accepted indication. Alternatively, Publix knew or had reason to know that these Programs would not pay claims submitted to them if they knew that the controlled substance prescriptions were otherwise invalid.

## VI.   BACKGROUND

186.   At all times material hereto, Publix acted as both a distributor of controlled substances to its own pharmacies and a retailer dispensing controlled substances. Publix warehoused and self-distributed controlled substances, including opioids, to its stores from a warehouse devoted to pharmacy products in Orlando, Florida (the "Orlando Warehouse").

187.   At all times material hereto, Publix distributed and dispensed unreasonable dosages, quantities, and combinations of opioids throughout the Southeastern United States (including this District) from its more than 1,000 retail pharmacies despite being on notice of red flags of diversion and abuse, in violation of its duties as a pharmacy under the CSA and state pharmacy laws and regulations.

188.   While Publix has a significant number of pharmacies, Publix's core business remains grocery sales. This means that, unlike other large pharmacy chains, Publix's pharmacies were almost an afterthought. As such, Publix did not make a rigorous—or even a minimal—effort to ensure compliance at its pharmacies because it was not a core business function. Spending time and money on pharmacy compliance would not only take resources away from other core business segments, it would also prevent the pharmacies from increasing their dispensing of opioids to help the bottom line. Thus, Publix made the intentional choice to staff its pharmacies leanly and not invest in ensuring that only legal dispensing took place in its pharmacies.

189.   At all times material hereto, Publix has operated a network of approximately 1,000 pharmacies throughout the Southeastern United States, which have dispensed massive quantities of opioids, fueling the opioid epidemic.  In so doing, Publix violated its obligations under the CSA and the state pharmacy laws and regulations to prevent diversion and abuse.

**A.  Publix Was Well Aware of the Opioid Crisis and Failed to Take Adequate Steps to Curtail and Prevent Expansion of the Problem at Its Stores**

190.   Publix has had knowledge and/or notice of the opioid problem since at least 2008. At any time since, Publix could have easily taken steps to curtail and prevent expansion of the problem, but it failed to do so because it was chasing the profit that wantonly and illegally dispensing opioids promised.

191.    Publix was well aware of the problem. For example, throughout the growing opioid epidemic, there have been widespread reports of pharmacy robberies and burglaries at its stores throughout the Southeastern United States tied to narcotics. For years, Publix-owned pharmacies experienced numerous instances of forgery, fraud, theft, and robbery by addicts and criminals seeking oxycodone and similar Schedule II drugs. A review of news reports reveals the rampant, opioid-related crime afflicting its pharmacies across the country which could not have gone unnoticed by Publix.

192.    Since 2008 there have been at least fifteen robberies at Publix-owned pharmacies in four different states specifically targeting opioids, including nine robberies in Florida alone. A list of news reports of these robberies is attached as Appendix A.

193.    Pain clinics and pill mills drive the narcotic burglary problem at pharmacies and the robberies mirror a national rise in the diversion and abuse of narcotic painkillers. The robberies, many of which happened at Publix-owned pharmacies, put Publix on notice of the growing opioid epidemic across the United States caused by the flood of opioids being dispensed by its pharmacies.

194.    Publix was well aware that doctors operating pill mills were sending patients to fill their prescriptions at Publix pharmacies.

195.    Even while its pharmacies actively filled voluminous numbers of clinically inappropriate and medically unnecessary prescriptions throughout the Southeastern United States, Publix paid only lip service to efforts to combat the opioid epidemic.

## B. Publix Only Cared About Profit and Enforced No Policies and Procedures to Prevent Illegal Dispensing

196.    Publix's role in fueling the opioid crisis throughout the Southeastern United States, as well as its attendant harms to the Government Programs, has been spurred by the company's

overarching goal of profitability above all else. Even while the opioid epidemic has raged throughout the Southeastern United States, Publix came to rely on its pharmacies as profit centers for the company. For its pharmacies to be profitable, however, they needed to dispense large amounts of the prescriptions with the highest profit margins. Unfortunately, those prescriptions are opioid prescriptions. Coupled with a company that has little institutional expertise in pharmacy operations—much less any real commitment to compliance with the laws governing controlled substances—the result was sadly predictable. Publix pressured its pharmacies to dispense as many prescriptions as possible (including opioids) and completely abdicated its legal duties to ensure legal dispensing of addictive and dangerous controlled substances.

197.    A pressure point for pharmacy profitability was The Affordable Care Act, signed into law in 2010. The legislation greatly reduced the reimbursements pharmacies would get from Government Programs. By 2013, pharmacy reimbursements were down over 20%.[145]

198.    Reduced pharmacy reimbursements could be offset only by filling a greater number of prescriptions. Unfortunately for the public and Government Programs, the timing was perfect for Publix to capitalize on the opioid epidemic's explosion of pills to recoup the lost reimbursements by filling an even greater volume of prescriptions.

199.    Publix's singular focus on filling all prescriptions to drive profits was enabled by a total lack of rigorous dispensing protocols or policies. Such policies would not only have resulted in denying more inappropriate prescriptions, but also would have slowed down the speed at which prescriptions were filled. Instead, Publix insisted its dispensing practices operate as a production line which rewarded volume and penalized attention to patient care.

---

[145] Adam J. Fein, Ph.D., *Obamacare Will Squeeze Pharmacy Profits* (Oct. 8, 2013), https://www.drugchannels.net/2013/10/obamacare-will-squeeze-pharmacy-profits.html.

200. Publix has next to nothing in the way of checklists, guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should or should not be filled. Even to the extent that Publix had policies and procedures, Publix rarely emphasized or enforced those policies.

201. Publix offered little or no guidance or training to its pharmacists in the areas of identifying, resolving, or documenting red flags when dispensing opioid prescriptions. (Pharmacist Nos. 1, 4, 5, 9, 11, 12, 13, 14, 18, 20, 21). Publix offered no red flag lists or checklists and had no software alerts set up to warn its pharmacists of problematic patients or prescribers. (Partner A).

202. For the entire relevant time period, Publix did not require its pharmacists to check state PDMP databases, despite the evidence that using this data reduces overdose deaths, doctor shopping, and inappropriate or medically unnecessary reimbursements. (Pharmacist Nos. 7, 11, 18). This has led in many of its stores to pharmacists simply never checking state PDMP databases at all. (Partner B, Pharmacist Nos. 7, 11, 18).

203. Even if a pharmacist or technician did identify a prescription that was not medically appropriate, there has been a complete lack of policies and procedures for the pharmacist to follow after identification. Publix has had no protocols about how to flag prescribers who consistently were writing medically unnecessary and/or inappropriate prescriptions, no protocols about how to flag prescription shopping by customers, and no protocols about how they were to communicate information about trends they were seeing. (Pharmacist Nos. 1, 10).

204. Publix-owned pharmacies essentially left the pharmacists and technicians on their own to evaluate prescriptions. In doing so, Publix abdicated its legal duty to leverage the information it had as a chain pharmacy to assist its pharmacists in exercising their corresponding responsibility. In fact, for at least some period of time, Publix pharmacies could only see the data

from the other 2-3 stores in a "pod." (Pharmacist No. 8). This meant that, in addition to not being required to check the PDMP, Publix pharmacists often could not even see if a customer was filling at other Publix pharmacies. Publix did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, or suspicious patients with its other pharmacies.

205.    One way Publix discouraged and prevented information sharing among its pharmacies is that, before approximately 2015, Publix's dispensing software did not allow pharmacists to write electronic "notes" in the patient records that would be saved for future reference. The practice of documenting important information about a patient, prescriber, or prescription is well-established as a critical part of pharmacy practice, not to mention a legally required one. Publix pharmacists' inability to write notes meant that they could not share important information about a patient's health history, personal information, and any other important clinical facts that could be lifesaving.

206.    Documentation in notes is not only important from a clinical perspective, but it also allows pharmacists to identify and resolve red flags of diversion as well. Without notes, pharmacists cannot easily communicate to other pharmacists about red flags they found and how they resolved them. Additionally, information about suspicious prescribers or suspicious patients can and should be notated in the system to allow other pharmacists to take such information into account when evaluating a prescription. The ability to easily share information via the computer system is particularly important when pharmacies are staffed by floaters who are not as familiar with the patients and prescribers around the store.

207.    Eventually, Publix did update its computer systems and software to allow pharmacist to enter notes. But this did not happen until approximately 2015 – many years after doing so was feasible and many years after other pharmacy chains had already provided the same

functionality to pharmacists. The notes field in the Publix patient records, however, remained largely ineffective. For example, even when a diligent pharmacist had made a notation in the system, often the notes were ignored (and sometimes even deleted) because of the time and profit pressures from Publix. (Partner B, Pharmacist No. 19).

208.   This has led to endemic inconsistency, with many simply choosing to fill as many prescriptions as possible. If one Publix refused to fill a suspicious prescription, there was nothing stopping another Publix from filling the same prescription. (Partner B). This was especially true given the pressures and incentives built into the structure of Publix-owned pharmacies' operations not to question prescriptions and to fill as many as possible, as quickly as possible.

209.   Publix did little, if anything, to identify, investigate, and block suspicious prescriber's prescriptions from being filled at Publix-owned pharmacies.  Not only has it routinely ignored ongoing criminal conduct, Publix has ignored the publicly available information regarding healthcare professionals who would lose their licenses for over-prescribing opioid drugs.  Publix maintained no central tracking system to monitor such criminal activity, or to update its pharmacists as to which prescribers had been arrested, charged, convicted, or receiving other forms of discipline due to their prescribing practices.

210.   Publix has never created or adopted a robust "Do-Not-Fill" list for blocked prescribers or patients, nor provided any meaningful database tools for its pharmacists to identify questionable prescriptions. (Partner A, Partner B and Pharmacist Nos. 1, 2, 3, 8, 9, 11, 12, 13, 14, 15, 19, 20). Even when pharmacists tried to share informal lists of suspicious prescribers, Partner B recounted how a manager directed pharmacists to destroy the list. In fact, Publix did not have prescriber profiles at all. (Pharmacist No. 2).

211.   Problematic prescriber activity is just one form of data Publix failed to utilize.  In a 2013 article in the New England Journal of Medicine, two CVS pharmacy executives recognized

that chain pharmacies are in a unique position to stop the dispensing for suspicious prescribers and outlined how data could be used. They explained that chain pharmacies "have the advantage of aggregated information on all prescriptions filled at the chain" and that "[a]nalyses of aggregated data ... can also target patterns of abuse by both prescribers and patients."[146] They thus concluded that "[g]iven the growing use of controlled substances and the resulting illness and deaths, *more innovative use of transparent data is only prudent.*"[147]

212.    But even though the CSA required Publix to develop protocols to identify outlier prescribers and inappropriate prescriptions, there is no evidence Publix used its own easily accessible data to identify suspect doctors and medically unnecessary prescriptions.

213.    As a sophisticated chain pharmacy, Publix had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations.  Its own data would have allowed Publix to observe patterns or instances of dispensing that were potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.[148]  Publix did not use data available to it to effectively comply with its legal obligations to prevent diversion and ensure only legal prescriptions were being filled at its pharmacies.

214.    To the extent Publix did provide its pharmacists with any visibility into the data it collected, Publix deprived its pharmacists of the ability to meaningfully review and apply this data by making such substantial demands on its pharmacists that it effectively prevented them from properly evaluating potential red flags, suspicious prescribers, and suspicious patients.

---

[146] Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H, *Abusive Prescribing of Controlled Substances—A Pharmacy View*, 369 NEJM 989-991 (Sept. 12, 2013), https://www.nejm.org/doi/10.1056/NEJMp1308222.
[147] *Id.*
[148] *See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

215.    Thus, Publix has done little to stop its pharmacies from dispensing medically inappropriate prescriptions. In reality, Publix did the exact opposite. Instead of blocking suspicious prescribers, Publix actively courted their business and, in many areas, became the go-to pharmacy to fill pill mill doctors' prescriptions.

216.    For example, a recent job posting for a "Pharmacist – Full-time Floater" in a Powder Springs, Georgia Publix store lists an overwhelming list of skills needed for an applicant:

- provide dedication to each pharmacies success, by executing strategy, motivating and inspiring staff as the pharmacist-on-duty

- set priorities to maximize contribution, executing daily tasks, supporting the team and building rapport with both customers and associates

- provide best-in-class pharmacy service to patients, empower your staff in providing value and service through counseling, building personalized relationships, promoting customer loyalty, offering pharmacist led clinical services to improve health and wellness and preventative care through services available at Publix

- inspire each team you work with to do the right thing, gaining buy in, and empowering the team to be accountable

- provide enthusiasm for all new pharmacy initiatives at your assigned location

- manage team performance, such as prescription promised time, by assigning tasks to ensure complex operational activities are met in a timely and efficient manner in the absence of the pharmacist-in-charge

- use best practices to make sound business decisions while covering as the pharmacist-on-duty

- be regarded as an expert on the pharmacy technology system and how it is used for both routine and complex prescription processing

- mentor others on Publix pharmacy best practices to maximize sales, minimize shrink while meeting customers needs, using programs such as auto refill and Sync Your Refills

- proactively advance pharmacy clinical initiatives including Medication Therapy Management (MTM), pharmacist point-of-care testing, immunizations, and diabetes management

- maintain a flexible work-week schedule in order to meet the needs of our customers, and

- assist in all other duties as assigned

217.    While the laundry list of responsibilities included in the "Pharmacist – 30-hour Floater" posting repeatedly highlights a pharmacist's role in pharmacy success, maximizing sales, meeting customers' needs, and gaining customer loyalty, the responsibilities list makes no mention of a pharmacists' role in identifying and evaluating potential red flags, suspicious prescribers, or suspicious patients to protect the public.

218.    Though the above job description details that the pharmacist must inspire staff and teamwork, in reality many Publix pharmacists have lamented publicly that Publix pharmacists often work without the aid of a pharmacy technician or other staff.  When pharmacy technicians are unavailable or pulled away to other areas in the supermarket, Publix pharmacists are often forced to work alone, and to act as both pharmacist and technician.  This lack of resources or aid impairs a pharmacist's ability to address patient safety and patient care, including his or her ability to evaluate potential red flags, suspicious prescribers, and suspicious patients.

219.    Chronic understaffing exacerbated the demands Publix placed on pharmacists. This meant that proper due diligence on controlled substance prescriptions fell by the wayside because pharmacists often did not have enough resources or time. (Partner B and Pharmacist Nos. 2, 3, 4, 6, 7, 8, 10, 12). For example, Pharmacist No. 10 recounted how critical steps like PDMP checks were not done because there was not enough staff. Pharmacist No. 4 called the workplace environment dangerous and ripe for mistakes, saying "it was scary." In fact, some pharmacists could not even take meal or bathroom breaks. (Pharmacist No. 16). Partner B recalled that pharmacists had no time to gather insurance information, leaving some to simply input data into the override fields to bypass certain insurance warnings.  While Publix required some overrides to occur only with a call to corporate, it placed no such requirements on Schedule II prescriptions. (Partner B).

220.    As a New York Times article details, the pressures on pharmacists can lead directly to patient harm.[149] For example, because of "chaos" at chain pharmacies like Publix, an elderly woman died in December 2018 after taking a powerful chemotherapy drug mistakenly dispensed by a Publix pharmacy in Lakeland, Florida. But instead of changing the profit-over-patient culture because of the incident, Publix would "not discuss how to avoid future errors, saying, '[Publix] already [has] systems in place.'"

221.    Publix's compensation structure also presents a conflict of interest for pharmacists on at least one front as it incentivizes pharmacists to fill as many prescriptions as possible to increase the store profit metric. In this structure, a pharmacist would necessarily receive a higher bonus for filling illegitimate prescriptions (by increasing overall department item counts, prescription counts, and store profits). On the other hand, rejecting illegitimate prescriptions would decrease overall sales and profits, and decrease the final bonus amount a pharmacist could receive.

### C. Publix's Pharmacists Faced Extreme Pressure and Time Constraints

222.    Instead of providing the tools to its pharmacists to identify medically inappropriate prescriptions, Publix insisted that its pharmacists meet required performance metrics aimed at increasing profit (Pharmacist No. 4). As Pharmacist No. 15 bluntly put it: "Publix was not a good company. They did not have the employee's best interest in mind; they just cared about money." The focus on profit meant that adequately reviewing controlled substance prescriptions was much more difficult, and frequently impossible.

---

[149] *See* Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, The New York Times (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

223.    In stark contrast to the dearth of information to help identify diversion, Publix pharmacies received monthly reports detailing the metrics scores for the district, comparing each store's financial performance. (Pharmacist No. 4).

224.    One of the key metrics that Publix measured was how fast prescriptions were filled. Publix wanted all prescriptions filled within 15 minutes, even if they were for Schedule II medications and proved challenging to vet. (Pharmacist Nos. 4, 9, 13, 16, 17, 20). The pharmacy systems encouraged the rushed filling of all prescriptions, with indicators turning yellow, then red to tell pharmacy staff were taking too long to fill the prescription. (Pharmacist No. 12).

225.    One of the most important metrics at Publix has been prescription count. Pharmacies were expected to increase prescription counts year over year. The prescription counts measured all prescriptions, including increased controlled substances. Thus, pharmacies were expected to dispense (and would be rewarded if they dispensed) more and more controlled substances. (Partner B). If pharmacists did not meet the metrics, they could be – and would be – fired. (Pharmacist No. 20).

226.    Likewise, in order to increase profits, the company has substantially reduced pharmacy staffing to dangerous levels, making it impossible for pharmacists to ensure that only medically necessary and clinically appropriate drugs were being dispensed.  (Partner A, Partner B, and Pharmacist Nos. 2, 3, 4, 6, 7, 8, 10, 12). Predictably, this has resulted in hundreds of thousands of clinically inappropriate and medically unnecessary opioid prescriptions pouring out of Publix pharmacies into communities throughout the Southeastern United States.

227.    Illustrating Publix's focus on profit is how Publix filled the void for suspicious customers whom other pharmacies turned away. (Pharmacist No. 1, Partner B). Pharmacist No. 1 saw an uptick in suspicious customers at Publix pharmacies in Florida because they no longer

could use CVS due to more stringent policies it had to implement as a result of a DEA enforcement action following the *Holiday CVS* case.

228.     Another important Publix metric was customer service. The routine feedback received by pharmacists regarding customer complaints or difficult interactions where customers contacted store management or corporate made it obvious that minimizing customer complaints was a top priority to Publix. (Partner B, Pharmacist Nos. 1, 11).

229.     It has been very common for patients to complain to pharmacy management, front end store management, or to corporate management about pharmacists who required verification or who refused to fill medications. It has been common for such complaints to provoke an immediate response from management and result in discipline against the pharmacist who was exercising appropriate diligence. (Pharmacist Nos. 1, 3, 19). This included management firing Pharmacist No. 1 because he would not follow direct orders to fill a prescription that could cause patient harm. Pharmacists were often instructed to apologize directly to patients and offer them gift cards or waive their copays after management had overridden the pharmacists' concerns about filling inappropriate prescriptions. (Pharmacist No. 18).

230.     The threat of patient complaints, and the corresponding adverse employment actions that would often be taken by Publix against them, caused many pharmacists to fill prescriptions that had obvious red flags. (Partner B).

231.     The focus on customer service over customer safety was exacerbated by the management structure. The pharmacists in the store fell in the hierarchy under the grocery store managers who were not themselves pharmacists. This created problems because the store managers cared primarily about the profitability of the pharmacy and the pharmacy's contribution to the overall customer store satisfaction. Thus, the store managers would often pressure or instruct

pharmacists to do things to improve store metrics without regard for what was clinically appropriate or legal dispensing. (Partner B).

232.     Publix made clear that a pharmacists' primary duty was to make a customer happy. The slavish adherence to profit-based metrics meant that Publix pharmacists would have to rush through filling prescriptions and try to avoid complaints.

233.     These metrics were not only used as a stick, but as a carrot as well. Pharmacists received thousands of dollars in bonuses based on the metrics scores of their pharmacy. (Partner A, Partner B, and Pharmacists Nos. 1, 10, 20).

234.     Pharmacy management has been focused on profits regardless of how they were made. When Partner B reduced the staggering amount of controlled substances that had been dispensed for customers of bad doctors by prior store management, he was reprimanded by senior management because the Schedule II opioids are high-margin drugs, especially when customers paid in cash.

235.     The demands on pharmacists have often been so intense that they caused mental and physical anguish. (Pharmacist Nos. 4, 11, 16). Pharmacist No. 4 recalled how she "considered going on anti-depressants because every day [she] would go to work crying." Pharmacist No 11 said she cannot enter a Publix store to this day due to the anxiety caused by her time at Publix. Many other Publix pharmacists simply quit due to the stress. (Pharmacist Nos. 4, 16).

**D.  Publix Turned a Blind Eye to the Opioid Crisis**

236.     Publix has had knowledge and/or notice of the opioid problem since at least 2008. At any time since Publix had knowledge and/or notice of the opioid problem, it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

237.    Rather than act to curb the expansion of opioid use that Publix knew was occurring at a breathtaking pace, Publix failed to (and/or chose not to) put in place many of the measures it was more than capable of undertaking.

238.    Publix was well aware of its obligations under the CSA and Whistleblower State pharmacy laws and regulations to serve as a safeguard against diversion and abuse.

239.    The opioid crisis and corresponding damage to Government Programs alleged herein are a direct and foreseeable result of Publix's actions and inactions. The United States and the Whistleblower States were thereby damaged.

240.    In addition to measures alleged above, Publix could and should have years ago unilaterally taken action, and/or offered programs to assist Government Programs, including: (a) limiting to seven days the supply of opioids dispensed for certain acute prescriptions; (b) reducing the dispensing of stronger and extended release opioids; (c) enhancing pharmacist counseling for new opioid patients; (d) limiting the daily dosage of opioids dispensed based on the strength of the opioid; and (e) requiring the use of immediate-release formulations of opioids before extended-release opioids are dispensed.

241.    Publix also failed to use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or combinations of opioids, or to use data available to it to do statistical analysis to limit shipments to its pharmacies and prevent the dispensing of prescriptions that were being illegally diverted, dispensed, or otherwise contributed to the opioid crisis.

242.    Publix further refused to take reasonable measures to limit suspicious shipments to its retail stores and from dispensing unreasonable amounts of opioids and filling suspicious prescriptions. Publix thereby ensured that the growing demand for opioids would be met by

skyrocketing supply and an unimpeded flow of drugs into communities across the Southeastern United States.

243.    Publix knew or should have known that its pharmacies were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash; (f) filling prescriptions of unusual size and frequency from the same prescribing physician; (g) filling prescriptions of unusual size and frequency from out-of-state physicians; and (h) filing prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. The volumes of opioids distributed to and dispensed by Publix pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

244.    Publix had complete access to, and full visibility of, all prescription opioid distribution data and dispensing data related to its pharmacies throughout the Southeastern United States.

245.    Publix had complete access to information revealing the doctors who prescribed the opioids being dispensed in its pharmacies throughout the Southeastern United States.

246.    Publix had complete access to information revealing the customers who filled (or sought to fill) prescriptions for opioids in its stores throughout the Southeastern United States.

247.    Publix also failed to conduct adequate internal or external audits of its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or, if it conducted such audits, it failed to take any meaningful action as a result.

248.   Publix was, or should have been, fully aware that the volume of opioids being distributed to and dispensed by its pharmacies was untenable, and in many areas was patently absurd; yet it did not take meaningful action to investigate, nor to ensure that it was complying with its duties and obligations under the law with regard to controlled substances.

249.   In 2015, Teva through its wholesaler Anda, found that Publix orders of opioids had "serious red flags" that "put them significantly above [its] peers as far as size and class of trade"[150]:

> 1. This is high-strength oxycodone ultimately going to Florida, a well-established hot spot for oxycodone abuse in the U.S.
> 2. The total quantities in the Publix forecast put them significantly above their peers as far as size and class of trade are concerned.
> 3. The breakdown by strength with an emphasis on 40mg does not appear to be normal for a retail pharmacy. I would expect the breakdown to be closer to that of Thrifty White, where the emphasis is on lower strengths.

250.   Yet, despite the "serious red flags" Publix still received its opioids because of its importance as an "established customer" and because stopping the suspicious orders would put the business relationship at risk.[151]

251.   Another wholesaler, McKesson, also identified problems with Publix's orders of opioids. Despite Publix stores routinely hitting McKesson's opioid ordering limits, Publix employee Chris Hewell, Manager of Procurement, requested "amnesty" from the ordering threshold program, thus permitting Publix to exceed the standard 80% threshold for ordering Oxycodone. McKesson ultimately granted Publix a temporary 2,000 dosage unit increase "across the board" thus allowing the unchecked flow of opioids to Publix pharmacies to continue.[152]

252.   As an October 20, 2016 PowerPoint acknowledged, Publix understood it had voluntarily "assumed additional regulatory responsibility" as a condition for the privilege of

---

[150] *In Re: National Prescription Opiate Litigation,* Plaintiff Cobb County's Supplemental and Amended Allegations To Be Added to "Short Form For Supplementing Complaint And Amending Defendants And Jury Demand." (Case No. 17-md-2804) (Dkt. 3787) at ¶¶ 466-467.
[151] *Id.*
[152] *In Re: National Prescription Opiate Litigation,* Plaintiff Cobb County's Supplemental and Amended Allegations To Be Added to "Short Form For Supplementing Complaint And Amending Defendants And Jury Demand." (Case No. 17-md-2804) (Dkt. 3787) at ¶¶ 468-469.

distributing controlled substances to its stores throughout the Southeastern United States (and in this District).

253.   The sheer volume of opioids it distributed and dispensed throughout the Southeastern United States (and in this District) should have been, by itself, sufficient to alert Publix that opioids were necessarily being diverted into unlawful channels at alarming levels.

254.   Publix breached its duty to maintain effective controls against diversion and abuse of opioids. The foreseeable result of its breach of its duties has been the widespread diversion and abuse occurring in the communities into which Publix was pouring these drugs.

255.   Publix's knowing and intentional breach of its duties has been the proximate cause and a substantial factor contributing to the damages suffered by Government Programs alleged in this Complaint.

## VII.   PUBLIX, AS A DISTRIBUTOR, VIOLATED THE CSA AND THE FCA

256.   The CSA defines a "distributor" as a person or an entity that delivers (other than by administering or dispensing) a controlled substance. The CSA defines "delivery" as the "actual, constructive, or attempted transfer of a controlled substance."[153]

257.   Distributors of controlled substances are required by the CSA to register with DEA and to maintain effective controls against the diversion of controlled substances for illegitimate uses.[154] The Attorney General has delegated this authority to DEA.[155]

258.   Under the CSA, it is unlawful for a distributor to distribute a controlled substance "[e]xcept as authorized by this subchapter."[156]

---

[153] See 21 U.S.C. § 802(8), (11).
[154] See 21 U.S.C. § 823(b)(1) (requiring the Attorney General, in registering a distributor, to consider whether the distributor has shown "maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels").
[155] See 28 C.F.R. § 0.100; 21 C.F.R. § 1300.01.
[156] 21 U.S.C. § 841(a) ("Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally (1) to . . . distribute . . . a controlled substance; . . . .").

259.    The CSA provides the Attorney General broad authority to "promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter."[157] The Attorney General has issued numerous regulations under the referenced subchapter —Subchapter I —establishing an extensive regulatory regime.[158]

260.    In particular, the Attorney General, by regulation, has long required distributors to design and operate a system to detect suspicious orders of controlled substances and to report those orders to DEA.[159] This provision reads, in full:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.[160]

261.    If a distributor fails to report a suspicious order, it violates the law. Under 21 U.S.C. § 842(a)(5), it is unlawful for any person, including a distributor, "to refuse or negligently fail to make, keep, or furnish any record, report, notification, … or information required under" Subchapter I.

262.    A distributor is liable for a civil penalty for each violation of 21 U.S.C. § 842(a)(5). The CSA provides that a person who violates 21 U.S.C. § 842(a)(5) shall, with respect to any such violation, be subject to a civil penalty not to exceed $10,000 for each violation on or before November 2, 2015, and not to exceed $16,864 for each violation after November 2, 2015.[161]

---

[157] 21 U.S.C. § 871(b); *see also* 21 U.S.C. § 821.
[158] *See* 21 C.F.R. §§ 1300.01-1321.01.
[159] *See* 21 C.F.R. § 1301.74(b).
[160] *Id.*
[161] *See* 21 U.S.C. § 842(c)(1)(A), (B); 28 C.F.R. § 85.5.

263.    As alleged above, since at least 2016 Publix acted as a self-distributor of controlled substances, delivering millions of shipments to Publix pharmacies throughout the Southeastern United States.

264.    By regulation, distributors are required to design and operate a system to detect suspicious orders of controlled substances, and to report those orders to DEA.[162] Suspicious orders "include," but are not limited to, orders that are unusual in size, pattern, or frequency.[163]

265.    As explained below, Publix failed to comply with its obligation under 21 C.F.R. § 1301.74(b) and did not report an extraordinary number of suspicious orders. It also violated the CSA by failing to design and operate a system to report suspicious orders to DEA.

266.    Publix had a wealth of information and data about dispensing patterns and its own pharmacies' orders such that it could readily have designed a system to adequately report suspicious orders.

267.    Publix operated a distribution center in Orlando, FL that distributed controlled substances to its pharmacies in the Southeastern United States.

268.    Because Publix acted as its own distributor, it had extensive data and other significant information that independent distributors would not ordinarily have.

269.    In particular, Publix had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Publix had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of the medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

---

[162] See 21 C.F.R. § 1301.74(b) ("The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.").
[163] Id.

270.    Publix had additional data and other information that could signal that an order was suspicious, or could be used in evaluating a suspicious order, including but not limited to the following:

- instances in which a pharmacist had refused to fill prescriptions written by particular prescribers;

- knowledge of pill-mill prescribers whose patients filled prescriptions at Publix pharmacies and the specific controlled substances that they unlawfully prescribed to patients;

- the distance between prescribers, patients, and pharmacies;

- information concerning patients who paid cash for controlled-substance prescriptions;

- drug diversion trends; and

- previous DEA Form 106 (Theft and Loss) filings.

271.    Publix also had distribution-related data and other information, including but not limited to the following:

- the number of bottles of controlled substances that each of its pharmacies had already ordered in any given week;

- historical order quantities and patterns;

- order and shipment history for orders that Publix pharmacies placed with independent distributors (*e.g.*, McKesson Corporation, Anda, and AmerisourceBergen), including reports warning when a pharmacy was nearing an independent distributor's threshold and information about instances when an independent distributor had refused to ship the order;

- orders that had been previously flagged for its pharmacies using order-size thresholds;

- analytics concerning each pharmacy's ratio of controlled-substance purchases to non-controlled-substance purchases;

- previous suspicious-order reports for its pharmacies; and

- prior and current suspicious order monitoring ("SOM") remediation plans, discussed below, for its pharmacies.

272.     Publix had the capability to use sophisticated data analytics to enhance and optimize its pharmacy operations. Publix has emphasized that it relies on "big data" in its pharmacy operations to "tackle business challenges" and "help Publix stay competitive," namely by using the data to "to help company leaders and other teams at Publix make important business decisions."[164]

273.     Although Publix had the ability to use this data and other information to flag and report suspicious orders, it chose not to do so.

274.     In addition to unusual orders flagged by Publix's order-size thresholds, Publix's compliance team received information about other unusually large orders and unusual circumstances at certain of its pharmacies.

275.     Although Publix had all of this information and had employees with control over both its dispensing and distribution practices, these employees did not use this information and corporate knowledge for suspicious order monitoring.

276.     Publix thus failed to comply with CSA requirements when it received controlled-substance orders from its pharmacies.

277.     At all times material hereto, Publix violated the CSA and FCA by failing to monitor and report suspicious orders received from its pharmacies.  Indeed, in Partner B's experience, despite his working at numerous high volume Publix pharmacies where numerous inappropriate and medically unnecessary scripts had been filled, only once does he recall the company ever

---

[164] https://blog.publix.com/publix/job-spotlight-marketing-analytics/ (last visited October 9, 2022).

limiting a shipment of controlled substances to its pharmacies. In that instance, Publix limited a Lorazepam shipment to his store.

## VIII.   PUBLIX, AS A DISPENSER, VIOLATED THE CSA AND THE FCA

278.   At all times material hereto, a DEA registrant like Publix had the duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[165] Diversion includes the use of medication outside the usual course of professional practice.

279.   The DEA has repeatedly emphasized that, as DEA registrants, a retail pharmacy chain like Publix is required to implement systems that will detect and prevent diversion and abuse and must monitor for red flags of diversion and abuse. The DEA has also repeatedly affirmed the obligations of a chain pharmacy like Publix to maintain effective controls against diversion and abuse in regulatory action after regulatory action.[166]   According to the DEA, pharmacists are the "[l]ast line of defense."[167]

280.   The framework of state and federal statutes and regulations, along with industry guidelines, make clear that a pharmacy chain like Publix is expected to use specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion and abuse of prescription narcotics when dispensing of medications outside the usual course of professional practice.

---

[165] 21 C.F.R. § 1301.71(a).
[166] *See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order); *East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (Dep't of Justice Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145 (D.D.C. 2012); *Townwood Pharmacy*; 63 Fed. Reg. 8,477 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*; 77 Fed. Reg. 44,069 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*; 73 Fed. Reg. 363 (Dep't of Justice Jan. 2, 2008) (revocation of registration).
[167] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015),
https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.

281.    Publix was on notice that case law and administrative proceedings interpreting the CSA clearly required that its pharmacies must recognize and resolve all "red flags" indicating addiction, diversion, and abuse, including:

- Criminal, civil, or administrative actions pending against the prescriber[168];

- Patient's use of street slang for certain opioids (*e.g.*, "the M's" or "the Blues")[169];

- Cash payments: cash payments exceeding the national average; "unusually large" cash transactions (cash transactions average 8% or less of all transactions according to DEA)[170];

- Multiple patients with same address/last name/prescription/diagnoses/prescriber/day: (*e.g.*, all prescriptions from the same doctor have diagnoses of lower lumbar pain; code L-4, L-5, lower back pain; or severe lower back pain)[171];

- Long distance between pharmacy and prescriber (*e.g.*, Western Pennsylvania Pharmacy filling out-of-state prescriptions; 200 miles; prescribers "not from local area")[172];

- Long distance between patient and prescriber (*e.g.*, "out of state")[173];

- Long distance between pharmacy and patient (*e.g.*, southern West Virginia residence to western Pennsylvania pharmacy; 200 miles; patients "not from local area")[174];

- Prescriptions filled piecemeal over multiple visits[175];

---

[168] *Holiday CVS, LLC v. Holder*, 839 F.Supp.2d 145, 160 (D.D.C. 2012).

[169] *Id.* at 161; *Holiday CVS, LLC*, 77 Fed. Reg. at 62321, 62344 (2012).

[170] *Oak Hill Hometown Pharmacy v. Dhillon*, 2019 WL 5606926, at *6; *Jones Total Health Care Pharmacy*, LLC v. DEA, 881 F.3d 823, 828 (11th Cir. 2018); *Pharmacy Doctors Enterprises, Inc. v. DEA*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62332; DEA Affirmance of Suspension Order, East Main Street Pharmacy, 75 Fed. Reg. 66150, 66158 (2010).

[171] *Holiday CVS*, 839 F. Supp. 2d at 161; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66159.

[172] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Holiday CVS*, 77 Fed. Reg. at 62321, 62332, 62333; *East Main Street Pharmacy*, DEA Affirmance of Suspension Order, 75 Fed. Reg. at 66163.

[173] *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62326, 62335.

[174] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62332, 62333; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150.

[175] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5.

- "Pattern Prescribing":

  o Prescribers writing in a "factory-like" manner, prescriptions for the same drugs, the same quantities, without any kind of variability or change considering the different patients that come into that pharmacy;

  o The presence of an unwavering combination of the same drugs in the same strengths in the same quantities across numerous patients;

  o Multiple patients on a single day with the same combination from a single prescriber;

  o No "individualized therapy" – same prescriptions for multiple patients; maximum doses across multiple patients[176];

- High abuse potential prescriptions / "Drug Cocktails":

  o Oxycodone and Xanax;

  o Oxycodone and Alprazolam;

  o Prescriptions for both 15mg and 30 mg strengths;

  o Oxycodone, Alprazolam, and Carisoprodol

  o Prescriptions of an opiate and a benzodiazepine;

  o Oxy 30, Oxy 15, and Xanax (Alprazolam);

  o Oxy 30, Oxy 15, Alprazolam 2mg, and a fourth "filler" drug;

  o Oxy 30, Oxy 15, Xanax 2 mg, Soma, and Flexural;

  o 210 mg dose prescription of Oxy 30;

  o High quantity prescriptions;

---

[176] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at 5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62332, 62333, 62335, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157.

- o  Prescriptions of large volumes of controlled substances in the highest strengths;

- o  Multiple drugs prescribed for the same thing;

- o  Drugs in different classes that can cause the same side effects, like respiratory depression;

- o  "The Triple" or "Holy Trinity": benzodiazepine, narcotic painkiller, and sleeping pill;

- o  "The Homerun": benzodiazepine, narcotic painkiller, sleeping pill, and Soma;

- o  Multiple narcotic painkillers at the same time;

- o  High doses of Oxy: normal dose is 5- 10mg/4 hours;

- o  High doses of Xanax (alprazolam): normal dose is 4mg/day;

- o  High doses of Valium (diazepam): normal dose is 10mg;

- o  Daily dose of 300 mg of oxycodone and 60mg of hydrocodone = overdose;

- o  "Duplicate Therapy": multiple drugs in the same class prescribed for the same thing;

- o  Multiple prescriptions of the same narcotic on same day;

- o  Multiple prescriptions of oxycodone, Xanax, and Soma for single patient; or

- o  High doses of opioids in light of overdose statistics.[177]

- • Patients who arrive together with identical or nearly identical prescriptions[178];

- • Patients seeking refills before prescriptions run out and/or patients with frequent loss of controlled substance medication[179];

---

[177] *Jones Total Health Care Pharmacy*, 881 F.3d at 828; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62319, 62322, 62325, 62326, 62331, 62336, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157, 66158, 66159, 66165; U.S. Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016, 65 Morb. And Mort. Wkly Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.
[178] Pharmacy Doctors Enterprises, 2019 WL 4565481, at *5.
[179] *Id.* at 5; *Holiday CVS*, 77 Fed. Reg. at 62343; *East Main Street Pharmacy*, 77 Fed. Reg. at 66157.

- Prescription numbers are very close sequentially[180];

- Multiple out-of-area patients from the same town/area ("Sponsor Arrangements" in which people from mostly the mountain states travel in buses and vans and drive to the pharmacy to fill opioid prescriptions)[181];

- Patient's appearance/behavior (*e.g.*, appear not to need the medication, appear high, slurred speech, stumbling walk, drooling)[182];

- Prescribers without a specialty in pain management writing large quantities of prescriptions (*e.g.*, prescription influx from board certified pediatricians or gynecologists; doctors prescribing outside the scope of their usual practice; dentists; veterinarians)[183];

- Patients between the ages of 25 and 40, often paying with cash[184];

- Evidence of doctor shopping (*e.g.*, same/similar prescription prescribed by two or more prescribers at the same time)[185];

- Prescriptions from physicians with an expired/revoked medical license, DEA number[186];

- Patients who are prescribed only controlled substance medications[187];

- Patients who present controlled substance prescriptions under different patient names[188];

- Patients who insist on brand name product or specific generic maker of opioid[189];

- Other pharmacies in the vicinity refusing to fill prescriptions from certain providers[190];

---

[180] *Holiday CVS*, 77 Fed. Reg. at 62319.
[181] *Id.* at 62319, 62331.
[182] *Id.* at 62319, 62331; *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.
[183] *Holiday CVS*, 77 Fed. Reg. at 62326, 62331; *Jones Total Health Care Pharmacy*, 881 F.3d at 828.
[184] *Holiday CVS*, 77 Fed. Reg. at 62331.
[185] *Id.* at 62331, 62343.
[186] *Id.* at 62342.
[187] *Id.* at 62343.
[188] *Id.*
[189] *Id.*
[190] *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

- Prescriber pattern of larger doses and higher quantities over time[191];

- Confluence of out of state patients on a single day receiving the same medications in the same quantities from the same in-state prescriber[192]; or

- The overwhelming proportion of prescriptions filled by the pharmacy is for opioids.[193]

282.   It is not just the single red flags that make the suspicious prescriptions unresolvable, but frequently the fact that there are multiple red flags at one time.  So, rather than just looking for unresolvable single red flags, Publix should have been looking for instances when there are multiple red flags in combination, which would make these truly unresolvable.  According to *Holiday CVS*:

> Professor Doering specifically identified such red flags as including that the patient is paying for controlled substance prescriptions with cash . . . ; the respective locations of the patient and the prescriber . . . ; that a prescriber writes for certain combinations or patterns of drugs. . . ; and multiple patients presenting "prescriptions for the same drugs, the same quantities . . . from the same doctor without any kind of variability or change considering the different patients that come into the pharmacy," thus suggesting that the physician prescribes in a "factory like manner." *Id*.  Professor Doering reviewed the various spreadsheets of the prescriptions dispensed by Respondents and testified regarding whether Respondents could have lawfully dispensed various prescriptions given the red flags they presented. For example, when questioned about CVS No. 219's dispensing of oxycodone 30 mg prescriptions, 8 which were issued by a Fort Lauderdale-based physician (P.G.) for persons whose addresses were in Kentucky and Tennessee and who paid cash, Professor Doering opined that the multiple red flags these prescriptions presented could not be resolved so that a reasonable pharmacist could dispense them consistent with his corresponding responsibility under federal law.[194]

283.   Nor would Publix be able to dispense a prescription with multiple red flags by simply making a call to verify it with the prescriber.  According to *Holiday CVS*:

---

[191] *Id*. at 66159.
[192] *Holiday CVS*, 77 Fed. Reg. at 62333.
[193] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.
[194] *Holiday CVS*, 77 Fed. Reg. at 62318.

Doering explained that the pharmacist examines multiple red flags collectively, and testified that, in his opinion, contacting the prescribing physician and/or obtaining a diagnosis code would not resolve these red flags to a degree where the medications should have been dispensed. Tr.792–93. Doering agreed that he did not know what measures, if any, the Respondents' pharmacists took to resolve any conflicts, or whether a patient history screen was consulted prior to the dispensing event. Tr.868, 873. When pressed on whether the distance red flags were potentially explainable under various hypothetical scenarios involving vacation and travel, Doering had this to say: "The kinds of medications that we're talking about here are for chronic health problems and not acute health problems. So, it would be unlikely that someone comes to Florida on vacation, breaks a leg, and has to get oxycodone in these quantities and in these strengths. So it just doesn't add up."[195]

284.    At all times material hereto, Publix has been in the position to recognize those red flags listed above. All or some of those red flags were frequently present in hundreds of thousands of prescriptions its pharmacies received during the relevant time period and should have caused Publix's pharmacies to refuse to fill prescriptions and/or report the behavior. However, Publix failed to do so.

285.    Publix, as a sophisticated chain pharmacy, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Publix to observe patterns or instances of dispensing that were potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.[196]

286.    Rather than use this data to identify problematic utilization and prescribing patterns, Publix sold this data to third party vendors who in turn resold this data to drug makers like Purdue Pharmaceuticals for use in promoting their opioid drugs.  These drug makers then used this data to stoke increased sales of opioid drugs to physicians throughout America to treat the "fifth vital sign" – requiring healthcare providers to ask every patient about their pain, given the perception

---

[195] *Id.* at 62334.
[196] *See, e.g., Holiday CVS*, 77 Fed. Reg. 62,315 (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

at the time was that pain was undertreated. Since that time, the United States has experienced a surge in opioid prescriptions – and, subsequently, an increase in overdoses and deaths tied to these painkillers.[197]

287.    Publix was clearly on notice of how a compliance program should operate. In 2006, the National Association of Chain Drug Stores ("NACDS"), to which Publix belongs, issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.[198] The Model Compliance Manual notes that a Retail Pharmacy may:

- Generate and review reports for its own purposes and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:

    - Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

    - Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.

    - Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of

---

[197] Kristina Fiore, Opioid Crisis: Scrap Pain as 5th Vital Sign? — Groups call on JC and CMS to re-evaluate policies that could lead to opioid overprescribing, MedPage Today (April 31, 2016), https://www.medpagetoday.com/publichealthpolicy/publichealth/57336 (last checked Dec. 25, 2021).
[198] *In Re: National Prescription Opiate Litigation,* Third Amended Complaint (Case No. 17-md-2804) (Dkt. 2613).

the provider who wrote the prescription and should include the location of the dispensing pharmacy.

288.    Yet, there is no evidence Publix ever leveraged its resources and troves of information to stop or even question the wildly inappropriate prescriptions being written by prescribers.

289.    Publix failed to fulfill its duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to a legitimate patient for a legitimate medical purpose by a practitioner acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Publix stores throughout the Southeastern United States.

290.    From at least 2008 to the present (and ongoing), Publix violated the CSA and the United States state pharmacy laws and regulations by dispensing controlled substances in violation of its corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

291.    Publix violated the CSA and state pharmacy laws and regulations each time it filled a controlled substance prescription without identifying and resolving those red flags because:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1).
- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a).

292.    Publix failed to maintain effective controls against diversion and abuse, or to conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing

of opioids. Publix thus directly contributed to today's opioid epidemic and the corresponding harm to Government Programs.

293.    The opioid crisis described herein is a direct and foreseeable result of Publix's actions and inactions. And it was foreseeable that Government Programs would be damaged thereby.

294.    Had they known that Publix dispensed scores of controlled substance prescriptions that were lacking a legitimate medical purpose and/or a medically accepted indication (and therefore did not constitute valid prescriptions under the CSA and the United States state pharmacy law and regulations), Government Programs would have refused to pay for those opioid medications.

295.    Below is just a representative sampling of the rampant fraud that has occurred at Publix-owned pharmacies throughout the Southeastern United States.

## A. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Florida

296.    Florida has been a key supplier of diverted powerful prescription opioid medications that supplied not only users in Florida, but throughout the East Coast.[199] From 2003 to 2010, Florida experienced a proliferation of "pill mills," a category that includes physicians, pain clinics, and other providers that dispense large quantities of prescription drugs, typically for cash only, outside the scope of standard medical practice.[200] By 2010, 90 of the 100 doctors purchasing the most oxycodone nationwide were practicing in Florida.[201] Accompanying increases

---

[199] Aric Chokey, Skyler Swisher, *5.6 billion opioid pills flooded the state, and rogue South Florida doctors helped get them on the streets*, South Florida Sun Sentinel (July 27, 2019), https://www.sun-sentinel.com/news/florida/fl-ne-opioids-flood-florida-data-20190726-3gltamcwojbltehe45aj73fyoy-story.html.
[200] Malbran P., *What's a pill mill?*, CBS News (May 31, 2007) http://www.cbsnews.com/news/whats-a-pill-mill.
[201] *Office of National Drug Control Policy, Fact sheet: prescription drug monitoring programs.* (2011) http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/pdmp_fact_sheet_4-8-11.pdf.

in pill mills and opioid prescribing was a rapid rise in mortality from prescription opioid overdoses in Florida.[202]

297.    Despite having some 833 stores located all over the State of Florida, Publix's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion activities.

298.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 20-Feb-02 | James F. Graves, MD | Pensacola, FL | 63 years |
| 23-Mar-06 | Mario Diaz, MD | Miami, FL | 30 months |
| 4-Apr-06 | Megaly Bethencourt, MD | Miami, FL | 2 years probation |
| 20-Apr-06 | Carlos Manuel Barrera | Miami, FL | 3 years probation |
| 5-May-06 | Jean Dominique, MD | Tampa, FL | 5 years probation |
| 25-Jul-06 | Augustin Castellanos, MD | Palm Beach Gardens, FL | 36 months |
| 30-Aug-07 | John Durfey, MD | Panama City, FL | 240 months |
| 27-Jul-09 | Robert L. Ignasiak, MD | Freeport, FL | 292 months |
| 19-Aug-09 | Craig Bammer, DO | Gulfport, FL | 17 years |
| 11-Sep-09 | Kevin Denny, MD | Tierra Verde, FL | 70 months |
| 2-Oct-09 | John Rew, MD | Tampa, FL | 3 years probation |
| 15-Oct-10 | Jeffrey Friedlander, MD | Tampa, FL | 9 years |
| 21-Oct-10 | Sylvia Hofstetter (Pain Clinic Owner) | Miami, FL | 33 years |
| 24-May-11 | Robert Bourlier, MD | Destin, FL | 30 years |
| 18-Aug-11 | Arthur Carl Haspel, DPM | Boca Raton, FL | 7 years |
| 23-Aug-11 | Beau Boshers, MD | Palm Beach Gardens, FL | 78 months |
| 23-Aug-11 | Michael Aruta, MD | Boca Raton, FL | 72 months |
| 23-Aug-11 | Roni Dreszer, MD | Sunny Isles, FL | 72 months |
| 23-Aug-11 | Patrick Graham, MD | Boca Raton, FL | 4 years |

---

[202] Centers for Disease Control and Prevention, *Drug overdose deaths—Florida, 2003–2009*, 60 Morb. And Mort. Wkly. Rep. 869–872 (2011).

| | | | |
|---|---|---|---|
| 23-Aug-11 | Daniel Hauser, MD | Hollywood, FL | 6 months |
| 23-Aug-11 | Robert Meek, DO | Davie, FL | 66 months |
| 23-Aug-11 | Vernon Atreidis, MD | Ft. Lauderdale, FL | 66 months |
| 23-Aug-11 | Augusto Lizarazo, MD | Jupiter, FL | 36 months home con. |
| 23-Aug-11 | Irwin Beretsky, MD | Boca Raton, FL | died before sentencing |
| 23-Aug-11 | Jacobo Dreszer, MD | Sunny Isles, FL | died before sentencing |
| 2-Sep-11 | Steven Pearlstein, MD | Coral Springs, FL | 12 months |
| 4-Jan-12 | Cesar Deleon, MD | Lake Worth, FL | 7 years |
| 16-Aug-12 | Michael Fronstin, MD | West Palm Beach, FL | |
| 16-Aug-12 | Adeline Essian, MD | Pompano Beach, FL | |
| 16-Aug-12 | Khanh Van Kim Duong, MD | Pompano Beach, FL | |
| 5-Sep-12 | John Anthony Gianoli, MD | St. Petersburg, FL | 5 years |
| 27-Nov-12 | Terrie Jaime, RN | Apopka, FL | 6 years |
| 5-Feb-13 | Ihad "Steve" Barsoum, PharmD | Lutz, FL | 17 years |
| 3-Jul-13 | Vijay Chowdary, MD | Boca Raton, FL | |
| 16-Jul-13 | Scott Becker, MD | Pembroke Pines, FL | 70 months |
| 1-Aug-13 | Cynthia Cadet, MD | Parkland, FL | 66 months |
| 1-Aug-13 | Joseph Castronuovo, MD | Key Largo, FL | 18 months |
| 24-Apr-14 | Stephen Anthony, MD | Davie, FL | 3 years |
| 2-Jun-14 | Thomas James Rodenberg, MD | Pompano Beach, FL | 220 months |
| 13-Jun-14 | Christopher Wayne, DO | Miami Beach, FL | 70 months |
| 9-Jul-14 | Michael Windley, DVM | Cantonment, FL | 20 months |
| 23-Jul-14 | Martha Otano, PharmD | Cape Coral, FL | 3 years |
| 24-Jul-14 | Ronald John, MD | Brandon, FL | 20 years |
| 12-Feb-15 | Jorge Otano, PharmD | Cape Coral, FL | 3 years |
| 13-Mar-15 | Russell Sachs, MD | Green Cove Springs, FL | 2 years |
| 1-May-15 | Richard Vitalis, DO | North Ft. Lauderdale, FL | |
| 27-May-15 | Lynn Averill, MD | Ft. Lauderdale, FL | |
| 8-Jun-15 | Ibem Borges, MD | Orlando, FL | arrested, charged with manslaughter |
| 6-Jul-15 | Brian C. Weller, PharmD | Melbourne, FL | 8 years |
| 23-Jul-15 | Fred Joseph Turner, MD | Sarasota, FL | 151 months |
| 31-Aug-15 | Armando Solis, MD | Miami Beach, FL | 46 months |
| 12-Jan-16 | Jacinta Irene Gillis, MD | Fort Myers, FL | 30 years |
| 21-Mar-16 | Valentine Okonkwo, PharmD | Orlando, FL | 24 years, 4 months |
| 24-May-16 | Kim Xuan Feldman | Tampa, FL | 4 years |

| 25-May-16 | Edward Neil Feldman, MD | Tampa, FL | 25 years |
| 12-Jul-16 | Thomas Merrill, DO | Panama City, FL | Life |
| 12-Jan-17 | Michael Morgan Dietch | Port Orange, FL | 135 months |
| 25-Jan-17 | John Peter Christensen, MD | West Palm Beach, FL | 4 years |
| 5-Apr-17 | Peter Katz, MD | Boynton Beach, FL | |
| 13-Jun-17 | Donald Willems, MD | Weston, FL | 10 years |
| 15-Jun-17 | William Ouw, MD | Pompano Beach, FL | 22 years |
| 30-Aug-17 | Anil Sahijwani | Tampa, FL | 45 months |
| 22-Jun-18 | John M. Gayden, MD | West Melbourne, FL | 19 years |
| 20-Jul-18 | Jeffrey John Abraham, MD | Tampa, FL | 36 months probation |
| 1-Aug-18 | Barry Schultz | West Delray Beach, FL | 157 years |
| 7-Sep-18 | Andres Mencia, MD | Fort Lauderdale, FL | 78 months |
| 24-Jan-19 | Michael T. Harris, MD | Gulf Breeze, FL | Pled Guilty |
| 30-Jan-19 | Jayam Krishna Iyer, MD | Clearwater, FL | 6 months |
| 7-Feb-19 | Victor Hugo Espinosa, MD | Ft. Lauderdale, FL | Pled Guilty |
| 7-May-19 | Marta Elena Farinas, MD | Miami Beach, FL | |
| 6-Jul-19 | Johnny Clyde Benjamin, MD | Vero Beach, FL | Life |
| 26-Sep-19 | Robert Patrick Jensen, MD | Gulf Breeze, FL | Indicted |
| 26-Nov-19 | Jeanne E. Germeil, MD | Aventura, FL | 210 months |
| 17-Dec-19 | Rodolfo Gonzalez-Garcia, MD | Weston, FL | 96 months |
| 8-Oct-20 | Medardo Queg Santos, MD | Lakeland, FL | 72 months |
| 16-Oct-20 | Kendrick Eugene Duldulao, MD | Tampa, FL | 12 months |
| 12-Oct-21 | William Wilson, MD | Pensacola, FL | Arrested |
| 20-Nov-21 | Mark Alan Zager, MD | South Miami, FL | arrested |
| 6-Dec-21 | Gerald Michael Abraham, MD | Naples, FL | 3 years |
| 6-Jan-22 | Qing McGaha, MD | Tampa, FL | Indicted |
| 27-Jul-22 | Tobias Bacaner, MD | Tampa, FL | civil penalties $600,000 |
| 6-Apr-22 | Habib Geagea Palacios | Miami, FL | 16 years |
| 6-Jul-22 | Ahmad T. Ismail, MD | Bonifay, FL | $130,000 fine and surrendered DEA license |
| 28-Jul-22 | Neelam Taneja Uppal, MD | Tampa, FL | restraining order to prevent opioid Rx |

1. *Partner A (Oviedo, Florida)*

299. Partner A worked as a pharmacy manager from June 2011 to January 2021 at the Publix Pharmacy # 1295 located at Shoppes at Aloma Walk, 2871 Clayton Crossing Way Ste 1001, Oviedo, FL 32765. Prior to working at Publix # 1295, Partner A worked at Publix Pharmacy # 1313 located at 2381 W State Rd 434, Longwood, FL 32779.

300. As a pharmacy manager at the Publix Pharmacy in Oviedo, FL, she was one of two pharmacists responsible for processing orders at the store's retail pharmacy counter and drive-through.

301. In her experience, Publix offered no guidance to its pharmacists in the areas of identifying, resolving, or documenting red flags when dispensing opioid prescriptions. Publix also offered no red flag lists or checklists and had no software alerts set up to warn its pharmacists of problematic patients or prescribers. Publix was instead more interested in maintaining and tracking metrics such as internal inventory, rather than offering tools to support pharmacists attempting to prevent diversion.

302. In Partner A's experience, incorrect or incomplete data and data exchange between the Publix systems and PDMP hampered her ability to evaluate prescriptions accurately and efficiently. Often the pickup dates in the system were inaccurate, typically when the pharmacist filled the prescription one day, but it was picked up several days later. The incorrect information made it difficult to track how far out from receiving their most recent opioid prescription a patient was. The glitches meant it was very difficult for Publix pharmacists to perform their corresponding responsibility.

303. This was especially true because in Partner A's experience, drug seekers intentionally circumvented the system by giving the wrong date of birth or changing something minor about the spelling of their name. Minor errors or differences in the data entered were enough

to result in a patient profile that was completely disconnected from a patient's other records. Unlike the Publix computer system, eFORCSE (the Florida Prescription Drug Monitoring Program) was set up so that you could search a birth range, so you would not miss patient profiles in the same way. But even though eFORCSE was made available in 2010/2011, Publix did not immediately provide its pharmacists access to the database.

304. Another major problem with Publix's computer system was that pharmacists did not have the ability to enter "notes" about patients, prescribers, or prescriptions until approximately 2015. This meant that there was no place within the Publix computer system to communicate information from one pharmacist to another. For example, pharmacists could not notate in the electronic record that a patient was selling pills in the parking lot or that a prescriber was refusing to explain his or her suspicious prescribing when contacted by a Publix pharmacist. Publix's choice to not provide its pharmacists this functionality – which was commonplace in the industry – greatly impeded pharmacists' ability to evaluate prescriptions. This was especially problematic because Publix discouraged, and outright prohibited, pharmacists' attempts to informally share important information amongst themselves.

305. Publix never provided any kind of "Bad Doctor" list to its pharmacists to assist with preventing diversion. Instead, Partner A kept her own, informal list of problematic prescribers. The doctors she became uncomfortable filling for mostly wrote the same combination of prescriptions: Soma, Xanax 2 mg, and a short-term opioid pain medication like oxycodone or Percocet 10 mg, 15 mg, or 30 mg. This "holy trinity" combination was dangerous and sought after by those abusing opioids.

306. But once Publix management found out that such a list existed, Partner A was admonished for maintaining a list of problematic prescribers by three separate managers at a

manager meeting. Publix forbid her from telling patients if pharmacists would not fill prescriptions from a particular doctor.

307.   According to Partner A, Publix had no policies or procedures about what a pharmacist was supposed to do when he or she refused to fill a prescription. This meant that Publix was not leveraging information about refusals to fill in order to identify suspicious patients and prescribers.

308.   Instead of telling the patient she would not fill a prescription from a particular doctor, Partner A could only tell the customer she did not have the product in stock. That was the only reason Publix allowed her to give to avoid friction between her and the customer when she refused to fill a prescription that she was uncomfortable filling.

309.   Partner A recalls that on one occasion, when she refused to fill a prescription for opioids, the customer contacted corporate. Pharmacy Supervisor Stanley Rouse admonished her for not filling the prescription, and instructed her to fill it.  But Partner A insisted that she would not fill the prescription, telling him that he could come to the store and put his own license on the line to fill it if that was what he wanted.

310.   Publix did not support its pharmacists' judgment when one refused to fill a prescription. Instead, Publix often undermined their pharmacists and encouraged suspicious customers to return. When patients complained after having their prescriptions refused by Partner A, Publix would often apologize and give them gift cards to use in the store under the guise of "customer service."

311.   Early in her tenure at Publix, when oxycodone and morphine were quickly becoming more widespread, Partner A's store had long stocked 5 mg and 10 mg methadone, a long-acting opioid used for pain in limited cases. Methadone is best known as a replacement maintenance therapy for those addicted to heroin and other opioids. Partner A's pharmacy stocked

methadone because two elderly regular customers had supporting diagnoses from an oncology pain management specialist.

312.   Publix did not advertise that its stores stocked methadone, but Pharmacy Supervisor Stanley Rouse informed an inquiring member of the public that Partner A's store had methadone available. Partner A knew when Rouse told a customer they stocked it that it would lead to trouble. Shortly after he told this customer they had methadone in stock, people began coming in with smaller prescriptions on printed paper from a known pill mill, Professional Pain Center in Longwood, FL.[203] The prescriptions were on blueish-grey paper and looked more like register tape than valid prescriptions.

313.   Customers informed her that her supervisor had told them the pharmacy had opioids in stock. As one customer who was a DEA agent told Partner A, drug seeking individuals use websites and Facebook groups to share information on which pharmacies had drugs in stock. Sure enough, once the supervisor told customers that Partner A's pharmacy had opioids in stock, new, suspicious customers started to show up at her pharmacy seeking to fill opioid prescriptions.

314.   Partner A felt intimidated by the new clientele.  She recalls the customers were not local but were from other parts of Florida.  One day a minivan of people arrived at the pharmacy, and each passenger came in seeking methadone with a similar prescription, all of which she refused to fill.  In addition to the suspicious prescriptions, Partner A felt unsafe working alone in the pharmacy with the drug-seeking customers constantly showing up at the pharmacy. With the influx of suspicious patients, and without any additional staff, Partner A made complaints to corporate. Publix, however, made no changes in response to her complaints and no improvements were made

---

[203] Pavuk, Amy *Pain clinic owners made millions, hired 10 doctors to write illegal scripts, feds say*, Orlando Sentinel (June 24, 2013) https://www.orlandosentinel.com/health/os-professional-pain-care-longwood-20130624-story.html

at the pharmacy. As evidenced by Partner A's complaints to corporate about the drug-seeking customers, Publix management paid little attention to the concerns of its pharmacists.

315.    During the COVID-19 pandemic, Publix did not allow flex work, which led to an exodus of pharmacists. Partner A recalls that 40 of the 100-plus pharmacists who reported to Rouse quit during the pandemic.

316.    At the time, working for Publix had become incredibly stressful, working 17-plus hour days with not enough time to research the legitimacy of prescriptions properly. Adding to their stress, pharmacists were expected to do 60-plus vaccinations a day, and there was only one pharmacist to pre-verify and do final check each prescription. Publix slotted tech hours based on prescription volume, and there were never enough techs available to help. Because her location had a drive-through, Publix allowed ten extra tech hours, but they were still always scrambling and staying after closing time to complete the massive load of work piled on them.

317.    Publix implemented an "efficiency team" to determine prescription and vaccine quotas, as well as the amount of tech hours allotted to its pharmacists, based on prescription volume. These teams, however, were not pharmacists and did not consider the realities of working in Publix's pharmacies. That is, they were not aware of the hardships pharmacists faced and the risks associated with not properly vetting opioid prescription. As a result, some Publix pharmacists were known to fill any and all prescriptions presented to them, in an effort to meet prescription fill quotas, receive additional technician hours, and receive associated bonuses from Publix.

318.    Partner A also saw firsthand how Publix put more emphasis on meeting the metrics rather than on pharmacists' corresponding responsibility. While Publix gave its pharmacists almost no information about suspicious prescribers, it routinely gave its pharmacies detailed information about the metrics they were supposed to meet. The Pharmacy Strategic Dashboards were easily available and accessible to Publix pharmacies. The Dashboard contained a large amount of data

about profitability metrics such as "Script Growth Over Prior Yr.," "Gross Profit % vs Goal," and "Net Profit Percent." The Dashboard also tracked in exacting detail the "Wait Times" for customers who dropped off prescriptions to be filled. The Dashboard sets a goal of a wait time less than 15 minutes and tracks the average time for the store. If the wait time is less than 15 minutes on average, the store receives a green rating; if the time is slightly over 15 minutes on average, the store received a yellow rating; and if the time is significantly over 15 minutes, the store would receive a red rating. The wealth of information about profitability Publix gave its pharmacies stands in stark contrast to the dearth of information it provided to help prevent diversion.

319.    Publix's focus on profitability over patients also can be seen in Partner A's performance evaluations. The evaluations included sections about "Optimizing Associate Productivity" and "Improving Growth." Often the reviews positively remark on increases in sales and prescription counts. But the evaluations make no attempt to reward, or even evaluate, compliance.

320.    Publix pharmacists were also expected to grow sales by visiting prescriber offices. Publix gave its pharmacies lists of prescribers the company expected the pharmacists to visit in order to generate new business. Partner A's understanding is that the target lists of prescribers that pharmacists were expected to visit were based on volume.

### 2.    *Partner B (Lake Mary, Florida)*

321.    Partner B worked as a Pharmacy Manager at Publix from January 2015 to 2019, as an Assistant Pharmacy Manager from November 2014 to December 2014, and as a Floating Pharmacist from August 2014 to November 2014. While in pharmacy school in 2013, Partner B also worked at Publix as part of a rotation, and then as an intern.

322.    Partner B worked as a floater at numerous Publix locations and later managed multiple stores. From 2014 to approximately 2016, Partner B worked at Publix #1127, located at

4195 W Lake Mary Blvd in Lake Mary, FL. He ended his tenure at store #379 at the Casselberry Collection location in Casselberry, Florida. Partner B also worked at Publix stores #436, #897, and #1747.

323.    As a new pharmacist at Publix, Partner B was highly motivated to pick up shifts and succeed professionally. During his time there, Partner B worked at many high-volume and problematic Publix stores, and the company began moving him to manage stores that were in disarray. Within only a year of completing his pharmacist education, Partner B rose to the rank of Pharmacy Manager. At 24 years old, Partner B was Publix's youngest Pharmacy Manager. Before he was appointed to his first management position at a problem store that dispensed high volumes of opioids, Partner B had served as an Assistant Manager and a Floating Pharmacist at this store.

324.    As a floater, Partner B worked at 40 Publix locations in Florida cities that included Ocala, Gainesville, Merritt Island, Bithlo, Celebration, and Sand Lake. It was not unusual for him to see the same customers at multiple stores. For example, Partner B regularly saw the same customer at multiple stores filling similar tramadol prescriptions within a short time period. When he looked at the customer's profile, this person had already been to Walgreens, Walmart, and other Publix pharmacies to fill other prescriptions that same month.

325.    In Partner B's experience, a pharmacist who checked the profile and eFORCSE would have noticed that the patient was filling an abnormally high number of similar prescriptions. However, Partner B realized other pharmacists were not checking eFORCSE. Despite the fact that Publix required PDMP checks to be documented in 2018 or 2019, Publix never trained its pharmacists in this area, or audited for compliance. As a result, some pharmacists would simply note the PDMP was checked, even if it was not. Partner B regularly put warning notes into similar patients' profiles, but inappropriate prescriptions would still regularly get filled.

326.    Publix lacked any semblance of official guidance or policies and procedures to help its pharmacists fulfill their corresponding responsibilities when processing controlled substance prescriptions.  Not only were these policies lacking, but Publix actively fought to prevent its pharmacists from setting up their own common-sense guardrails.

327.    For instance, in 2017 or 2018, Pharmacy Supervisor Rouse discovered a copy of a list of "Do-Not-Fill" prescribers that Publix pharmacists had informally shared by fax to assist them in fulfilling their corresponding responsibility. Rouse directed the store with the list to dispose of it and told the Pharmacy Managers they should only "fill based on clinical judgment." In practice, pharmacists understood that as a directive to fill all prescriptions.

328.    Publix's complete lack of policies and procedures around dispensing controlled substances resulted in Partner B having grave concerns for patients' – and pharmacists' – safety. In Partner B's experience, Publix locations like Store #379 were "out of control" in the volume of controlled substances dispensed, along with a highly problematic patient base.  As a result, Partner B and other pharmacists developed their own list of guidelines and safeguards to follow when dispensing controlled substances.  Their proposals included rules such as only filling controlled substance prescriptions for patients who reside a reasonable distance from the pharmacy, stricter refill guidelines, a prohibition on filling holy trinities and other problematic combinations, accepting cash only in limited situations, and capping high volume dosage units for oxycodone prescriptions.  Despite their reasonable proposals, however, Publix never adopted, endorsed, or enforced any such rules or guidelines.

329.    This lack of policies and procedures meant that no prescribers were off-limits in Publix's dispensing system — even while years' long criminal investigations were underway. Publix made no efforts to stop pharmacies from filling for a given provider. In fact, Partner B was aware of several pill mill doctors who sent patients to his Publix pharmacy locations, including:

- **Dr. Michael Moyer:** Partner B understood Dr. Moyer's prescriptions were questionable. The Florida Board of Medicine had taken several actions against his license after he dispensed high-quantity, high-dose, Oxycontin, Xanax, and Soma to numerous patients without a clear medical need. Florida's Board of Medicine accepted Moyer's voluntary license relinquishment and he promised to never work as a doctor in Florida again in April 2016.

- **Dr. Vincent Mamone:** A physician at Primary Care Physicians of Sanford in Sanford, FL, Mamone prescribed medication for a 37-year-old woman to treat neck pain, cervical radiculopathy, back pain, hypothyroidism, insomnia, and anxiety between August 2017 and January 4, 2018. Mamone prescribed the woman excessive quantities of Duragesic fentanyl patches, Oxycodone, Alprazolam, and Dilaudid, and failed to assess whether she was improving or keep records detailing her care. The Florida Board of Medicine ultimately took action against his license.

330. In Partner B's experience, doctors like Moyer and Mamone wrote prescriptions for huge quantities of high-strength opioids, often in combination with an anxiety medication and muscle relaxer. These "trifecta" or "trinity" drug combinations were sought after by addicts and could easily be lethal for the uninitiated. While it was the pharmacist on duty's choice whether to fill each prescription, Partner B typically opted not to, telling the customer that their medication was not in stock.

331. Besides these specific prescribers, Partner B also regularly encountered identical prescriptions from suspicious doctors for patients who were not suffering from the same ailment. For instance, he recalls seeing five-times-a-day dosing of 30mg oxycodone tablets, extended-release Adderall, and anxiety medication.

332.     Partner B's experience at certain Publix pharmacy locations resulted in his disillusionment with Publix's approach to processing controlled substance prescriptions. Publix's Lake Mary location (#1127), for instance, was at the crossroads of Sanford, Florida and Lake Mary, Florida, an area where high and low-income neighborhoods collided. At the time he became manager, the store had been filling high amounts of controlled substances and saw lots of problems with inappropriate therapies, out-of-area doctors, staff turnover, and customer service issues.

333.     Partner B also recalls the store had been dispensing staggering amounts of Schedule II controlled substances for known bad doctors in the area. The Lake Mary Publix was so busy and disorganized that Partner B suspected the previous pharmacist may have lacked time to vet opioid prescriptions responsibly.

334.     A couple of months after Partner B was appointed Pharmacy Manager at Lake Mary, his pharmacy supervisor called to say that Fred Ottolino, the Publix Vice President of Pharmacy, wanted to know why #1127 had the largest quarterly drop in controlled substance prescriptions of any Publix pharmacy.

335.     Ottolino was a senior executive who reported directly to Executive VP and CFO David Phillips, and it was not typical for Partner B to receive a call relaying a question from him. Partner B's supervisor never told him a percentage, but understood it had to be a lot to warrant a phone call. It was clear that the concern was lost profit on high-margin drugs. Customers were paying cash (a known red flag), which management believed was good for business.

336.     Partner B's experience at Store #379 further contributed to his disillusionment. After picking up several shifts at the "out of control" Store #379, the idea of being formally staffed at that location frightened Partner B. In 2019, he wrote a letter to Publix to protest such a decision, noting the patients there have had controlled substance prescriptions consistently filled for 13 years with "no questions asked," and his stricter policy of filling such prescriptions would endanger his

physical safety, affect his compensation, and result in negative employee evaluations.  In a gesture of lip service to his concerns, Publix's Human Resources department conducted an "evaluation" of the store, but concluded there were no meaningful problems, and Partner B was moved to that location over his objections.

337.    Partner B recalls that the Market at Southside Publix in downtown Orlando was in the top 2% busiest of all Publix locations, and the clientele was similar to what he saw at Lake Mary. There were lots of red-flagged prescriptions and doctors writing prescriptions from out of the area, along with numerous patients from out of the area.  Even then, doing the necessary due diligence came down to how much time one had to vet prescriptions.

338.    When Partner B stopped filling many of the red flagged controlled substance prescriptions, customers regularly became abusive, insisting the former pharmacists had regularly filled their prescriptions.

339.    In Orlando, the pharmacists knew that there was a significant illicit drug problem, with large swaths of patients either diverting or abusing. Partner B recalls, for instance, that other pharmacists in Orlando were aware that the Holiday CVS had recently lost its DEA license.

340.    Partner B saw first-hand that dispensing controlled substance prescriptions was a high-margin profit engine for Publix.  Specifically, pain medications, muscle relaxers, and other Schedule II narcotics gave Publix much higher reimbursement and gross profit margins than other traditional prescriptions.  Partner B's own analysis of Publix sales data revealed that Publix saw between 50% and 90% gross profits on a litany of controlled substance prescriptions, with profit margins for all drugs in general averaging only about 25%. To Partner B, the lucrative nature of controlled substance prescriptions aligned with Publix's consistent efforts to pressure pharmacists to fill as many high-margin prescriptions as possible.

341.   With profits on prescriptions the central focus of Publix's concerns, the company required pharmacists to visit high volume prescriber offices in an effort to elicit even more business and fill even more prescriptions. Pharmacists felt the directive was bizarre and made them deeply uncomfortable.

342.   In keeping with its emphasis on profits, whenever pharmacists re-ordered controlled substance shipments from Publix's internal distribution arm, virtually all orders – regardless of their size, pattern, or frequency – were routinely filled as requested. This ensured fully-stocked pharmacy locations that could readily fill all volumes of problematic prescriptions that came through the doors, with no apparent monitoring for reasonableness.

343.   In Partner B's experience, the pharmacy at each Publix had a separate profit and loss calculus from the grocery side of the store, and when item counts would drop in the pharmacy, his tech hours would drop dramatically.

344.   The profitability of filling prescriptions meant that a pharmacist's decision to refuse to fill a prescription was often not met with support by Publix. For instance, Publix policy required that pharmacists take personal responsibility when they refused to fill a prescription. This meant that when a patient contacted corporate following a denial, the company did not have to stand behind or support its pharmacists. Partner B experienced this conflict of interest first-hand, as he regularly turned away 180-count hydrocodone prescriptions with early refills at Lake Mary, and profit metrics dropped precipitously.

345.   When a prescription was actually refused, management instructed pharmacists to say they "don't feel comfortable" filling a prescription. But when pharmacists actually said that, there was, again, little if any support from corporate. Instead, when the patient called to complain, corporate would intervene and often not support the pharmacist's decision. Corporate office staff would reach out to the store following a customer complaint and ask why they had not filled the

prescription. Then, Publix corporate would pressure the pharmacist to fill the prescription over their objections.

346.    The directive to fill prescriptions to avoid customer complaints was a constant pressure Partner B and other pharmacists felt from Publix.  As refusing to fill a suspicious prescription would often result in a customer complaint and a negative response from corporate, pharmacists commonly filled problematic prescriptions over their own objections and concerns, simply to avoid marks on their record and negative scrutiny from supervisors.

347.    A pharmacist's decision to block a prescription, however, would not always prevent that prescription from being filled.   Customers whose prescriptions were declined would commonly go to another Publix location where it would be filled.  Even though the Publix data allowed them to track pharmacy shoppers, in Partner B's experience, Publix was not actively leveraging this data to inform other pharmacists what was happening, or how customers were circumventing other pharmacist's decisions.

348.    A typical pharmacy-hopping patient's profile was littered with red flags. For example, pharmacists would see notes that other pharmacies had declined the patient's refills, that they routinely filled too early, and did not use pharmacies near their home or doctor's office.  At Partner B's stores, pharmacists sometimes added "***DO NOT FILL***" to the address field, making it so that anyone who pulled up the profile would see the message.

349.    But pharmacists at other stores would often delete the notes, even though the profiles contained a lot of information that could help a pharmacist make an informed decision and exercise their corresponding responsibility.

350.    Moreover, few Publix pharmacists took the time to review the information carefully because they were under tremendous pressure to complete so many tasks each shift with so little support.  Publix pharmacists simply did not have the tools or staffing to properly perform their

corresponding responsibility. The thin staffing at Publix stores resulted in a high-volume situation without time to conduct due diligence, leading to "clicking fatigue," meaning they would simply not have time to review prescription notes and action notes. In short, Publix fostered an environment where pharmacists were unable to adequately spend time checking the validity of prescriptions.

351.   Publix also directly tied prescription volume to the level of tech support a pharmacist could receive. That is, tech hour allocations depended on item count. Thus, Publix incentivized pharmacists to fill everything they could in order to receive more tech hour support. If patients are kept happy with consistently-filled prescriptions, they typically return to Publix stores, in turn give those stores higher item counts, and thus more tech hours.

352.   This situation created a sharp conflict of interest among pharmacists: on the one hand, pharmacists had a duty to refuse to fill prescriptions with unresolved red flags, but on the other hand, doing so would reduce the ultimate prescription count, and result in fewer tech hours allotted. Fewer tech hours would then make appropriate prescription filling practically impossible.

### 3.   *Pharmacist No. 1 (Venice and North Port, Florida)*

353.   Pharmacist No. 1 was employed as a pharmacist with Publix from 2003 to 2016. During most of his tenure with Publix, he worked at Publix store #802 located at 535 S. Tamiami Trail, Venice, Florida 34285 first as a Staff Pharmacist and then spent approximately ten years working as a Pharmacy Manager.

354.   Pharmacist No. 1 was fired from Publix after he got into a dispute with his District Manager stemming from Pharmacist No. 1's refusal to fill a narcotic prescription.

355.   Pharmacist No. 1 said that management at Publix did not provide any guidance, policies, or procedures in regard to the dispensing of opioids. Nor did he recall any training at Publix to identify suspicious prescribers, or fraudulent prescriptions. Pharmacist No. 1 said that

there was initial, one- or two-day training on filling prescriptions in general, but he recalled no training at all on controlled substances. Pharmacist No. 1 said that once you started working Publix management kind of "set you free."

356.    Pharmacist No. 1 witnessed a culture at Publix where, if a pharmacist would not fill an opioid prescription, the customer would complain to the District Manager, and the pharmacist would be "bullied" by the District Manger to fill the prescription.

357.    Pharmacist No. 1 struggled with this and continued to refuse to fill prescriptions he felt were suspicious or fraudulent. Pharmacist No. 1 witnessed other pharmacists who did not have a "backbone," who would just acquiesce to their District Manager and fill suspicious prescriptions. This was also the case for the floater pharmacists, or pharmacists who were not entrenched at a store in a community, who went ahead and filled prescriptions at the request of the District Manager.

358.    Pharmacist No. 1 recalled that his District Manager, Chad Madill, would often challenge his pharmacists, ordering them to fill a prescription they had denied. Pharmacist No. 1 attributed this to this District Manager wanting the store's numbers to look good so it would impact his end of year bonus, and increase his chances for promotion.

359.    Pharmacist No. 1 said that he routinely got into arguments over the phone with District Manager Madill over prescriptions he would not want to fill. In 2016, Pharmacist No. 1 refused to fill a prescription for two narcotics – Ambien and Xanax – given together, which Pharmacist No. 1 knew could cause respiratory depression.

360.    The customer complained to the store manager and was referred to District Manager Chad Madill. Pharmacist No. 1 got a call from Madill who, after listening to Pharmacist No. 1 give his justification for his refusal, told Pharmacist No. 1 "you are going to fill this prescription." Pharmacist No. 1 said that he told Madill that "you have a license, you come down

here and fill it." Pharmacist No. 1 was then let go from Publix because of this and was told by Madill the reason for his dismissal was because of the way he handled this situation.

361.  Pharmacist No. 1 said that during his first six years or so at Publix, pharmacists were limited only by their own discretion with regard to filling opioid prescriptions. In approximately 2012, eFORCSE (the Florida Prescription Drug Monitoring Program) was put in place by the state and this assisted pharmacists when it came to filling opioid prescriptions.

362.  Pharmacist No. 1 did see some change during this time in terms of tighter management at Publix when it came to the dispensing of opioids, but could recall no change in policies, or action on the part of management.

363.  Pharmacist No. 1 did not recall Publix requiring its pharmacies to keep a "Do-Not-Fill" list for suspicious prescribers. Pharmacist No. 1 said, for example, he never heard of the term "red flag" until after he left Publix and opened up his own pharmacy.

364.  Pharmacist No. 1's only interaction with law enforcement at Publix was when the police arrested someone who was in the store. Pharmacist No. 1 was not instructed by Publix management at the time to report suspicious prescription activity to law enforcement.

365.  Pharmacist No. 1 said that once or twice a year, inspectors from the state would visit the pharmacy, but this was mostly to conduct narcotics storage type audits. Publix would also conduct audits once a year on medications, but this had to do with the inventory count, not prescription activity. The only goal of these audits was to prevent pharmacists, or other employees in the pharmacy, from stealing medications.

366.  Pharmacist No. 1 recalled that at one point CVS paid a lawsuit settlement to the DEA that pertained to prescription activity related to Pill Mill operations. When CVS tightened up its policies in response, Publix saw a noticeable increase in prescription requests from suspicious physicians and customers who had been former CVS customers.

367.    Pharmacist No. 1's compensation at Publix consisted of a base salary and a bonus. Pharmacist No. 1's bonus was tied to the store's performance, and not just the pharmacy, in addition to the overall company's performance.

368.    Pharmacist No. 1's District Manager's end of year bonus was connected to the overall prescription volume for each store. This volume included all prescriptions, part of which was controlled substances.

369.    Pharmacist No. 1 was asked why he felt a District Manager would want to reverse a decision not to fill a prescription by a pharmacist and he stated "money." The district managers that oversaw the pharmacies were focused on prescription volume. Pharmacist No. 1 said the district managers were of the view that the "better the stores do, the bigger the bonus."

### 4.    *Pharmacist No. 2 (Saint Petersburg, Florida)*

370.    Pharmacist No. 2 worked as a Pharmacy Manager at Publix from 2009 to 2016. He was based at store number 1199, the Publix Super Market at Shoppes at the Royale, located at 1600 66th Street North in Saint Petersburg, FL.

371.    As a Pharmacy Manager at a Publix Pharmacy in Saint Petersburg, Florida, Pharmacist No. 2 managed the pharmacy staff and inventory.

372.    Pharmacist No. 2 often lacked the adequate time or staff to vet opioid prescriptions as carefully as he would like to.

373.    However, Publix expected him to provide excellent customer service by attending to customers quickly. Pharmacist No. 2 said that Publix was trying to grow prescription volume at his store each year, and he was accountable for that goal.

374.    Publix believed that providing excellent customer service could gradually win business from other nearby pharmacies.

375.    Pharmacist No. 2 said that there were multiple pill mill doctors in his area during his tenure. "They would always prescribe the same cocktails," Pharmacist No. 2 said, noting that the pill combinations were a red flag based on his pharmacy school training.

376.    One popular combination was the "Holy Trinity," composed of a benzodiazepine, an opioid, and a muscle relaxant. "At that time frame, especially the early part, it was raging," Pharmacist No. 2 said. "You learn to tell who the person was bringing the script in."

377.    Pharmacist No. 2 said that prescribers did not have profiles in the dispensing system, so there was no way to note suspicious activity. Nor did Publix have a "bad doctor" list, nor any formal process for tracking suspicious prescriptions.

378.    The same went for patients, Pharmacist No. 2 said. He would not put much in a patient's notes, he said, especially not anything that someone could construe as derogatory. Sometimes unexpected information is printed out, and patients might see a comment added to their profiles. "I would avoid that as much as possible," Pharmacist No. 2 said of noting in a patient's profile that they routinely brought in prescriptions from a sketchy provider or did not appear to have a medical need for the prescribed narcotics.

379.    Pharmacist No. 2 said he was "not in love with Publix" when it came to the demanding and sometimes unrealistic "metrics and things of that nature."

380.    A pharmacist who was not well-trained or intentioned could have gotten away with filling problematic opioid prescriptions because there just was not much oversight. Publix corporate took a hands-off approach to its pharmacies.

381.    Among the pill mill doctors practicing nearby during Pharmacist No. 2's tenure at Publix:

- In 2017, Yolanda Camara and Justin Oliveria of Brandon, FL were charged with conspiracy and distributing controlled substances outside the usual course of professional medical

practice and without a legitimate medical purpose. The pair operated from the Family Medical Express Center, Inc.[204]

- In 2016, Pinellas County doctor Dr. Edward Neil Feldman was sentenced to 25 years in federal prison for conspiracy to prescribe controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, and for prescribing controlled substances that resulted in the deaths of three patients. Feldman was the proprietor of the Feldman Orthopedic and Wellness Center.[205]

- In 2015, Dr. Jacinta Irene Gillis lost her license to practice after prescribing unnecessary opioids to numerous patients without conducting proper medical exams. She was also convicted on charges related to two pill mills she ran, one in Pinellas Park.[206]

### 5. *Pharmacist No. 3 (Lake Wales and Haines City, Florida)*

382.    Pharmacist No. 3 worked as a pharmacy manager at a Publix Pharmacy in Lake Wales, FL from November 2012 to October 2020. Pharmacist No. 3 worked as an assistant pharmacy manager for a Publix Pharmacy in Haines City, FL from September 2011 to November 2012. In addition, from March 2011 to July 2011 she served as a pharmacy intern at the Haines City store.

383.    Pharmacist No. 3 said that Publix's dispensing system did not have a bad doctor list or any means of alerting colleagues at other locations about problem prescribers.

---

[204] Press release, Florida Medical Clinic Manager And Son Arrested For "Pill Mill" Conspiracy To Distribute Oxycodone And Other Controlled Substances, U.S. Attorney, M.D. Fla. (Mar. 8, 2017), https://www.justice.gov/usao-mdfl/pr/florida-medical-clinic-manager-and-son-arrested-pill-mill-conspiracy-distribute
[205] Press Release, *Pill Mill Doctor And Wife Sentenced To Federal Prison*, U.S. Attorney, M.D. Fla. (May 25, 2016), https://www.justice.gov/usao-mdfl/pr/pill-mill-doctor-and-wife-sentenced-federal-prison
[206] *State of Florida vs. Jacinta Irene Gillis, M.D.*, Case Nos. 11-5691PL, Florida Div. of Ad. Hearings, Dept Of Health, Bd of Med. (Fe. 3, 2012), http://flrules.elaws.us/courtorders/index/11-005692pl

384.    "I am aware that other chains have a blackball list that is sent down from corporate of physicians they don't feel comfortable filling for," Pharmacist No. 3 said. "[Publix had] no way to list, no flagging system,"

385.    The only way to alert other Publix pharmacists when you encountered high-dose prescriptions or dangerous combinations written by a particular doctor was to "communicate directly between pharmacists," Pharmacist No. 3 said, noting that sometimes the district supervisor heard things and passed them along. Pharmacist No. 3 said that the district manager always provided those notifications in person, not via email.

386.    At Publix, there was no consideration for the extra time required to fill opioid prescriptions with proper due diligence. A Publix Pharmacy's Key Performance Indicators were negatively impacted if opioids made up a large portion of a store's total prescription volume.

387.    Pharmacist No. 3 said that about seven years ago a supervisor chastised her for turning away a Publix Pharmacy customer seeking opioids.  "That particular supervisor wasn't very qualified for his job," Pharmacist No. 3 said, explaining that this supervisor, whose name she did not recall, had pressured her to go against her professional judgment.

388.    The directive to fill a prescription for opioids she had already refused was given to her after the customer complained to corporate, Pharmacist No. 3 said. The supervisor said, "I want you to fill it anyway," Pharmacist No. 3 recalled. Luckily, the customer never returned, so the issue was moot. Instead, Pharmacist No. 3 believed the patient got the opioid prescription filled at another Publix.

6.    *Pharmacist No. 4 (Sarasota and Nokomis, Florida)*

389.    Pharmacist No. 4 worked for Publix from September 2013 to October 2019 as a Pharmacy Intern, Floating Pharmacist, Assistant Pharmacy Manager, and Pharmacy Manager.

390.    The Publix pharmacy location in Sarasota, Florida where she worked was severely understaffed, often leaving her to work alone and creating an environment that was dangerous and ripe for mistakes.   "I had phone [calls] I couldn't get to – 1 had to tell people, 'You have eight callers ahead of you,'" she said. "It was scary."   Some days, a cashier from the grocery section of the Publix store would come back to the pharmacy for two hours to assist Pharmacist No. 4. But other times, she was by herself.  The number of prescriptions the pharmacy dispensed "was enough to be overwhelmed," she said.

391.    The understaffing issues led to situations where pharmacists would make mistakes. Recalling one instance, Pharmacist No. 4 noted, "I had to go fast. I overlooked something, and the wrong [medication] was given."

392.    When Pharmacist No. 4 asked for additional staffing, Publix's response was, "'You're not doing enough prescriptions or enough shots to warrant [extra] help,'" she said, explaining that staffing levels were set based on "the amount of prescriptions you sold and shots you did.  It was really rough conditions," she said.

393.    "It was understaffed, overworked, and I was written up for not doing enough flu shots even though I worked by myself most of the time. It was not good. . . . Every time, they kept telling me 1 needed to do more, and they kept cutting help, cutting hours," she said. "My help wasn't really motivated to learn because they were paid very little and [Publix] wouldn't give them full-time, so they wouldn't give them any benefits."

394.    "I had to quit because I almost considered going on anti-depressants because every day, I would go to work crying," she said.

395.    Publix sent pharmacy staff monthly reports ranking the area's stores by sales volume.  The company also measured returns, calls to patients, the number of prescriptions sold,

and shots administered, she said.  The strict metrics were tied to bonuses.  "I didn't care about the bonus," she said. "I just wanted more help."

396.    Publix also wanted pharmacy staff to fill prescriptions in less than 15 minutes, which was unrealistic during times when Pharmacist No. 4 was working alone.  She said the time limit might be achievable "if you have enough help and you have people answering phones and somebody else types [up the prescription], somebody else fills them, somebody else checks them … But in my case, I did it from start to finish. I typed it, I filled it. And that's another thing that would lead to errors – the confirmation bias where I'm checking my own work."

397.    Pharmacist No. 4 recounted one instance in which Publix fired a colleague of hers because he "wouldn't fill someone's opioid prescriptions."

398.    Publix did not maintain a "Do-Not-Fill" list or list of suspicious prescribers, Pharmacist No. 4 said.

399.    She also said there was no policy requiring pharmacists to report suspicious prescribers or prescriptions to the DEA or other authorities.  Asked if Publix required pharmacy staff to document instances when they refused to fill prescriptions, Pharmacist No. 4 said: "We didn't refuse very many."

### 7.    *Pharmacist No. 5 (Gainesville, Florida)*

400.    Pharmacist No. 5 worked as a Pharmacy Assistant Manager at a Publix Pharmacy in Gainesville, FL from March 2014 to March 2015, and at Publix Pharmacy No. 735, located at Springhill Commons at 9200 NW 39th Ave, Gainesville, FL 32606.

401.    Pharmacist No. 5 said that Publix's corporate leadership displayed little care for opioid dispensing practices compared to other pharmacies where she has worked. She has worked at CVS, Walgreens, and Kroger, and each provided opioid training and corporate dispensing philosophy beyond what she saw at Publix.

402.    "Everything seemed to be at the pharmacist's discretion," Pharmacist No. 5 said. "It didn't seem like the higher-ups had much knowledge or cared."

403.    Pharmacist No. 5 said that all Publix cared about was running a profitable pharmacy and providing customer service.

404.    Pharmacist No. 5 said that, as a recent pharmacy school graduate who had witnessed the pill mill problems Florida endured through 2010 or 2011 when tightening state legal guidelines shuttered many rogue pain clinics, she was well aware of opioids when she arrived at Publix.

405.    Pharmacist No. 5 did not receive training at Publix on red flags or continuing education on new laws around opioid dispensing. She recalled some limited training on state and federal laws she was already familiar with, but said the resources were far less than what she had received elsewhere.

406.    Pharmacist No. 5 said it would have been very helpful if Publix could have provided additional resources to help pharmacists vet prescriptions.

407.    Although Pharmacist No. 5 does not recall them, law enforcement shut down multiple Central Florida clinics that were illegally prescribing opioids while Pharmacist No. 5 worked as a Gainesville, Florida pharmacist:

- In April 2016, Orlando doctor Laurence Skolnik was arrested by the Metropolitan Bureau of Investigation after his pain clinic, A Stop Pain Management and Weight Loss Clinic, was raided. Skolnik was charged with crimes including trafficking and conspiracy to traffic in hydrocodone and oxycodone. A Stop Pain Clinic had lost its license to dispense during

a previous bust and could only prescribe opioid medications that patients filled elsewhere.[207]

- In Tampa, Dr. Kendrick Eugene Duldulao and Dr. Medardo Queg Santos were indicted on October 3, 2017, for conspiracy to distribute and dispense controlled substances for no legitimate medical purpose and outside professional practice. "According to testimony and evidence presented at trial, Duldulao and Santos were the medical directors at Health and Pain Center, a pain management clinic in Tampa, from June 2011 through March 2014, and April 2014 through October 2016, respectively. They prescribed excessive amounts of controlled substances, including oxycodone, hydrocodone, hydromorphone, morphine, methadone, and alprazolam. During their tenures as medical directors, Duldulao and Santos had brief and timed medical visits with patients, performed cursory physical examinations, and required minimal medical history or documentation for purposes of treatment."[208]

### 8. *Pharmacist No. 6 (Jacksonville, Florida)*

408.    Pharmacist No. 6 worked as a pharmacist at a Publix Pharmacy in Jacksonville, FL from May 2015 to November 2015.  As a pharmacist at Publix in Jacksonville, FL, Pharmacist No. 6 dispensed prescription medications to pharmacy customers, typically without any tech support at all.

409.    Pharmacist No. 6 said he did not have enough time to vet each opioid prescription thoroughly. "We were never staffed well enough to look at opioids," Pharmacist No. 6 said. "Just in general, we were never staffed well enough."

---

[207] *MBI raids Orlando-area pain clinic*, Fox 51 Gainesville (Apr. 20, 2016), https://www.wogx.com/news/mbi-raids-orlando-area-pain-clinic

[208] *Federal Jury Finds Two Tampa Doctors Guilty Of Conspiracy To Illegally Distribute Opoids*, U.S. Atty., M.D. Fla (May 29, 2019), https://www.justice.gov/usao-mdfl/pr/federal-jury-finds-two-tampa-doctors-guilty-conspiracy-illegally-distribute-opoids

410.     Pharmacist No. 6 said his store was low volume in terms of overall prescription count, meaning they qualified for limited pharmacy technician hours each week. That left the dispensing pharmacist to manage all pharmacy work.

411.     "My store was not so busy, so I did not really have a lot of tech help," Pharmacist No. 6 said. "I was always time-crunched."

412.     Pharmacist No. 6's store was not especially busy or high-volume, but opioids accounted for such a large portion of their business that vetting each one as he would have preferred was untenable.

413.     Pharmacist No. 6 did not recall his store's opioid customers fitting into a typical red flag profile. They were not typically traveling long distances, overpaying with cash, or arriving in large groups. However, Pharmacist No. 6 said that he witnessed pattern prescribing on an ongoing basis. Each day, patient after patient came in with similar prescriptions from the pain clinic right around the corner.

414.     Every day, multiple customers presented similar opioid prescriptions written by the "doc right around the corner," Pharmacist No. 6 said. "That whole clientele was used to my predecessor."

415.     Pharmacist No. 6 said that the pain clinic patients seemed familiar with the pharmacist who previously served in his role at the Jacksonville, FL Publix. Patients were confident that the Publix Pharmacy would fill their prescriptions, and most were. Some days, Pharmacist No. 6 said, he felt like he was filling back-to-back opioid prescriptions all day.

416.     Opioids accounted for 25% to 35% of total prescription volume at his store, Pharmacist No. 6 estimated. Despite signs of diversion and abuse, Publix never stopped filling the pain clinic doctor's prescriptions. Pharmacist No. 6 said there was not a system in place at Publix to alert other stores to a problem prescriber, nor did Publix provide a "Bad Doctor" list.

417.    Pharmacist No. 6 said that Publix could have done much more to give pharmacists the time and support to vet each opioid prescription properly.

### 9.    *Pharmacist No. 7 (New Smyrna Beach and Deltona, Florida)*

418.    Pharmacist No. 7 worked as a pharmacy manager at four Publix pharmacies between November 2015 and March 2021. Pharmacist No. 7 worked at Publix's in Deltona, FL, Wilmington, NC, New Smyrna Beach, FL, and Fayetteville, NC.

419.    Publix had no opioid dispensing policy, and Pharmacist No. 7 did not feel like the company provided much prescription vetting support to its pharmacists. "There's not a whole lot of support related to that at Publix," Pharmacist No. 7 said.

420.    Pharmacist No. 7 said that staff levels also were not adequate to allow for extensive vetting. "When I was in Wilmington, I didn't really have any tech hours or support [vetting prescriptions]," Pharmacist No. 7 said.

421.    Many doctors wrote large numbers of opioid prescriptions in Florida when Pharmacist No. 7 started work at Publix in 2015. He remained in Deltona, FL through 2016, continuing to see hundreds of opioid prescriptions.

422.    Pharmacist No. 7 said that all pharmacists had was "your own personal judgment and the PDMP sites," referring to the prescription monitoring program website. "We didn't have a different system" to track bad doctors or pill mills.

423.    Unlike many of its larger peers, Publix did not have a system where corporate could block a pill mill doctor, making it impossible for pharmacists to dispense their prescriptions.

424.    "Publix is a smaller company and it is based out of Florida, and Florida is well known in the pharmacy community for filling a whole lot of controlled substance prescriptions," Pharmacist No. 7 said. "That's how Publix gets a lot of money, so I'm guessing they probably didn't want to do too much against it even with what's going on in this in the world right now."

425.   Pharmacist No. 7 said he saw some improvement in Florida between when he left in 2016 and returned a couple of years later.

426.   "When I first went down there, it was a nightmare in 2015 and 2016," Pharmacist No. 7 said. "A nightmare — all you do is fill controlled[] [substance prescriptions] and Sudafed and needles, just all day."

427.   When he returned from North Carolina, Florida had improved significantly. Pharmacist No. 7 said that laws like the STOP Act and the Florida PDMP had helped. A new generation of pharmacists also contributed, entering the field with a different outlook on opioids than the older pharmacists, who had grown accustomed to filling opioid prescription after opioid prescription.

### 10.   *Pharmacist No. 8 (Panama City, Florida)*

428.   Pharmacist No. 8 worked as a Pharmacy Manager at Publix from December 2016 to February 28, 2019, based in Panama City, FL.

429.   Pharmacist No. 8 also worked as a Pharmacy Manager at Publix from December 2016 to February 28, 2019. He was based in Panama City, FL.

430.   Pharmacist No. 8 said he did not have the resources or time to vet opioid prescriptions while he worked at Publix. "They were pushed through so fast," Pharmacist No. 8 said. "We often couldn't log on to the PMP."

431.   Pharmacist No. 8 said that the pharmacists could not access the prescription monitoring program due to technical problems Publix had been experiencing for an extended period of time. When he could not access the PDMP to check out a patient, Pharmacist No. 8 said, "a lot of the time, I don't fill unless they're our customers."

432.   Pharmacist No. 8 said there was "too much pill mill shopping" in his region of Florida, noting that there was "quite a bit" of pill mill activity in the area.

433.    There were times when Pharmacist No. 8 was aware of pill mill doctors sending patients to the Publix Pharmacy where he worked. Unfortunately, Publix management did not require its pharmacies to keep a "Do-Not-Fill" list to track suspicious doctors or even those under investigation or prosecuted for operating pill mills.

434.    Pharmacist No. 8 recalled a pill mill doctor whose prescriptions his location had filled for some time. "One was an 81-year-old doctor who would pump meds out left and right," Pharmacist No. 8 said. Eventually, Publix and Walmart across the street stopped filling for that prescriber following a directive from corporate. "We were told don't take scripts from this physician, so we didn't," Pharmacist No. 8 said.

435.    They had filled the prescriptions from the suspicious physician, whose name Pharmacist No. 8 did not recall, for six to eight months in 2018 before the directive. The doctor was under investigation by the government. "We were told it was common knowledge that he was being investigated by the state of Florida as well as the DEA," Pharmacist No. 8 said.

436.    "Mostly his scripts were all CIIs — pain meds, and a lot of them, very large quantities; he was maxing out the morphine equivalents every day."

437.    Pharmacist No. 8 recalled lines of customers waiting to pick up opioid prescriptions. The lines typically coincided with the 1st and 15th of the month, when most customers saw their opioid prescriptions renew. "Just waiting to get a refill," Pharmacist No. 8 said. "Typically, doctors write for 30 days."

438.    Pharmacists were discouraged from turning customers away "We would get in trouble if we wouldn't fill it for personal reasons," Pharmacist No. 8 said. As an older pharmacist, he would not fill anything that made him feel uncomfortable.

439.    It was not unusual for patients to complain in such instances. "The patient calls a toll-free number, and then the District Manager asks why you didn't fill," Pharmacist No. 8 said.

He would then explain that he thought 120 pills in 30 days was excessive in a patient with "no cancer or anything but back aches."

440.    Pharmacist No. 8 said there was "no ceiling" with opioids — patients could increase their tolerance to very high levels.

441.    Publix management could not force him to fill, Pharmacist No. 8 said. But the corporate leadership certainly discouraged pharmacists from turning patients away. Doctors sometimes prescribed 180 or 240 high-dose opioid pills a month and Publix was okay with filling those orders when a doctor prescribed them, even though they could lead to respiratory distress and death.

442.    Pharmacist No. 8 said he considered it a red flag when a prescriber wrote a first prescription and then put two additional scripts on file. "I didn't see any attitude [from corporate]," Pharmacist No. 8 said of the company's disposition toward opioids.

443.    "It was dependent on your district manager… We're in a city with lots of elderly and veterans, so we did a lot of pain killers," Pharmacist No. 8 said. "We stocked a lot of controlled[] [substances] — maybe 3 to 5 to 8% of volume."

444.    Pharmacist No. 8 said that at Publix, the younger pharmacists were focused on bonuses and meeting quotas for the number of prescriptions.

445.    Pharmacist No. 8 said the Panama City, FL store, where he worked, and the Lynn Haven store were "top five producers" in terms of prescription count for their Publix district.

446.    The workflow at Publix was very different than at CVS, where handling 5,000 prescriptions per week was normal. At his Publix, a busy week was 1,000 prescriptions. Pill mill customers sought out Publix and other grocery stores to fill: "Supermarkets are where a lot of pill mill people go," Pharmacist No. 8 said.

447. "CVS, Walgreens, and the others are all tied together, but Publix wasn't like that." Instead, Pharmacist No. 8 recalled that his store was looped in "computer-wise" into "a pod" with just two or three other Publix locations. "If you were in Alabama getting prescriptions, I could not see that being dispensed," Pharmacist No. 8 said. "Whereas at CVS, they're on real-time systems, so when CVS in Charleston dispenses, Jacksonville can look and see a dispense just occurred."

448. Pharmacist No. 8 left retail pharmacy altogether because "I was getting dismayed by how much we allowed to go out of the building," he said. "Some customers got 540 pills for the month."

449. Pharmacist No. 8 said that it was often apparent those pills were not for personal use. "You walk out behind them, and there were people waiting in the parking lot,"

450. Pharmacist No. 8 said. "I once saw a guy hand out a whole bottle of Dilaudid" (an extremely high-strength opioid medication.). In that instance, Pharmacist No. 8 noted "patient was seen distributing medication" on the patient profile.

451. In the future, he would not fill for that patient, but others likely did. "If I see that note, I don't sell it," Pharmacist No. 8 said. "If the pharmacist took the time to put that in there, I'm not going to further [the problem]."

452. Senior management did not seem to have a philosophy toward the dispensing of opioids. They tracked prescription volume, and the portion that opioids comprised was not allowed to go above a certain threshold at any store. That was due to government regulations, not Publix internal rules. If a store hit the maximum opioid dispensing threshold in a given month, then they could no longer fill opioid prescriptions and would need to send customers to another store even if they had their medication in stock.

453. Senior management did not advise Pharmacist No. 8 and his colleagues on methods to track pill mill doctors in the region. Pharmacist No. 8 said his location filled a lot of opioid

prescriptions due to the elderly population, but he never heard anyone espouse a philosophy about when to fill and when not to fill. Instead, pharmacists were left to make their own decisions based on their professional wisdom.

### 11.    *Pharmacist No. 9 (Parkland, Fort Lauderdale, Aventura, West Palm Beach, Boca Raton, and Coral Springs, Florida)*

454.    Pharmacist No. 9 worked for Publix from May 2017 to November 2018 as a Floating Pharmacist and Staff Pharmacist, working at Publix locations throughout Florida, including stores in Parkland, Fort Lauderdale, Aventura, West Palm Beach, Boca Raton, and Coral Springs.

455.    Publix did not maintain a "Do-Not-Fill" list or a list of suspicious prescribers, nor did the company send out alerts or communications instructing pharmacy staff not to fill prescriptions from certain prescribers, Pharmacist No. 9 said.

456.    Publix did not require pharmacy staff to document instances when they refused to fill prescriptions, Pharmacist No. 9 said. "You could put a note on the patient [in the computer system], but there was no record created saying why I didn't fill this prescription," he said.

457.    Additionally, Pharmacist No. 9 recalled that Publix wanted all prescriptions to be filled within just 15 minutes.

458.    Publix awarded bonuses based on a pharmacy's overall prescription count, Pharmacist No. 9 said. "You were able to earn [bonuses] … based off several metrics," he said. "Every year they changed it." The main metrics used for bonuses was related to the "amount of scripts" a pharmacy filled, or "overall script count."

459.    Because the Pharmacy Manager was ultimately responsible for everything that happened in a store, the Pharmacy Manager received a larger bonus than other pharmacists.

Pharmacist No. 9 said the breakdown might have been 65% for the Pharmacy Manager and 35% for pharmacists.

460. Publix adopted a "virtual verification" process that allowed pharmacists at one store to verify prescriptions being processed at another store. The system was designed to improve "efficiency" by enabling pharmacists who were not busy to help those who were, but Pharmacist No. 9 said the process created a higher possibility for errors in verifying prescriptions.

461. "I would verify scripts that weren't in my store [as part of the virtual verification process]," he said. "I don't have the physical prescription in front of me, so I'm just looking at [it] on a screen."

462. Pharmacist No. 9 explained that he might have to verify a prescription written by a doctor with whom he was not familiar from a location 15 miles away. "That was one thing I didn't really care for," he said.

463. Asked if verifying prescriptions virtually and from prescribers with whom he was not familiar could have created problems, such as approving prescriptions that required more scrutiny or should have been denied, Pharmacist No. 9 said, "Absolutely," especially if "someone felt really rushed and pushed it through."

464. Pharmacist No. 9 recalled that during his time at the Boca Raton Publix in 2018, he read media reports of a local drug trafficking bust that resulted in the arrest of at least seven people, including one area pharmacist. The drug bust was part of a "large-scale prescription drug trafficking ring that pushed opioid drugs including oxycodone, oxymorphone, hydromorphone (Xanax) and promethazine with codeine."[209] Pharmacist No. 9 was never apprised of the drug trafficking bust by Publix, or given the name of the Miami-based prescriber implicated in the drug

---

[209] https://www.wpbf.com/article/seven-people-charged-in-major-opioid-bust-in-south-florida/28226129#

ring. According to the Arrest Warrant Affidavit associated with the bust, between January 1, 2018 and October 16, 2018, 583 Schedule II prescriptions written by Dr. Douglas Slavin's office were filled at the K-Mart where the arrested pharmacist worked.[210] Meanwhile, the Publix location next door filled dozens of prescriptions from Dr. Slavin's office during that same period. Publix never flagged Dr. Slavin – or anyone else implicated in the prescription drug trafficking ring – for its pharmacists.

## B. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Alabama

465.    The opioid epidemic has had a particularly devastating impact on Alabama.

466.    Alabama has the highest rate of opioid prescriptions issued in the nation — 1.2 prescriptions per person compared with the national average of 0.71.[211] In 2017, no fewer than 422 deaths were attributable to opioid overdoses in Alabama.[212]

467.    According to the Alabama Medicaid Agency, total federal and state expenditures on opioids increased more than 147% from 2011 ($9.9 million) to 2016 ($14.6 million).[213]

468.    Opioids have had an especially dire impact on rural states like Alabama. According to a recent report by the U.S. Department of Agriculture: "Rising rates of prescription medication abuse, especially of opioids, and the related rise in heroin-overdose deaths are contributing to this unprecedented rise in age-specific mortality rates after a century or more of steady declines. This trend, if it continues, will not only lower rural population but will increase what is known as the

---

[210] *See* Affidavit in Support of Arrest Warrants, Circuit Court of the 17th Judicial Circuit for Broward County, Florida
[211] CDC, *U.S. State Prescribing Rates, 2016*, https://www.cdc.gov/drugoverdose/maps/rxstate20 16.html.
[212] The Henry J. Kaiser Family Foundation, *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths* (2017), https://www.kff.org/other/state-indicator/opioid-overdose-deaths/.
[213] Robert Moon, MD, Alabama Medicaid Opioid Prescribing Trends and Outcomes: The Opioid Crisis in Alabama: From Silos to Solutions (March 10, 2017).

dependency ratio: the number of people likely to be not working (children and retirees) relative to the number of people likely to be wage earners (working-age adults)."[214]

469.    Despite having some 82 stores located all over the State of Alabama, Publix's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion activities.

470.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Doctor | City | Sentence |
|---|---|---|---|
| 5-Jan-10 | Jason Michael Hunt, MD | Guntersville, AL | License suspended |
| 23-Apr-14 | Joseph Ngui Mwau Ndolo, MD | Fairhope, AL | 2 years |
| 28-Oct-15 | Peter Lodewick, MD | Birmingham, AL | 4 year probation |
| 10-Nov-15 | Ernest Albert Claybon, MD | Midfield, AL | 4 years probation |
| 8-Apr-16 | Muhammad Ali, MD | Jasper, AL | 30 months |
| 29-Apr-16 | Francisco Huidor-Figueroa, MD | Opelika, AL | 5 years probation |
| 17-Feb-17 | Shelinder Aggarwal, MD | Huntsville, AL | 15 years |
| 17-Mar-17 | Bridgette Parker, NP | Mobile, AL | 20 months |
| 24-Apr-17 | Thomas "Justin" Palmer, NP | Mobile, AL | 30 months |
| 10-May-17 | Robert Ritchea, MD | Phenix City, AL | 10 years |
| 25-May-17 | John Patrick Couch, MD | Mobile, AL | 20 years |
| 26-May-17 | Xiulu Ruan, MD | Mobile, AL | 21 years |

---

[214] U.S. Dept. of Ag., *Rural America at a Glance*, Economic Information Bulletin 182 (Nov. 2017).

| 17-May-18 | Shepherd Odom, MD | Montgomery, AL | 5 years probation |
| 8-Jun-18 | Rassan Tarabein, MD | Daphne, AL | 5 years, $15,000,000 restitution |
| 17-Jan-19 | Willie Chester, MD | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Steven Cox, MD | Montgomery, AL | 3 years probation |
| 17-Jan-19 | Elizabeth Cronier, NP | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Julio Delgado, MD | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Stephanie Ott, RN | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Gilberto Sanchez, MD | Montgomery, AL | 12 years |
| 17-Jan-19 | Johnnie Chaisson Sanders | Montgomery, AL | 7 months |
| 17-May-19 | Steven Bruce Hefter, MD | Birmingham, AL | 87 months |
| 29-May-19 | Lillian Akwuba, NP | Montgomery, AL | 10 years |
| 30-May-19 | Erik Raul Torres | Opelika, AL | 6 months |
| 21-Jun-19 | Rodney Morris, MD | Birmingham, AL | Pled Guilty, no sentencing set yet |
| 18-Nov-19 | Cindy Louise Hyche Dunn | Birmingham, AL | 10 years |
| 18-May-20 | Celia Lloyd-Turney, MD | Huntsville, AL | Pled Guilty; two years home confinement; five years probation |
| 8-Sep-20 | Paul Roberts, MD | Fultondale, AL | 6 years |
| 16-Oct-20 | Richard Stehl | Montgomery, AL | 15 years |
| 14-Jan-21 | James Edwards, MD | Opelika, AL | probation |
| 5-May-21 | Elizabeth Korcz, MD | Hoover, AL | 52 months |
| 4-May-22 | Francene A. Gayle | Huntsville, AL | Indicted |
| 9-Jun-22 | Marshall Plotka, MD | Huntsville, AL | one year + one day in medical facility |
| 11-Aug-22 | Di'Livro Beauchamp, MD | Montgomery, AL | pled guilty, sentencing 10/27/22 |

1.      *Pharmacist No. 10 (Dothan, Montgomery, and Prattville, Alabama)*

471.    Pharmacist No. 10 joined Publix in February 2019 as a Floating Pharmacist, working at various Publix locations throughout Alabama, including in Dothan, Montgomery, and

Prattville. Pharmacist No. 10 was ultimately let go by Publix in April 2020 because of "quality violations" he committed as a result of being overworked and the company's understaffing.

472.    The understaffing problem at Publix pharmacies was chronic. Pharmacist No. 10 consistently did not have enough staff to keep up with the workload. For instance, while Pharmacist No. 10 generally tried to use Alabama's PDMP when filling controlled substance prescriptions for new patients, doing so was often impossible at the Prattville location. "We'd get 200-300 prescriptions behind [at the Prattville location], and it was one of those things where I can barely keep up with the C2 count, let alone try to plug in for PDMP. In hectic situations, it would fall by the wayside pretty regularly."

473.    Pharmacist No. 10 recalled at least one instance where he was forced to work despite having the flu, even though he reached a point where he could hardly stand. The end result was that he was severely reprimanded by his Regional Pharmacy Manager for underperforming on that shift so that the queue of unfilled prescriptions reached over 300.

474.    Even high-volume locations like the one in Prattville typically had just one pharmacist working at a time, which was not enough, and the problem was compounded by pharmacy technicians who were "undertrained." According to Pharmacist No. 10, "People left the company, and the floater pool was stretched."

475.    Pharmacists were routinely pressured to work after hours to meet the crushing demand of their workloads. Publix instituted "bonus incentives" on pharmacists for things like high volumes of flu shots, which impacted the amount of time pharmacists could allot to filling prescriptions carefully.

476.    According to Pharmacist No. 10, Publix did not maintain a "Do-Not-Fill" list, or other type of list to track suspicious prescribers, nor did the company send out emails or other communications to notify pharmacy staff about suspicious prescribers or prescriptions. While

some pharmacists would turn prescriptions away on their own volition, "there wasn't anything like that required companywide," Pharmacist No. 10 said.

## C. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Georgia

477.    Georgia finds itself in the midst of an unprecedented prescription drug crisis, with hundreds of deaths attributable to opioid prescription drug overdoses every year.[215]

478.    The State of Georgia had the eleventh highest number of opioid overdoses in the United States between 1999 and 2014.[216] Opioid-involved overdose deaths have not just increased – *but exploded by an astonishing 1000%* – since 1999 when these drugs were first meaningfully introduced to the State of Georgia.[217]

479.    Statistics in recent years show the ever-increasing momentum of this crisis: from 2010 to 2017, the total number of documented opioid-involved overdose deaths in Georgia increased by an astounding 104%, from 514 to 1051 deaths.[218] In 2017, opioid-involved overdoses accounted for 5,656 emergency department visits and 2,622 hospitalizations. Tellingly, the annual number of such hospital admissions had tripled since 2000.[219] In 2018, there were 1,396 deaths attributed to all drugs in the State of Georgia, but an overwhelming number of them (1,051) were the result of opioids.[220]

---

[215]The Henry J. Kaiser Family Foundation, *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths* (2015), https://www.kff.org/other/state-indicator/opioid-overdose-deaths/.
[216] Substance Abuse Research Alliance, *Prescription Opioids and Heroin Epidemic in Georgia, 2017*, http://www.senate.ga.gov/sro/Documents/StudyCommRpts/OpioidsAppendix.pdf.
[217] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.
[218] Georgia Department of Public Health, *Opioid Overdose Surveillance Georgia, 2017*, https://dph.georgia.gov/sites/dph.georgia.gov/files/2017%20Georgia%20Opioid%20Overdose%20Report%20Final.pdf.
[219] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.
[220] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.

480.    The death, addiction, and increased cost associated with prescription opioids is a direct consequence of Georgia's opioid prescription rate increase over the same time period. By 2013, Georgia's average prescription rate for opioids (90.7 per 100 persons) was well over the national average (79.3).[221] In 2016, there were 0.778 opioid prescriptions per person in Georgia, according to the CDC.[222]

481.    Despite having some 196 pharmacies located all over the State of Georgia, Publix's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion activities.

482.    Upon information and belief, none of the following prescribers (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|------|------|------|----------|
| 6-Jul-05 | David Mark Battista, MD | Atlanta, GA | 3 years, 10 months |
| 26-May-05 | Lisa Sanders, MD | Fort Gordon, GA | 6 months |
| 22-Jan-06 | George Williams, MD | Duluth, GA | 7 years |
| 27-Mar-06 | Anthony Junco, Jr., MD | Savannah, GA | 3 months |
| 20-Oct-07 | Noel Chua, MD | Kingsland, GA | life (felony murder) |
| 16-Jan-08 | William McArthur, III, MD | Jesup, GA | 30 months |
| 18-Mar-08 | In Whan Yun, MD | Wrens, GA | 5 years probation |
| 12-May-09 | Phil Astin III, MD | Newnan, GA | 10 years |
| 11-Aug-10 | Spurgeon Green, Jr., MD | Perry, GA | 30 years |
| 5-Aug-10 | Brian Weaver, MD | Atlanta, GA | 27 months |
| 5-Jul-12 | Michael Assevero, MD | Northlake, GA | arrested |
| 19-Dec-12 | Hung Thien Ly, MD | Savannah, GA | 97 months |
| 27-Aug-13 | Dennis Momah, MD | Douglas, GA | three years |
| 15-Nov-13 | Hugh Maddux, DDS | Newnan, GA | 1 year, 1 month |

---

[221]Ctrs. for Disease Control & Prevention, *U.S. State Prescribing Rates, 2016*, https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.
[222] *Id.*

| 1-Aug-14 | Kenneth Gossett, DO | Rome, GA | 42 months |
| 6-Aug-14 | Najam Azmat, MD | Waycross, GA | 11 years, 1 month |
| 8-Aug-14 | Cleveland J. Enmon, MD | Decatur, GA | 20 years |
| 9-Oct-15 | Michael Johnston, MD | Tucker, GA | 10 years |
| 27-Oct-15 | Sanjay Sinha, MD | Woodstock, GA | 5 years |
| 12/9/2015 | James Chapman, MD | Macon, GA | 120 months |
| 15-Aug-16 | Bradley Lane Frost, MD | Dublin, GA | 127 months |
| 23-Feb-17 | Romie Earl Roland, MD | Atlanta, GA | 10 years, 10 months |
| 29-Mar-17 | Nisar Piracha, MD | Atlanta, GA | 7 years, 3 months |
| 4-Apr-17 | Paul Spencer Ruble, DO | Brunswick, GA | 5 years |
| 25-Apr-17 | Edd Colbert Jones, III, MD | Fitzgerald, GA | 18 months |
| 26-Jun-17 | Nevorn Askari, MD | Atlanta, GA | 5 1/2 years |
| 26-Jun-17 | William Richardson, MD | Atlanta, GA | 4 1/2 years |
| 11-Mar-18 | Narendra Negareddy, MD | Jonesboro, GA | Indicted twice, murder charges |
| 29-Aug-18 | Joseph Burton, MD | Alpharetta, GA | 8 years |
| 18-Sep-18 | George Mack Bird, MD | Eastman, GA | 100 months |
| 7-Dec-18 | William Bacon, MD | Valdosta, GA | 72 months |
| 7-Dec-18 | Donatus O. Mbanefo, MD | Columbus, GA | 96 months |
| 4-Apr-19 | Vinod Shah, MD | Valdosta, GA | 72 months |
| 13-Jun-19 | Johnny Di Blasi, MD | Braselton, GA | 33 months |
| 31-Jul-19 | TaShawna Stokes, MD | Alpharetta, GA | guilty plea |
| 31-Jul-19 | Oscar Stokes, MD | Alpharetta, GA | guilty plea |
| 11-Sep-19 | Victor Hanson | Atlanta, GA | indicted |
| 9-Oct-19 | Arnita Avery-Kelly, DPM | Sandy Springs, GA | 120 months |
| 14-Feb-20 | Frank H. Bynes, Jr., MD | Savannah, GA | 20 years |
| 27-Feb-20 | John Patrick Schilling | Stockbridge, GA | indicted on 58 counts |
| 22-Jun-21 | Thomas H. Sachy. MD | Gray, GA | pled guilty, sentencing pending |
| 10-Jun-22 | Theresa Pickering | Norcross, GA | indicted |
| 22-Aug-22 | Keith Jeffords, MD | Smyrna, GA | $100,000 penalty, lost DEA registration |

### 1.    *Pharmacist No. 11 (Lawrenceville and Snellville, Georgia)*

483.    Pharmacist No. 11 worked as a Pharmacy Manager at Publix for approximately twenty years.  From 1997 to 2008, Pharmacist No. 11 worked at Publix store #612 located on Sugarloaf Parkway in Lawrenceville, Georgia.  From 2008 to 2010, Pharmacist No. 11 worked at another Publix store on Athens Highway, also in Lawrenceville, Georgia.  From 2010 to her resignation in July of 2017, Pharmacist No. 11 worked at Publix store #508 located in Snellville,

Georgia. For fifteen of those approximately twenty years at Publix, Pharmacist No. 11 also trained other pharmacists.

484.     Pharmacist No. 11 said that Publix had no guidance or policy, and certainly no written policy, to assist its pharmacists in dispensing opioid medications. Pharmacist No. 11 said that as a respected pharmacist and valued trainer, she would have been aware of this policy if it existed. Instead, the only guidance she received from Publix was to "use your own professional judgment" when it came to dispensing opioid medications.

485.     Pharmacist No. 11 said that there were no requirements from Publix management to keep "Do-Not-Fill" lists, or to alert law enforcement about suspicious prescribers. There was also no internal policy at Publix to record encounters with suspicious prescribers. Pharmacist No. 11 recalled that during the middle of her career, despite the state's introduction of the PDMP, Publix management never directed its pharmacists to use it.

486.     Pharmacist No. 11 recalled one instance in approximately 2016 at Publix Store No. 508, in which a patient presented her with a prescription for Oxycontin. After observing multiple red flags that indicated the prescription was not issued for a legitimate medical purpose, Pharmacist No. 11 refused to fill it. After the customer complained to the store manager, the manager told Pharmacist No. 11 she had to fill the prescription, arguing, "if you have the meds, you need to fill it." Pharmacist No. 11 concluded that Publix management was more concerned with satisfying its customers than preventing drug diversion and abuse.

487.     Pharmacist No. 11 said that in her later years at Publix, the employee performance review process changed and the pharmacy prescription count became a more critical element to a pharmacist's rating.

488.     Initially, Pharmacist No. 11 was paid a base salary, plus any additional bonus payment she received was related to the overall store's performance. In more recent years, if the

pharmacy's prescription output was down, then the pharmacist was held accountable and their rating was lowered, which in turn lowered their bonus payment.

489.    Pharmacist No. 11 said that the prescription count unquestionably became a more stressful topic for pharmacists at Publix due to this rating process. Prescriptions for opioids continued to be a part of the overall prescription count.

490.    Pharmacist No. 11 said that for the fifteen years she was a respected trainer for pharmacists at Publix, no part of the training process for Publix pharmacists contained any guidance on the dispensing of opioid medications. In fact, the topic was not even touched upon during the onboarding of new Publix pharmacists.

491.    According to Pharmacist No. 11, when it came to training pharmacists, Publix was simply "going through the motions." Pharmacist No. 11 said that she tried to work up a simple employee onboarding checklist for pharmacists at Publix, but she wasn't allowed to implement it.

492.    Pharmacist No. 11 said that Publix was more concerned with the auditing and tracking the internal theft of controlled substances, rather than the output flow of controlled substances into communities. This policy further alienated pharmacists at Publix, according to Pharmacist No. 11, as the company provided no oversight or support for dispensing controlled substances in the community. Publix instead focused only on internal inventory controls.

493.    Pressure from management at Publix, and the burden of working alone in the pharmacy, both contributed to Pharmacist No. 11's heightened anxiety levels. In 2017, about three months before her resignation, and after almost twenty years at Publix, Pharmacist No. 11 asked her supervisor if she could step down as a Pharmacy Manager. As a result, Pharmacist No. 11 said she went from a "golden girl to an inconvenience" at Publix. To this day, Pharmacist No. 11 will not enter a Publix store due to the anxiety caused by her time at Publix.

2.    *Pharmacist No. 12 (Lawrenceville, Georgia)*

494.    Pharmacist No. 12 joined Publix in August 2016 as a pharmacist working at a Publix pharmacy location in Lawrenceville, Georgia, and left in 2017.

495.    Pharmacist No. 12 said the Publix pharmacy in Lawrenceville dispensed about 200-300 prescriptions per day.  Lamenting the poor staffing situation at her store, she noted the pharmacists there needed more help.  There were usually only two or three people working at the store on any given day: one pharmacist, one pharmacy technician, and one pharmacy intern.  There were times there simply was not enough staff to run the pharmacy properly, she said.

496.    Pharmacist No. 12 said the pharmacy frequently saw suspicious prescriptions being presented to be filled.  Despite this, Publix did not maintain a "Do-Not-Fill" list or a list of suspicious prescribers, and the company relied only on "the previous knowledge" of pharmacy staff at various stores to detect suspicious prescriptions, she said.

497.    In addition, Publix did not require pharmacy staff to document instances when they refused to fill prescriptions.  Pharmacist No. 12 also could not recall any Publix policy that required its staff to report suspicious prescriptions or prescribers to the DEA or other authorities.

498.    She also said she did not remember Publix ever checking to see whether pharmacy staff were consulting the Georgia Prescription Monitoring Program database when filling controlled substance prescriptions.

499.    Publix emphasized metrics in evaluating the performance of individual pharmacies and pharmacy staff, according to Pharmacist No. 12.  For example, the company tracked the number of prescriptions, vaccinations, average wait times, and errors linked to each pharmacy and communicated these metrics to pharmacists.  "I remember seeing comparisons… talking to a colleague about how many [prescriptions] other stores are filling per day and things like that," she said.

500.   A key metric for Publix was wait times–how long it took pharmacies to fill prescriptions.  "It was like a big deal – what is the wait time from when we get the prescription until we fill it," Pharmacist No. 12 said. "We had to meet that goal, and if anything passed that time, it was red flagged and one of the indications of how good [or bad] the pharmacist was doing."

501.   "As soon as the prescription was in the pharmacy system, we needed to fill it out," she said. "Otherwise, after a certain time, [the computer screen] was turning yellow and then red, indicating that the time is passing and we need to take care of this one as soon as possible."  When the screen changed from yellow to red, that indicated that pharmacy staff were taking too long to fill the prescription, she said.

502.   These metrics factored into the bonuses received by pharmacy staff.  A pharmacy's performance metrics were also used in determining staffing levels, Pharmacist No. 12 said.

503.   She recalled that Publix cut staffing hours at her store despite the fact that the pharmacy was struggling, which "surprised" her.  "Before I left, they were pushing to cut staff if performance was not good – [they] were cutting staff time for next week," she said. "We got surprised.  Why are they handling it like this? If we are not doing good, it means we need more staff, not less.  They were pushing us to do better [by filling more prescriptions] if we wanted to keep help."

### 3.   *Pharmacist No. 13 (Fayetteville, Peachtree City, and Morrow, Georgia)*

504.   Pharmacist No. 13 worked as a Pharmacy Manager at Publix pharmacies in Fayetteville, Peachtree City, and Morrow, Georgia, from 2016 to June 2021.

505.   According to Pharmacist No. 13, Publix expected its pharmacists to fill prescriptions in under 15 minutes, even if they were for Schedule II medications and proved challenging to vet.

506.    Publix also did not provide its pharmacists with resources to identify suspicious prescriptions and the company had no formal systems to report suspicious activity or avoid filling dubious opioid prescriptions, Pharmacist No. 13 said.

507.    Refusing to fill problematic prescriptions at Publix came with risks. "I had a situation once where I told a guy didn't want to fill it because I didn't feel comfortable with it," Pharmacist No. 13 said. His District Manager then told him that he should have done more to get the prescription filled for the customer, despite the presence of red flags. He further told Pharmacist No. 13 that he should have figured out a way to fill the prescription. "The [patient] got mad and called corporate about it," Pharmacist No. 13 said. "I was kind of told … I probably should have filled it for him, and he ended up coming back [and getting the prescription filled anyway]," Pharmacist No. 13 said.

508.    According to Pharmacist No. 13, Publix was far less structured and policy-heavy than other pharmacies he worked at. "When I came here, I realized how little guidance and structure Publix gave when it came to [refusing and blocking prescriptions from being filled]," Pharmacist No. 13 said. For instance, Publix pharmacies had no system to report or keep track of doctors who overprescribed opioids. Publix also did not track pill mill doctors at the corporate level, and information-sharing among regional stores was low.

509.    "My pharmacy was extremely busy, so I had a line [for prescriptions] constantly," Pharmacist No. 13 said. "And many of them were getting opioids and controlled substances." Pharmacist No. 13 said several area doctors routinely prescribed abnormally high volumes of pain medicine to patients. "We saw that pretty frequently," Pharmacist No. 13 said. Pharmacist No. 13 further noted that he was unaware of any situation where Publix reported a doctor for overprescribing opioids or prescribing the drugs in dangerous combinations or dosages.

### 4.    *Pharmacist No. 14 (Lithonia, Georgia)*

510.    Pharmacist No. 14 managed a busy Publix pharmacy in Lithonia, Georgia.  She noted that even with tech support, the long shifts working at the chain would be grueling.

511.    According to Pharmacist No. 14, Publix Pharmacy Managers were left to run the pharmacy as they saw fit, without much oversight in how prescriptions were filled.  She never heard of a "bad doctor" list or similar method used to track problem prescribers, despite the fact that nearby doctors had been arrested.[223]

512.    Despite the fact that prescription drug abuse was a problem in Atlanta, Pharmacist No. 14 said that Publix had no explicit policies on handling red flags when dispensing opioids.

### D. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in North Carolina

513.    North Carolina has been especially ravaged by the national opioid crisis. It has an opioid prescription rate of 96.6 per 100 persons, which ranks thirteenth in the country (U.S. median rate 82.5) and a benzodiazepine prescription rate of 45.3 per 100 persons which ranks 15th nationally (U.S. median rate 37.6).[224]

514.    An overview of relevant data for the state is devastating:

- Five North Carolinians on average die from opioid overdoses every day;

- More people die from opioid overdoses than car crashes;

- More than 2,000 North Carolinians died of an opioid overdose in 2017 – a 32 percent increase over the previous year;

---

[223] *See, e.g.*, https://www.justice.gov/usao-ndga/pr/jury-finds-podiatrist-guilty-operating-pill-mill, noting that in May 2019, podiatrist Dr. Arnita Avery-Kelly was convicted for illegally prescribing opioid painkillers from a Lithonia, GA clinic.

[224] *See* Leonard Paulozzi, M.D., et al., Vital Signs Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012, Morbidity and Mortality Weekly Rep. (July 4, 2014).

- Between 1999 and 2017, more than 13,169 North Carolina residents have lost their lives to unintentional opioid overdoses;

- The number of unintentional opioid overdose deaths in 2017 was nearly 17 times higher than in 1999;

- The number of unintentional opioid overdose deaths has more than doubled in the past decade; and

- In 2017, there were nearly 125 unintentional opioid-related overdose emergency department visits per week on average.[225]

515.    Despite having some 51 stores located all over the State of North Carolina, Publix's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion and abuse activities in North Carolina.

516.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 24-Jun-05 | Benjamin Moore, MD | Winston Salem, NC | Committed suicide |
| 28-Jan-02 | Joseph Talley, MD | Wilmington, NC | Lost DEA License |
| 7-Jun-06 | Warren H Williams, MD | Charlotte, NC | 1 year + 1 day |
| 1-Jun-09 | John Blevins Davis, MD | Winston Salem, NC | 3 years probation |
| 1-Aug-09 | Margaret McIntosh-Fulmore, MD | Charlotte, NC | 1 year home confinement |
| 22-Feb-10 | Perry Reese III, MD | Cary, NC | 20 years |
| 3-Mar-17 | James Randall Long, MD | Lexington, NC | 1 year + 1 day |
| 27-Aug-18 | Donovan Dave Dixon, MD | Fayetteville, NC | 240 months |
| 21-Feb-19 | Michael Alson Smith MD | Mount Holly, NC | 3 years |

---

[225] North Carolina Department of Health and Human Resources, *The Impact of Opioids*, https://www.morepowerfulnc.org/get-the-facts/the-impact/.

| 22-Feb-19 | Wayland McKenzie, MD | Greensboro, NC | License Revoked |
| 19-Dec-19 | Okechukwu Dimkpa, MD | Rowan County, NC | 46 months |
| 8-Sep-20 | Sanjay Kumar, MD | New Bern, NC | 240 months |
| 30-Nov-20 | Thomas F. Kline, MD | Raleigh, NC | DEA license revoked 2/17/20; Medical License Revoked 11/30/2020 |
| 1-Oct-21 | Byron Leak, MD | Charlotte, NC | 4 years |
| 7-Apr-22 | Jong Whan Kim, MD | Tabor City, NC | 78 months |

1.    *Pharmacist No. 15 (Weaverville, North Carolina)*

517.    Pharmacist No. 15 worked as a pharmacist at a Public pharmacy in Weaverville, North Carolina from October 2010 to October 2019.   While there, she oversaw pharmacy operations, training, and administrative duties. In addition, she maintained stock inventory and ensured compliance with all state and federal laws related to controlled substances.   Pharmacist No. 15 managed her pharmacy staff as they filled approximately 1,000 prescriptions each week.

518.    Publix was "not a good company," Pharmacist No. 15 said. "They did not have the employee's best interest in mind; they just cared about money."

519.    Publix had quotas for prescription volume and immunizations that were impossible to meet without cutting corners. "We had no tech support, and pharmacists worked 12-hour shifts with no breaks," Pharmacist No. 15 said.

520.    "Not pertaining to opioids," Pharmacist No. 15 said when asked if Publix created internal training materials for its pharmacists. There were no internal materials or corporate ethics policies toward opioids at Publix, she said.   The executives were not particularly interested in oversight of the opioid pain medications.

521.    "There was no 'Do-Not-Fill' list," Pharmacist No. 15 said. "Pharmacists took it upon themselves to share sometimes, but it wasn't a corporate directive."   Similarly, there was no

"bad doctor" list or similar method used to track problem prescribers, despite the fact that nearby

doctors had been arrested.[226]

### 2.   *Pharmacist No. 16 (Charlotte, North Carolina)*

522.    Pharmacist No. 16 worked as an Assistant Pharmacy Manager at a Publix pharmacy

in Charlotte, North Carolina from August 2016 to April 2017. From January 2016 to July 2016,

she served as a Floater Pharmacist in Publix's Charlotte Division, which covered North and South

Carolina.

523.    Publix assigned Pharmacist No. 16 to Pharmacy #1483 at Steele Creek Crossing to

implement an engagement pilot to drive prescription sales and retention as part of a company-wide

initiative.  North Carolina was a new market for Publix, and the company was struggling to hit its

prescription volume growth goals in the state.

524.    At the Publix Pharmacy in Steele Creek Crossing, Publix did not provide

Pharmacist No. 16 a technician – or any other support staff – to support her.  No one relieved her

to take a lunch or bathroom breaks.  As the day progressed, Pharmacist No. 16 would fall further

and further behind, requiring that she stay an extra two hours past 8 p.m., when the pharmacy

closed and she was supposed to go home.  Publix would not compensate her for this extra time,

which she spent catching up on prescriptions to meet the company's goals.

525.    Publix insisted that customers should not wait longer than 15 minutes to have their

prescriptions filled, but the immense workloads resulted in customers frequently waiting between

30 and 45 minutes.  "My whole experience with Publix was awful," Pharmacist No. 16 said.  "We

were understaffed, and it was just horrible with no tech support whatsoever."  Publix expected its

---

[226] *See, e.g.*, https://www.justice.gov/usao-ednc/pr/former-doctor-sentenced-78-months-drug-offenses-arising-tabor-city-pill-mill, noting Columbus County doctor John Whan Kim was sentenced to 78 months in federal prison on April 7, 2022 for improperly prescribing opioids like Oxycodone, Hydrocodone, and Methadone.

pharmacists to answer the phone within three rings, call doctors to follow up on every prescription, and push flu shots. "Your name was in red if you weren't getting a certain number of flu shots," Pharmacist No. 16 said.

526.    She would often call customer service at her store to get someone to cover for her while she ran to the restroom, but they never agreed to send someone over to help, and she couldn't leave the pharmacy unattended. "No one was counting for me — I was doing everything myself," Pharmacist No. 16 said of her long days in the pharmacy. "We weren't qualified for a tech, or we were, but they took it away — we trained a tech for 20 hours per week when we had 500 prescriptions per week, but then they said we needed 1,000 scripts per week to justify the paltry 20 hours of tech support."

527.    "We had a lot of sketchy customers all the time," Pharmacist No. 16 said. "Like drug seekers. I remember at one store where I worked in Fort Mill, my tech was telling people I would fill stuff, and I would absolutely refuse," Pharmacist No. 16 said. "I told people no."

528.    One woman accused Pharmacist No. 16 of prejudice when she refused to fill in a case where there was blatant doctor shopping. The woman had visited five doctors for opioids in the past month, Pharmacist No. 16 said. She had a toothache but was not addressing it. Finally, she contacted the doctor and alerted him that the woman had filled five scripts for opioids at other pharmacies, written by other prescribers. "I'm not filling," Pharmacist No. 16 told the prescriber.

529.    "I caught plenty of patients" in the pharmacies she worked at "who were trying to scam opioids," Pharmacist No. 16 said, explaining that the patients lacked medical necessity for prescriptions that were often for alarmingly high strengths and large quantities of medications.

530.    "One prescriber right in the middle of Charlotte would write Oxycontin scripts for ridiculous strengths," Pharmacist No. 16 said, noting that those prescriptions, which she saw a lot

of around 2015 through 2016, were for such high strengths of Oxycodone that the pharmacy did not even carry them.

531.    The Steele Creek Crossing Publix was near the state line, which contributed to the volume of suspicious prescriptions.  However, Pharmacist No. 16's District Manager and Publix corporate were "unrelenting" as they continued to pressure her to grow volume.

532.    Pharmacist No. 16 said she was sometimes bullied by disgruntled customers.  Some customers arrived with prescriptions that lacked critical information, such as patient names. "I'm very proud that I was that difficult pharmacist — and no one else gave me trouble," Pharmacist No. 16 said. "But it impacted my volume and ability to move up within the company."

533.    Despite these facts, Pharmacist No. 16 knew that filling opioid prescriptions was a reliable means to grow volume. "You fill one, and within a couple of days, opioids explode," Pharmacist No. 16 said, explaining that news of a pharmacy with lax due diligence spread quickly among the drug seekers. "Soon, you have a volume boost from all these opioid scripts," she said.

534.    At Steele Creek, Pharmacist No. 16 said, "we didn't get the volume increases we need," and Publix was unhappy.  At first, Pharmacist No. 16 wondered if, at 52, she wasn't performing as well as other pharmacists. However, her accuracy was fine, and she soon realized that her younger peers were not meeting the company's demands, either. The company simply was not allotting adequate time to fill prescriptions.

535.    Pharmacist No. 16 said that half a dozen pharmacists in the Charlotte region quit the same week she did due to the "unsustainable working conditions. There was so much pressure to increase volume," she said.  Her District Pharmacy Manager "wanted us to explode that pharmacy, and there was so much urgency."  Pharmacist No. 16 became so miserable under the constant pressure to grow volume that she ultimately left Publix.

**E. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in South Carolina**

536.    The outcomes from the opioid epidemic in South Carolina are catastrophic—and getting worse. As of January 2018, combined heroin and prescription opioid overdose deaths in South Carolina had exceeded the number of homicides in the state for three straight years.

537.    In 2017, Governor Henry McMaster declared South Carolina's opioid epidemic a public health emergency, describing the epidemic as a "silent hurricane." The same year, South Carolina saw 748 fatal overdoses, a 21% increase from the number of lives lost in 2016. This was the third straight year that deaths from opioid-related overdoses increased in the state, and there has been a 47% percent increase in overdose deaths since 2014.

538.    South Carolina stands out even amidst the national epidemic. Heroin overdoses in the state increased by 57% from 2014 to 2015 — the largest percentage increase in any state during that time period — the result of patients who could not get access to prescription opioids and turned to heroin. In 2017 alone, 144 people in South Carolina lost their lives to heroin overdoses, and in 2018, the number of lives lost grew to 168.

539.    From 2013 to 2016, as the epidemic grew, the number of attempts to reverse opioid overdoses by EMS personnel throughout South Carolina increased by 67%. In 2017 alone, South Carolina emergency and inpatient departments treated and discharged more than 10,700 people suffering from issues related to opioid use or dependence.

540.    Although the most recent data was not yet available, the Director of the South Carolina Department of Alcohol and Other Drug Abuse Services commented in March 2018: "I'm afraid of what it's going to say and how heavy it's going to feel when this is perhaps the biggest killer in our state." In just the first six months of 2019, opioids have been blamed for 46 deaths in Charleston County alone.

541.    Fears about the number of lives lost in 2018 proved justified when, in August 2019, the South Carolina Department of Environmental Control ("DHEC") released a report showing that 816 people in South Carolina died of opioid overdoses that year.

542.    According to public information, the overall number of opioid prescriptions in South Carolina increased in 2015. That year, there were nearly 4.5 million opioid prescriptions filled in the State — more than 1.5 times the national average.  Even though the volume declined by a million pills in 2016, there were still more than 70 million opioid pills dispensed in South Carolina in 2016 than 2010 – already an artificially high baseline given the surge in prescriptions and distribution at that time.

543.    According to media reports, in 2016, 26 of 46 South Carolina counties had more prescriptions dispensed than people.  In 2017, opioids were prescribed in South Carolina at a rate of 79.3 opioid prescriptions for every 100 persons, far higher than the national average of 58.7 prescriptions for every 100 persons. Even with a decrease in prescriptions from the previous year, there were still 297,920,468 opioid pills dispensed in South Carolina in 2017, an extraordinary volume compared to the state's population of approximately 5 million. According to the Governor, there were approximately 5 million opioid prescriptions issued in the state in 2018, enough for each man, woman, and child in the state to receive a prescription.

544.    Despite having some 64 stores located all over the State of South Carolina, Publix's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion and abuse activities in South Carolina.

545.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many later

convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 26-Jun-05 | Deborah Bordeaux, MD | Myrtle Beach, SC | 8 years, 1 month |
| 1-Sep-02 | David Michael Woodward, MD | Myrtle Beach, SC | 15 years |
| 1-Feb-03 | Ricardo Alerre, MD | Myrtle Beach, SC | 19 years, 7 months |
| 9-Jun-03 | Michael D. Jackson, MD | Myrtle Beach, SC | 24 years |
| 1-Sep-05 | Ronald Allen McIver, DO | Hodges, SC | 30 years (deceased) |
| 1-Jul-06 | James Shortt, MD | W. Columbia, SC | 1 year, 1 day |
| 1-May-07 | Michael Frank Myers, MD | Greenville, SC | 78 months |
| 3-Apr-09 | George C. Aycock, MD | Sumter, SC | 1 year, 1 day |
| 1-Feb-10 | Roger Hershline, MD | Hilton Head, SC | 41 months |
| 6-Mar-18 | James Hanahan, MD | Seneca, SC | Arrested |
| 6-Mar-18 | Carol Helene Meltzer-Beckenhauer, NP | Seneca, SC | Arrested |
| 6-Mar-18 | Jessica Taylor Glymph, NP | Seneca, SC | Arrested |
| 1-May-18 | Mackie James Walker, Jr. | Aiken, SC | 188 months |
| 5-Feb-19 | Fred Gilliard, MD | Aiken, SC | 54 months |
| 1-Jun-19 | Deborah Sutherland, MD | Myrtle Beach, SC | 2 years |
| 22-Jul-19 | Ronald A. Hargrave, MD | Mt. Pleasant, SC | convicted, sentencing date pending |
| 1-Oct-19 | Horace Bledsoe, MD | Lexington, SC | 3 years probation |
| 19-Feb-21 | Christopher W. Degn, MD | Myrtle Beach, SC | arrested |
| 22-Apr-22 | Jennifer Bracey, MD | Charleston, SC | Charged |
|  | Thomas Devlin, MD | Myrtle Beach, SC | 2 years |

### 1.    *Pharmacist No. 17 (Greenville, South Carolina)*

546.    Pharmacist No. 17 worked as an Assistant Pharmacy Manager and Staff Pharmacist for Publix in Greenville, South Carolina from November 2009 to January 2019. She monitored inventory, educated patients, and dispensed prescribed medications, including opioids, which accounted for 15-20% of her store's output.

547.    Pharmacist No. 17 noted that taking the time to properly vet prescriptions thoroughly hurt her Publix performance metrics, which mandated that she take no longer than 15 minutes to fill each prescription. 15 minutes was simply not enough time to double or triple count,

check with providers, or use the state Prescription Monitoring Program, according to Pharmacist No. 17.

548.    Pharmacist No. 17 even recalled several occasions in which corporate reprimanded her for refusing to fill prescriptions.  "The customer would complain, then I got the backlash of that," Pharmacist No. 17 said.  Even in instances of rejecting fake prescriptions or early refills, Publix would "come down on you for complaints," Pharmacist No. 17 said, noting that if the chain was truly customer service focused, they would provide pharmacists more support.

549.    The reprimands came from the corporate office, Pharmacist No. 17 said. Anytime the corporate office received a customer complaint about a store, the store heard about it.

550.    According to Pharmacist No. 17, until a physician surrendered their license, there was no way to block their prescriptions from being filled in the Publix computer system, despite the fact that there were problematic prescribers nearby.[227]

### 2.    *Pharmacist No. 18 (North Augusta, Aiken, Columbia, Greenville, South Carolina)*

551.    Pharmacist No. 18 joined Publix in December 2017 as a Floating Pharmacist, and worked in various Publix pharmacy locations in Augusta, Georgia; Alpharetta, Georgia; North Augusta, South Carolina; Aiken, South Carolina; Columbia, South Carolina; and Greenville, South Carolina.

552.    According to Pharmacist No. 18, Publix did not check to determine whether its pharmacy staff were using state Prescription Drug Monitoring Program databases to verify the legitimacy of prescriptions, even though states like South Carolina required them to be used.

---

[227] *See, e.g.,* https://www.wspa.com/news/dhec-easley-doctor-facing-29-charges-for-illegally-prescribing-drugs, noting Dr. Dwight Jacobus of the Foothills Bariatric and Wellness Center in Easley, South Carolina was charged with 29 drug-related crimes stemming from illegally prescribing Carisoprodol, Alprazolam, Hydrocodone , Oxycodone, and Tramadol between April 16, 2018, and November 14, 2018.

553.    Publix also did not require pharmacy staff to document notes in the company's computer system when refusing to fill prescriptions, Pharmacist No. 18 said.  Further, Publix did not require its pharmacy staff to report suspicious prescribers or prescriptions to the DEA, state pharmacy boards, or any other authorities.  Publix also did not maintain any type of "Do-Not-Fill" list or list of suspicious prescribers.

554.    Pharmacist No. 18 recognized the conflict of interest with which Publix burdened its pharmacists.  Recalling instances in which Publix pressured its pharmacists to fill prescriptions, she noted, "with Publix, any time anybody complained, they were going to give them some type of gift card."  She continued, "Publix's thing is the patient is always right – the customer is always right. [But] you can't always say the patient and the customer is right when you have a [duty of] due diligence to the community."

## F. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Tennessee

555.    Tennessee is among the hardest-hit states when it comes to the opioid crisis. The story of its impact is often told in numbers:  1,268 opioid overdose deaths in Tennessee in 2017; more than six million painkiller prescriptions in Tennessee in 2018.[228]

556.    In 2017, Tennessee had the third highest prescribing rate in the country[229] and one of the highest amounts of opioids prescribed per person in the country as measured in MMEs, according to the CDC.[230]

---

[228] Tennessee Department of Health, Tennessee Faces of Opioids, https://www.tn.gov/tnfacesofopioids.
[229] NIH National Institute on Drug Abuse, Tennessee Opioid Summary, https://www.drugabuse.gov/opioid-summaries-by-state/tennessee-opioid-summary.
[230] Centers for Disease Control and Prevention, *Opioid Prescribing, Where you live matters*, https://www.cdc.gov/vitalsigns/opioids/infographic.html.

557.    In 2015, Tennessee had 13,034 nonfatal overdose outpatient visits and 7,092 overdose inpatient stays.[231] In 2016, 7,636,112 opioids were prescribed in Tennessee. In 2016, there were 1,186 opioid-related overdose deaths in Tennessee -- a rate of 18.1 deaths per 100,000 persons -- higher than the national rate of 13.3 deaths per 100,000.[232]

558.    Tennessee is ranked number six (6) in the nation for rates of opioid-related hospital admissions among senior citizens. In 2005, 467 out of every 100,000 Tennesseans aged 65 and older spent time hospitalized from opioid related use. By 2015, that rate shot up to 1,055 out of every 100,000 Tennesseans aged 65 and older.[233]

559.    Opioid use and misuse have increased the numbers of infants suffering from Neonatal Abstinence Syndrome ("NAS"). The number of NAS cases attributable to prescription opioids has been disproportionately high in Tennessee.  A 2015 NAS update prepared by the Tennessee Department of Health shows that "[w]hen categorized into mutually exclusive categories of exposure, 48.5% of cases were exposed to prescription drugs only, 26.8% were exposed only to illicit or diverted drugs, and 23.2% were exposed to a mix of prescription and illicit or diverted drugs."[234]

560.    In Tennessee, the rate of NAS was three times above the national average between 2009 and 2012 and has been more than 10 times the national average in some areas of East

---

[231] Tennessee Department of Health, *Tennessee Drug Overdose Dashboard*, https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard/.
[232] National Institute on Drug Abuse, *Tennessee Opioid Summary*, https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/tennessee-opioid-summary.
[233] Anita Wadhwani, *Opioid-related Hospitalizations More than Triple for Tennessee Seniors*, THE TENNESSEAN, (August 12, 2017), https://www.tennessean.com/story/news/2017/08/13/opioid-related-hospitalizations-more-than-triple-tennessee-seniors/545556001/ (citing the U.S. Agency for Healthcare Research and Quality).
[234] A.M. Miller, *Neonatal Abstinence Syndrome Surveillance Annual Report* 2015, Tennessee Department of Health 5 (2015), https://www.tn.gov/content/dam/tn/health/documents/nas/NAS_Annual_report_2015_FINAL.pdf.

Tennessee.[235] In 2013 and 2014, Tennessee had NAS rates of 25.5 and 28.5 per 1,000 live births respectively.[236]

561.   Despite having some 52 pharmacies located all over the State of Tennessee, Publix's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of alleged illegal prescribing and diversion activities.

562.   Upon information and belief, none of the following prescribers (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 19-Sep-05 | Christopher W. Fletcher, MD | Nashville, TN | 3 yrs probation |
| 13-Apr-07 | Joe P. Moss, MD | Franklin, TN | 18 mos. |
| 15-Aug-07 | Robert Delaplane | Columbia, TN | License revoked August 2007, but he currently practices medicine. |
| 29-Sep-08 | Kelvin Lynn Douglas, MD | Jackson, TN | Time served |
| 24-Nov-08 | Sanford K. Myers, MD | Knoxville, TN | 156 months |
| 14-Aug-10 | Larry Karr | Hixson, TN | 108 months |
| 21-Oct-10 | Sylvia Hofstetter (Pain Clinic Owner) | Knoxville, TN | 33 years |
| 9-Mar-11 | Elisabeth Reimers, MD | Winchester, TN | 70 months |
| 28-Mar-11 | Samuel Ashby, MD | Fayetteville, TN | 108 months |
| 14-Apr-12 | Allen R. Walker, MD | Portland, TN | |
| 30-May-12 | Ihsaan Al-Amin, MD | Chattanooga, TN | 100 months |
| 8-Feb-13 | Larry E. Boatwright, PharmD | Germantown, TN | 15 2/3 years |
| 1-Apr-13 | Thomas Patrick Brown, PharmD | Johnson City, TN | 5 years |
| 18-Apr-13 | Tamral Guzman, owner | Maryville, TN | 21 years |
| 4-Jun-13 | Robert D. McNeese, PharmD | Greenville, TN | 63 months |
| 7-May-14 | Randy Kincaid, owner | Maryville, TN | 69 years |

[235] Paul Campbell, M.D., PhD, Neonatal Abstinence Syndrome in East Tennessee: Characteristics and Risk Factors among Mothers and Infants in One Area of Appalachia, 28 J. Health Care Poor Underserved 1293-1408 (2017).
[236] Id.

| | | | |
|---|---|---|---|
| 23-May-14 | Dustin Morgan, Owner's Son | Maryville, TN | 17 years |
| 24-Jul-14 | Michael Alan Patterson, MD | Bartlett, TN | 16 years |
| 19-Aug-14 | Sandra Kincaid, owner | Manchester, TN | 39 years |
| 5-Sep-14 | Wendi Henry, owner's daughter | Maryville, TN | 18 years |
| 16-Oct-14 | David Eric Brickhouse, PA | Maryville, TN | Deceased |
| 5-Nov-14 | Rosaire Michel Dubrule, MD | Tiptonville, TN | 12.5 years |
| 1-May-15 | Charles Larmore, NP | Chattanooga, TN | 13 years |
| 28-Aug-15 | Barbara Lang, owner | Chattanooga, TN | 280 years |
| 1-Oct-15 | Faith Blake, owner | Chattanooga, TN | 44 years |
| 1-Oct-15 | Jerome Sherard, MD | Chattanooga, TN | 5 years |
| 1-Feb-16 | Sherry Barnett, NP | Jonesborough, TN | 2 years |
| 24-Mar-16 | Matthew Anderson, DCM | Lenoir City, TN | |
| 24-Mar-16 | David Florence, DO | Manchester, TN | |
| 1-Oct-16 | Cynthia Clemons, NP | Knoxville, TN | |
| 4-Oct-16 | Sylvia Hofstetter, owner | Knoxville, TN | |
| 17-Nov-16 | James Brian Joyner | Maryville, TN | 70 months |
| 17-Nov-16 | Deborah G. Thomas, MD | Maryville, TN | 10 years |
| 13-Jan-17 | Jamie Chiles Cordes, NP | Maryville, TN | 54 months |
| 21-Jan-17 | Sherry Ann Fetzer, NP | Maryville, TN | 3 yrs probation |
| 21-Jan-17 | Buffy Rene Kirkland, NP | Maryville, TN | 2 years |
| 24-Feb-17 | Donna Jeanne Smith, NP | Maryville, TN | 2 years |
| 4-Mar-17 | Walter D. Blankenship, PA | Maryville, TN | 3 yrs probation |
| 24-Mar-17 | Don Robert Lewis, PA | Maryville, TN | 3 years |
| 26-Jul-17 | James E. Hanus, MD | South Whitley, IN | 2 years home detention |
| 14-Mar-18 | Abdeirahman Mohamed, MD | Morristown, TN | 36 months |
| 13-Dec-18 | Samson Orusa, MD | Clarksville, TN | Trial August 2021 |
| 10-Apr-19 | Bowdoin G. Smith, DO | Carthage, TN | Trial Oct. 2021 |
| 17-Apr-19 | Brian Richey, NP | Cookeville, TN | Trial Nov. 2022 |
| 17-Apr-19 | Daniel Seeley, NP | Batesville, MS | Trial Nov. 2022 |
| 17-Apr-19 | Jonathan White, NP | Tullahoma, TN | Trial Nov. 2022 |
| 17-Apr-19 | John Polston, PharmD | Tompkinsville, TN | |
| 17-Apr-19 | Charles Brooks, Jr., MD | Maryville, TN | pled guilty, sentencing 9/9/21 |
| 17-Apr-19 | Henry Babenco, MD | Paducah, KY | deceased |
| 17-Apr-19 | Sharon Naylor, NP | Jacksboro, TN | trial 10/10/22 |
| 17-Apr-19 | Alicia Taylor, NP | Oneida TN | pled guilty, sentencing 12/8/22 |
| 17-Apr-19 | Gregory Madron | Jacksboro, TN | trial 10/10/22 |

| 17-Apr-19 | Glenn Bonifield, PharmD | Bells, TN | deceased |
|---|---|---|---|
| 8-Apr-20 | Michelle Bonifield, PharmD | Bells, TN | 3 years probation |
| 18-Apr-19 | Alexander Alperovich, MD | Jackson, TN | pled guilty, sentencing 11/30/22 |
| 18-Apr-19 | Jeffrey Young, NP | Jackson, TN | Trial 11/17/22 |
| 18-Apr-19 | Andrew Rudin, MD | Jackson, TN | Trial 11/17/22 |
| 20-Oct-21 | Thomas Kelly Ballard, MD | Jackson, TN | 20 years |
| 14-Sep-22 | Loran Karlosky, MD | Bells, TN | 36 months |
| 18-Apr-19 | Jay Shires, MD | Bells, TN | pled guilty, sentencing 11/15/22 |
| 18-Apr-19 | Charles Alston, MD | Jackson, TN | trial 1/9/23 |
| 18-Apr-19 | Britney Petway, NP | Jackson, TN | pled guilty, sentencing fall 2022 |
| 18-Apr-19 | Mary Bond, NP | Bells, TN | sentencing 10/11/22 |
| 18-Apr-19 | James Litton, NP | Memphis, TN | |
| 22-Apr-19 | Steven Mynatt, MD | Knoxville, TN | pled guilty, 3 years probation |
| 9-Aug-19 | Timothy Dennis Gowder, MD | Hixson, TN | 21 years |
| 30-Aug-19 | Pete Anthony Tyndale, Owner | Hixson, TN | 29 years |
| 18-Oct-19 | Samuel Mcgaha, MD | Sevierville, TN | pled guilty |
| 18-Oct-19 | Frank McNiel, MD | Knoxville, TN | pled guilty |
| 23-Oct-19 | Heather Marks, NP | Murfreesboro, TN | Indicted |
| 29-Oct-19 | Hemal V. Mehta, MD | Brentwood, TN | indicted |
| 14-Dec-19 | Harrison Yang, MD | Manchester, TN | 3 years probation |
| 14-Jan-20 | David Bruce Coffey, MD | Oneida, TN | Under investigation |
| 3-Sep-20 | Timothy Abbott, DPM | Nashville, TN | pled guilty, three years probation |
| 30-Oct-20 | Richard Farmer, MD | Memphis, TN | 48 months |
| 12-Nov-20 | Lawrence Joseph Valdez | Hendersonville, TN | 24 months |
| 16-Jun-21 | Darrell R. Rinehart | Columbia, TN | 3 years |
| 20-Oct-21 | Thomas Ballard, MD | Jackson, TN | 20 years |
| 16-Dec-21 | Kelly McCallum, NP | Dyersburg, TN | arrested |
| 1-Mar-22 | Mark A. Murphy, MD | Lewisburg, TN | convicted, sentencing pending |
| 5-Apr-22 | David G. Newman, MD | Knoxville, TN | pled guilty, 3 years probation |
| 4-May-22 | Yogeshwar Gill | Manchester, TN | Indicted |
| 4-May-22 | Contessa Holley | Pulaski, TN | Indicted |
| 4-May-22 | Hau T. La | Brentwood, TN | Indicted |

1.     *Pharmacist No. 19 (Antioch, Tennessee)*

563.     Pharmacist No. 19 worked as a Pharmacy Manager at a Publix pharmacy in Antioch, Tennessee, then part of the Atlanta Division, from February 2015 to January 2020.

564.     Pharmacist No. 19 was reprimanded by a supervisor for refusing to fill a controlled substance prescription for a customer who came in with a GoodRx coupon. After that, many customers came in with GoodRX coupons, and based on her supervisor's earlier instructions, Pharmacist No. 19 filled their orders despite her suspicions.

565.     Pharmacist No. 19 recalled that Publix customers would present GoodRx coupons, and would go pharmacy to pharmacy. Some of those coupons allowed for discounts on controlled substances. The coupon discount codes "really dropped the price," she said. As a result, Publix was the cheapest place in the area to fill controlled substance prescriptions. The GoodRx coupons had a less dramatic impact on the price of non-controlled drugs, she said.

566.     "For controls, it lowered the price so much," Pharmacist No. 19 said of the coupons. "At least in my area — we had the lowest prices for [Schedule II drugs] — we had an influx of new patients coming to us."

567.     The new patients would only fill a high-dose opioid or another controlled substance prescription — they never needed antibiotics or the other things she expected to see with a legitimate case. "Some of these were for big amounts," she said.

568.     Pharmacist No. 19 did not recall encountering a "bad doctor" list at Publix at either the store or corporate level. "I do remember one doctor in particular that whenever I got scripts from him, I didn't fill because I was told it was kind of a shady operation," Pharmacist No. 19 said.

569.    Publix pharmacists could have also entered notes into the dispensing system, but that wouldn't have blocked the doctor for other pharmacists.  Instead, Publix pharmacists were left to rely on informal communications between themselves to circulate information.

### 2.    *Pharmacist No. 20 (Franklin and Nashville, Tennessee)*

570.    Pharmacist No. 20 joined Publix in May 2016 as a Floating Pharmacist, working at stores in the Nashville, Tennessee area.  She then worked as a Staff Pharmacist and Assistant Pharmacy Manager at a Publix location in Franklin, Tennessee.  She was ultimately fired by Publix in February 2019 due to failing to meet Publix's strict "pharmacy metrics," including the speed at which she was supposed to process prescriptions.

571.    Pharmacist No. 20 said she was fired by Publix for failing to meet the company's goals as measured by metrics such as prescriptions filled per hour, medication therapy management calls, virtual prescription verifications for other pharmacies, and insurance claims cleared.  "I was fired over pharmacy metrics," she said.

572.    Publix had a "weekly range" metric for the number of prescriptions it expected pharmacist to fill per hour based on the characteristics of their store, and the target was usually unrealistic, according to Pharmacist No. 20.  "It's usually a little bit out of range to consistently hit whatever it was," she said.

573.    For one location where she worked, Publix set a goal of 800 flu shots for the roughly 2.5-month season during which most flu shots were administered.  This impacted her ability to fill prescriptions properly.  According to Pharmacist No. 20, mistakes were more likely to be made "if you were to fill as many [prescriptions] as they wanted you do to per hour," adding that she "was very particular on controls" and made sure to verify them properly, even if it meant missing the goals set by Publix.  "It makes it harder to get everything done," she said of the company's metrics.

"They didn't like that I would not skip on stuff [such as vetting controlled substance prescriptions] and it slowed down what I did."

574.    The company also evaluated pharmacists' performance using a metric for the number of prescription verifications completed for pharmacy staff at other locations as part of a "shared queue" using a virtual verification system, Pharmacist No. 20 said. "[Publix management said] I wasn't clearing enough [prescriptions] for other stores because I ended up getting suck [with] what's going on in front of me [i.e., dealing with prescriptions and customers in the store]," she said.

575.    Publix also directly tied pharmacists' bonuses to meeting various metrics.

576.    Checking the Tennessee prescription monitoring program database when filling controlled substances was "more of a suggestion" than a requirement from Publix, Pharmacist No. 20 said.

577.    Although Publix sometimes sent out emails to pharmacy staff concerning DEA alerts about prescribers or prescriptions, the company did not maintain a "Do-Not-Fill" list or a list of suspicious prescribers, Pharmacist No. 20 said.  The company also did not mandate that pharmacy staff document instances when they refused to fill prescriptions.

578.    When it came to dealing with suspicious prescriptions, Publix did not have a detailed protocol. "You pretty much call the doctor and verify that they wrote it," she said. "That's about it."  Pharmacist No. 20 said the company also had no policy requiring pharmacy staff to report suspicious prescriptions or prescribers to the DEA or other authorities.

## G. Publix Did Little to Investigate or Halt Dispensing of Inappropriate or Medically Unnecessary Opioid Prescriptions in Virginia

579.     Between 2007 and 2019, 5,410 Virginians have fatally overdosed on prescription opioids.[237] In 2017, 507 deaths in Virginia were attributable to prescription opioids (excluding fentanyl), more than in any other year.[238]

580.     Even when opioid users do not die from an overdose, they may require significant medical intervention and incur health care costs. One such cost is the immediate administration of Narcan (a brand of naloxone), which counteracts the effects of an overdose. Virginia reported 4,076 administrations of Narcan in 2016.[239]

581.     Despite having 19 stores located all over the Commonwealth of Virginia, Publix's gross inadequacies under the CSA in its obligations to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions are underscored by the following examples of alleged illegal prescribing and diversion activities in Virginia.

582.     Not only did Publix not conduct adequate investigations, it knowingly and intentionally failed to report or halt inappropriate or medically unnecessary prescriptions. Indeed, none of the following health care professionals (many of whose prescriptions were filled at Publix pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Publix despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|------|------|------|----------|
| 1-Oct-93 | Ram Singh, MD | Big Stone Gap, VA | 41 months |
| 27-Nov-01 | Franklin Sutherland, MD | Grundy, VA | 70 months |
| 15-Nov-02 | Freeman Clark, MD | Bland County, VA | 6 years |

---

[237] Va. Dep't of Health, Number and Rate of All Fatal Prescription Opioid (Excluding Fentanyl) Overdoses by Locality of Injury and Year of Death, 2007-2019, http://www.vdh.virginia.gov/content/uploads/sites/18/2019/07/Prescription-Opioids-Ex-Fentanyl.xlsx.
[238] Id.
[239] Va. Dep't of Health, *Virginia Opioid Addiction Indicators*, http://www.vdh.virginia.gov/data/opioid-overdose/

| | | | |
|---|---|---|---|
| 13-Jul-07 | William Hurwitz, MD | McLean, VA | 5 years |
| 18-Nov-08 | Ehteshaumul Hague, MD | Norfolk, VA | Plea |
| 1-Aug-09 | James Stanley Ross | Clarksville, VA | 19 months |
| 15-Oct-09 | Sidney S. Loxley, MD | Chesapeake, VA | 77 months, deceased |
| 1-Nov-11 | Jamal Raza, MD | Reston, VA | 15 months |
| 9-Nov-12 | Paul Boccone, Owner | Chantilly, VA | 15 years |
| 9-Nov-12 | Charles Brown, CFNP | Chantilly, VA | 5 years |
| 1-Feb-13 | Linda Sue Cheek, MD | Dublin, VA | 33 months |
| 25-Apr-13 | Larren Wade, MD | Alexandria, VA | 70 months |
| 1-Aug-14 | Derron McRae Simon, MD | Arlington, VA | 15 years |
| 1-Sep-14 | Steven Collins, MD | Roanoke County, VA | 10 years |
| 23-Oct-14 | Robin Anne Krohn, Patient | Stafford, VA | 143 months |
| 26-Jun-15 | Nibedita Mohanty, MD | Stafford, VA | 4 years |
| 23-Mar-16 | Gloria Faye Kennedy, FNP | Richlands, VA | 46 months |
| 1-Feb-17 | Heatwole Stanley, MD | Lexington, VA | 3 year probation |
| 1-Feb-17 | Stanley Elmer Heatwole, MD | Staunton, VA | 3 years probation |
| 11-Aug-17 | Clarence Scranage, MD | Fredericksburg, VA | |
| 15-Dec-17 | Felix Eugene Shepard, MD | Norton, VA | 6 months |
| 1-Feb-18 | Craig Charles Krause, MD | Gainesville, VA | 5 years |
| 19-Mar-18 | Gurcharan Kanwal | Wise, VA | Two years probation |
| 1-May-18 | Jim -David Gaglione, MD | Norfolk, VA | 30 months |
| 7-Feb-19 | Dwight Bailey, MD | Lebanon, VA | 151 months |
| 26-Apr-19 | Shriharsh L. Pole, MD | Woodbridge, VA | 7 years |
| 19-Jul-19 | Una Fage Ford | Appalachia, VA | |
| 19-Jul-19 | Michael B. Ford | Appalachia, VA | |
| 23-Sep-19 | Dr. Vincent K. Jones | Martinsville, VA | indicted (deceased) |
| 2-Oct-19 | Joel Adams Smithers, MD | Martinsburg, WV | 40 years |
| 1-Nov-19 | Zeljko Stjepanovic, MD | Chesterfield, VA | 4 years, 9 months |
| 8-Jan-20 | Gurpreet Singh Bajwa | Oakton, VA | 10 years |
| 28-Jan-20 | Frank Craig Purpera, MD | Blacksburg, VA | 20 months, addl sentencing on 9/24/20 |
| 1-May-20 | Felicia Donald, MD | Alexandria, VA | 7 years |
| 24-Jul-20 | Raymond Michael Moore, MD | Norton, VA | Pled Guilty, 108 months |
| 1-Nov-20 | Uzma Ehtesham, MD | Norton, VA | 2 years probation |
| 1-Mar-21 | Amalie Derdeyn, MD | Charlottesville, VA | 12 months probation |
| 13-May-21 | Phillip Peterson, MD | Bluefield, VA | Pled Guilty, one month in prison |
| 1-Aug-21 | Lopito Burarin, MD | Chesapeake, VA | 2 years |
| 17-Sep-21 | Robert M. Cao, MD | Falls Church, VA | indicted |
| 17-Nov-21 | Verna Mae Lewis, MD | Roanoke, VA | 36 months |

1.    *Pharmacist No. 21 (Fredericksburg, Williamsburg, Midlothian, Colonial Heights, Charlottesville, and Glen Allen, Virginia)*

583.    Pharmacist No. 21 worked for Publix from June 2019 to February 2021 as an Assistant Pharmacy Manager.  She worked at Publix locations in Virginia, and floated to several stores including stores in Fredericksburg, Williamsburg, Midlothian, Colonial Heights, Charlottesville, and Glen Allen.

584.    Pharmacist No. 21 could not recall any formal policy or procedure in place at Publix on how to handle suspicious prescriptions.  "There were not many specifics," she said.  "You ran your own store, make up your own process."

585.    According to Pharmacist No. 21, without formal corporate policies in place, Publix pharmacists informally share stories and situations to help one another.  "We share stories, like fake scripts are on the rise, or out of state patients on the rise, just to watch your back." Pharmacist No. 21 said when they decline patients, there is no formal notification to management.

586.    Pharmacist No. 21 knew from experience always to document red flag issues in the system, but Publix did not require its pharmacists to document.

587.    Publix also did not require its pharmacy staff to report suspicious prescribers or prescriptions to the DEA, state pharmacy board, or other authorities. Pharmacist No. 21 stated, "the discretion was just left to the pharmacist."

588.    At Publix, Pharmacist No. 21 had a yearly review and bonus which was based on the number of immunizations, prescription volume, and profit/loss margins, creating a clear conflict of interest in a pharmacist's dispensing obligations.

## IX.   CAUSES OF ACTION

### COUNT I

#### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

589.   Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

590.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to the United States of America false or fraudulent claims for reimbursement of the cost of their drugs, in violation of 31 U.S.C. § 3729(a)(1)(A).

591.   Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

### COUNT II

#### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

592.   Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

593.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B).

594.   The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements,

paid and continues to pay or reimburse for their drugs provided to recipients of health care programs funded by the United States.

595.    Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT III

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))

596.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

597.    Defendant knowingly and intentionally conspired, and may still be conspiring, with others alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B).  Defendant and its co-conspirators committed overt acts in furtherance of the conspiracy as alleged above.

598.    Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

599.    Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

600.    Defendant knowingly and intentionally avoided or decreased its obligation to pay or transmit money to the Government.  Specifically, Defendant: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) Defendant knew that the records or statements were false.

601.    Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT V

### (Violation of False Claims Act, 31 U.S.C. § 3730(h))

602.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

603.    Because of Relator's lawful acts in furtherance of protected activities in the investigation and reporting of fraud, Defendant discriminated against him by terminating his employment, and refusing to provide a positive reference for prospective employers.

604.    Relator's termination of employment was a direct result of Defendant's retaliatory acts, causing Relator to suffer, and continue to suffer, substantial reputational, financial and psychological damage in an amount to be proven at trial.

## COUNT VI

### (Violation of Florida False Claims Act)

605.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

606.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

607.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used,

false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

608.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

609.   The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for opioids prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

610.   Because of Defendant's actions, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT VII

### (Violation of Georgia False Medicaid Claims Act)

611.   Relators incorporate herein by reference the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

612.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

613.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

614.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

615.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for opioids prescriptions for recipients of Medicaid.

616.    Because of Defendant's actions, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII

### (Violation of North Carolina False Claims Act)

617.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

618.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

619.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

620.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

621.   The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for opioid prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

622.   Because of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX

### (Violation of Tennessee Medicaid False Claims Act)

623.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

624.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

625.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

626.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

627.   The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for opioids prescriptions for recipients of the Medicaid program.

628.   Because of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X

### (Violation of Virginia Fraud Against Taxpayers Act)

629.   Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

630.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

631.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

632.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

633.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for opioids prescriptions for recipients of state funded health insurance programs.

634.    Because of Defendant's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** Relator prays for judgment against Defendant as follows:

- That Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; and Va. Code Ann. §§ 8.01-216.1 *et seq.*

- That judgment be entered against Defendant in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3)[240] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses

---

[240] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

- That judgment be entered in Relator's favor and against Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- That judgment be entered in Relator's favor and against Defendant for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l),

plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code Ann. § 71-5-182(a)(l)[241] to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- That judgment be entered in Relator's favor and against Defendant in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

- That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

- That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

- That the Court issue an order enjoining the Defendant from continuing to engage in the fraudulent conduct alleged herein; and

- That this Court award such further relief as it deems just and proper.

---

[241] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  October 14, 2022

By: _____

P. Matthew Luka
Florida Bar No.  0555630
Ronald P. Hanes
Florida Bar No. 375624
**TROMBLEY & HANES. P.A.**
707 North Franklin Street
10th Floor
Tampa, Florida  33602
Telephone: (813) 229-7918
Facsimile:  (813) 223-5204
Email:  mluka@trombleyhaneslaw.com
            rhanes@trombleyhaneslaw.com

W. Scott Simmer (*pro hac vice forthcoming*)
William Powers (*pro hac vice forthcoming*)
**BARON & BUDD, P.C.**
The Watergate, 10th Floor
600 New Hampshire Ave. NW
Washington, DC  20037
Telephone: 202-333-4562
Facsimile: 202-337-1039
ssimmer@baronbudd.com
wpowers@baronbudd.com

Jay Lichter (*pro hac vice forthcoming*)
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Telephone: 818-839-2333
Facsimile: 214-520-1181
jlichter@baronbudd.com

Attorneys for Plaintiff/Relator